1    MATTHEW L. LARRABEE (No. 97147)
     matthew.larrabee@dechert.com
2    DAVID A. KOTLER (*pro hac vice*)
     david.kotler@dechert.com
3    MURIEL M. KOROL (No. 261909)
     muriel.korol@dechert.com
4    DECHERT LLP
     One Maritime Plaza, Suite 2300
5    San Francisco, California  94111-3513
     Telephone:  415.262.4500
6    Facsimile:  415.262.4555

7    Counsel for Defendants
     RYDEX SERIES FUNDS; PADCO
8    ADVISORS INC. d/b/a RYDEX
     INVESTMENTS, INC.; RYDEX
9    DISTRIBUTORS, INC.; NICK BONOS;
     MICHAEL P. BYRUM; RICHARD M.
10   GOLDMAN; and CARL G. VERBONCOEUR

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14

15   JAMES RAFTON, TRUSTEE OF THE          Case No. 10cv1171 LHK
     JAMES AND CYNTHIA RAFTON              Action filed: March 19, 2010
16   TRUST,
                    Plaintiff,
17   v.                                    **THE RYDEX DEFENDANTS' MOTION,**
     RYDEX SERIES FUNDS; PADCO             **NOTICE OF MOTION AND**
18   ADVISORS INC. d/b/a RYDEX             **MEMORANDUM OF POINTS AND**
     INVESTMENTS, INC.; RYDEX              **AUTHORITIES IN SUPPORT OF**
19   DISTRIBUTORS, INC.; RICHARD M.        **MOTION TO DISMISS PLAINTIFFS'**
     GOLDMAN; CARL G.                      **FIRST AMENDED CLASS ACTION**
     VERBONCOEUR; JOHN O. DEMARET;         **COMPLAINT**
20   NICK BONOS; MICHAEL P. BYRUM;
     COREY A. COLEHOUR; J. KENNETH
21   DALTON; WERNER E. KELLER;             Date:       December 16, 2010
     THOMAS F. LYDON; PATRICK T.           Time:       1:30 p.m.
22   MCCARVILLE; ROGER SOMERS; and         Dept:       Courtroom 4, 5th Floor
     DOES 1 through 25, inclusive,         Judge:      Hon. Lucy H. Koh
23                  Defendants.

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2 TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD

3      PLEASE TAKE NOTICE THAT, on December 16, 2010, at 1:30 p.m. or as soon

4 thereafter as the matter may be heard in the courtroom of the Honorable Lucy H. Koh, United

5 States District Court for the Northern District of California, San Jose Division, Courtroom 4,

6 Fifth Floor, 280 South 1st Street, San Jose, California, Defendants Rydex Series Funds (the

7 "Trust"), PADCO Advisors Inc. d/b/a Rydex Investments, Inc. ("PADCO"), Rydex Distributors,

8 Inc., Nick Bonos, Michael P. Byrum, Richard M. Goldman, and Carl G. Verboncoeur

9 (collectively, the "Rydex Defendants") will and hereby do move for an order dismissing

10 Plaintiffs' First Amended Class Action Complaint with prejudice pursuant to Federal Rule of

11 Civil Procedure 12(b)(6). This motion also expressly incorporates the Defendants Corey A.

12 Colehour, J. Kenneth Dalton, John O. Demaret, Werner E. Keller, Thomas F. Lydon, Patrick T.

13 McCarville and Roger Somers' Notice Of Motion And Motion To Dismiss; Memorandum Of

14 Points And Authorities In Support Thereof ("Independent Trustees' Motion"). Accordingly, the

15 Rydex Defendants' motion to dismiss is based upon this notice of motion, the memorandum of

16 points and authorities set forth below, the accompanying request for judicial notice, Exhibits A –

17 N to the concurrently filed Declaration of Muriel M. Korol ("Korol Decl.") and Exhibits A-E to

18 the concurrently filed Declaration of Craig Bridwell, the Independent Trustees' Motion, and such

19 other written or oral arguments as may be presented to the Court.

20

## STATEMENT OF THE ISSUE

21

(Civil Local Rule 7-4)

22      Have Plaintiffs failed to state a claim under either Section 11 or Section 12(a)(2) of the

23 Securities Act because they have not identified and cannot identify a single false or misleading

24 statement or omission of material fact in any of the Rydex Inverse Government Long Bond

25 Strategy Fund's registration statements?

26

27

28

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**

PAGE

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 2

    A.    The Inverse Government Long Bond Strategy Fund's Prospectuses Repeatedly Disclosed That The Fund Seeks Its Investment Objective On A Daily Basis. .................................................... 2

    B.    The Inherent Effects Of Compounding On A Daily Inverse Fund. ....................... 3

    C.    The Fund's Prospectuses Repeatedly Disclosed How Compounding Could Affect Its Cumulative Performance Over Time. .................................................... 5

        1.    The Fund consistently alerted investors to the inherent effects of compounding. .................................................................................. 6

        2.    The effects of compounding also were readily apparent from the Fund's historical returns. ................................................................. 7

    D.    Plaintiffs Nevertheless Purchased Millions Of Dollars Of Fund Shares Pursuant To The Fund's 2007 And 2008 Prospectuses. ........................................ 8

    E.    Plaintiffs Held On To Their Shares Despite Numerous Additional Disclosures Demonstrating The Fund's Daily Investment Objective And The Impact Of Compounding On The Fund's Cumulative Performance. ............... 9

    F.    FINRA And SEC Issued Notices To Brokers And Investors Regarding The Impact Of Compounding On The Cumulative Performance Of Inverse Investments. ....................................................................................................... 10

    G.    The Fund Updated Its Daily-Investment- Objective And Compounding Disclosures In Its 2009 Prospectus And Supplement. ......................................... 11

PLAINTIFFS' ALLEGATIONS ....................................................................................... 12

THE GOVERNING LEGAL STANDARDS .................................................................... 12

ARGUMENT ................................................................................................................... 15

I.    THE FUND'S REGISTRATION STATEMENTS CONTAINED NO ACTIONABLE MISSTATEMENTS OR OMISSIONS. ................................................. 15

    A.    Contrary To Plaintiffs' Core Assertion, The Fund Fully And Repeatedly Disclosed That It Was Not A "Simple Directional Investment" That Would Match The Cumulative Performance Of Its Benchmark Over "Long Periods Of Time". ............................................................................................. 15

    B.    The Fund's Prospectuses Do Not Contain Any Materially Misleading Omissions Regarding Either The Fund's Daily Investment Objective Or The Effects Of Compounding. ............................................................................. 18

    C.    All Claims Based On The 2009 Prospectus And Supplement Similarly Fail. ...... 22

D.      Alleged Omissions About The Suitability Of The Fund Are Not
        Actionable. ........................................................................................................... 23

CONCLUSION ............................................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

Page

3

CASES

4
*Bell Atlantic Corp. v. Twombly*,
5    550 U.S. 544 (2007) .................................................................................................. 13

*Belodoff v. Netlist, Inc.*,
6    No. 07-00677-MLGx, 2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ............................ 17, 20

7
*Benzon v. Morgan Stanley Distribs., Inc.*,
8    420 F.3d 598 (6th Cir. 2005) .......................................................................................... 15

*Borow v. nView Corp.*,
9    829 F. Supp. 828 (E.D. Va. 1993) ................................................................................... 14

10
*Brody v. Transitional Hosps. Corp.*,
11    280 F.3d 997 (9th Cir. 2002) ............................................................................... 14, 18, 19

12
*Denny v. Barber*,
   576 F.2d 465 (2d Cir. 1978) ........................................................................................... 22

13
*Donovan v. American Skandia Life Assurance Corp.*,
14    96 Fed. Appx. 779 (2nd Cir. 2004) ................................................................................. 24

15
*Dorschester Investors v. Peak Int'l Ltd.*,
   134 F. Supp. 2d 569 (S.D.N.Y. 1991) ............................................................................. 22

16
*Dura Pharms., Inc. v. Broudo*,
17    544 U.S. 336 (2005) ...................................................................................................... 13

18
*Freidus v. ING Groep N.V.*,
   2010 WL 3554097 (S.D.N.Y. Sept. 14, 2010) ................................................................. 15

19
*Greenapple v. Detroit Edison Co.*,
20    618 F.2d 198 (2d Cir. 1980) ........................................................................................... 14

21
*Hayden v. Walston & Co., Inc.*,
   528 F.2d 901 (9th Cir. 1975) .......................................................................................... 18

22
*Hecker v. Micron Tech., Inc.*,
23    32 F. Supp. 2d 1193 (D. Idaho 1997) .............................................................................. 14

24
*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ........................................................................................ 15

25
*In re FoxHollow Techs., Inc. Sec. Litig.*,
26    No. 06-4595-PJH, 2008 WL 2220600 (N.D. Cal. May 27, 2008) ...................................... 19

27
*In re Hyperion Sec. Litig.*,
   1995 WL 422480 (S.D.N.Y. July 14, 1995), *aff'd sub nom.*, *Olkey v. Hyperion 1999*
28    *Term Trust*, 98 F.3d 2 (2d Cir. 1996) ............................................................................. 22

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1106 (C.D. Cal. 2003) ............................................................. 17

*In re LeapFrog Enterprises, Inc. Securities Litigation*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) ....................................................... 19, 20

*In re Lyondell Petrochemical Co. Sec. Litig.*,
  984 F.2d 1050 (9th Cir. 1993)............................................................................ 14

*In re Metro. Sec. Litig.*,
  532 F. Supp. 2d 1260 (E.D. Wash. 2007) .......................................................... 13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)................................................................................ 23

*In re RAC Mortgage Inv. Corp., Sec. Litig.*,
  765 F. Supp. at 864 (D. Md. 1991) ..................................................................... 20

*In re Stac Elec. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996).......................................................................... 12, 13

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  683 F. Supp. 2d 1236 (D.N.M. 2010) ................................................................. 14

*In re Verifone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993)........................................................................... 17, 24

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
  No. 09-01376-LHK, slip op. (N.D. Cal. Oct. 5, 2010) ....................................... 13

*Klamberg v. Roth*,
  473 F. Supp. 544 (S.D.N.Y. 1979)...................................................................... 14

*Krouner v. American Heritage Fund, Inc.*,
  899 F. Supp. 142 (S.D.N.Y. 1995)...................................................................... 22

*La Pietra v. RREEF America L.L.C.*,
  2010 WL 3629597 (S.D.N.Y. Sept. 16, 2010).................................................... 14

*Lopez v. E Trade Bank*,
  No. 10-CV-01826-LHK, 2010 WL 3325627 (N.D. Cal. Aug. 20, 2010).............. 13

*Malone v. Microdyne Corp.*,
  26 F.3d 471 (4th Cir. 1994)................................................................................. 22

*McCormick v. Fund Am. Cos., Inc.*,
  26 F.3d 869 (9th Cir. 1994)................................................................................. 15

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996)..................................................................................... 14

*Rubke v. Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009)................................................................. 13, 17, 19

*Sable v. Southmark/Envicon Capital Corp.*,
   819 F. Supp. 324 (S.D.N.Y. 1993).................................................................. 16, 23

*Spicer v. Chicago Bd. Options Exch.*,
   1992 WL 380929 (N.D. Ill. Dec. 10, 1992) ............................................................ 18

*Stark Trading v. Falconbridge Ltd.*,
   552 F.3d 568 (7th Cir. 2009) ................................................................................. 13

*Steckman v. Hart Brewing, Inc.*,
   No. 96-1077-JNK, 1996 WL 881659 (S.D. Cal. Dec. 24, 1996),
    *aff'd*, 143 F.3d 1293 (9th Cir. 1998) ................................................................... 17

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)............................................................................................... 15

*Twinde v. Threshold Pharms. Inc.*,
   No. 07-4972-CW, 2008 WL 2740457 (N.D. Cal. July 11, 2008).......................... 19

*Valley Nat. Bank of Az. v. Trustee for Westgate-California Corp.*,
   609 F.2d 1274 (9th Cir. 1979)............................................................................... 14

*Zeid v. Kimberley*,
   930 F. Supp. 431 (N.D. Cal. 1996) ....................................................................... 20

STATUTES

15 U.S.C. § 77k(a) .................................................................................... 12, 15, 22, 23

15 U.S.C. § 77*l*(a) ............................................................................................................. 12

15 U.S.C. § 77s(a) ............................................................................................................. 18

RULES/REGULATORY AUTHORITIES

Fed. R. Evid. 407 .............................................................................................................. 22

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 13

17 C.F.R. § 239.15A .......................................................................................................... 18

17 C.F.R. § 270.30e-1 ......................................................................................................... 6

Form N-1A, *Registration Form For Registered Open-End Management Investment
   Companies* (SEC 2052)................................................................................... 18, 23

Final Rule, *Enhanced Disclosure And New Prospectus Delivery Option For Registered
   Open-End Management Investment Companies*, Inv. Co. Act Rel. No. 28584, 74 Fed.
   Reg. 4546, 4574 (Jan. 26, 2009) ......................................................................... 18

NASD Conduct Rule 2310 (Recommendations to Customers (Suitability))....................... 24

Regulatory Notice 09-31, *Non-Traditional ETFs: FINRA Reminds
   Firms of Sales Practice Obligations Relating to Leveraged
   and Inverse Exchange-Traded Funds* (June 2009) ..............................10-11, 20, 24

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

U.S. Securities and Exchange Commission, *Leveraged and Inverse ETFs: Specialized*
*Products with Extra Risks for Buy-and-Hold Investors* (Aug. 18, 2009) .......................... 10-11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Since its founding in 1995, the Rydex Inverse Government Long Bond Strategy Fund (the "Fund") has performed exactly as it was designed.  Each day, the Fund has been managed to ensure that its investments perform inversely to (*i.e.*, the opposite of) the Fund's benchmark--the daily price of the 30-Year U.S. Treasury bond (the "Long Treasury Bond").  Prior to and during the entire time period at issue in this lawsuit, the Fund has gone about its business in precisely the same fashion and performed quite successfully.  Plaintiffs do not allege otherwise.

This is therefore a very unusual securities fraud lawsuit, brought by self-professed "sophisticated" investors who are not complaining that the Fund was mismanaged to their detriment or that it suffered unexpected market declines.  Instead, this case is based on the implausible assertion that Defendants never disclosed the Fund's basic nature--the way the Fund inherently must operate and perform.  Specifically, the central theory of Plaintiffs' Complaint is that the Defendants violated the Securities Act by misleadingly portraying the Fund as a "simple directional investment" that would match the inverse of the returns on the Fund's benchmark not on a daily basis, but over "long periods of time".[1]

The rhetorical flourish in Plaintiffs' Complaint notwithstanding, the premise of Plaintiffs' lawsuit is flatly contradicted by the actual Fund disclosures.  The prospectuses that Plaintiffs challenge nowhere state that the Fund is a "simple directional investment" of any kind and nowhere state the Fund will try to correlate its returns with the inverse of its benchmark over time.  To the contrary, each of those prospectuses stated repeatedly that "the Fund's objective is to perform, on a *daily* basis, exactly opposite its benchmark, the Long Treasury Bond."[2]  Indeed, the page of each prospectus that set forth the Fund's investment objective and strategy stated no less than *five times* that the Fund sought to match the inverse of the price movements of its benchmark on a "*daily*" basis.

As the Complaint acknowledges, the necessary implication of this daily goal is

---

[1] *See* First Amended Class Action Complaint ¶41 ("Complaint" or "FAC").

[2] 2007 Prosp. at 16, Korol Decl. Ex. A; 2008 Prosp. at 28, Korol Decl. Ex. B; 2009 Prosp. at 25, Korol Decl. Ex. C.

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

RYDEX DEFENDANTS' MOT. & MEM. ISO OF MOT. TO DISMISS FAC          10CV1171 LHK

"compounding"--each day the Fund gains or loses some percentage of its value, and that new value becomes the basis for the next day's performance. This daily "compounding" is therefore an inevitable mathematical outgrowth of the Fund's design. In other words, "compounding" is inherent in the structure and operation of the Fund. Again, Plaintiffs do not allege otherwise. Instead, Plaintiffs complain that the impact of mathematical "compounding" on the Fund's cumulative performance versus its benchmark was "undisclosed."[3] This allegation is also directly refuted by the plain language of each of the challenged prospectuses. For example, among other similar disclosures, each prospectus stated that because the Fund "is tracking the performance of its benchmark on a daily basis, mathematical compounding may prevent a Fund from correlating with the monthly, quarterly, annual or other period performance of its benchmark."[4]

For these reasons, the claims that form the very foundation of this lawsuit must be dismissed. And absent that foundation, Plaintiffs cannot establish any legal duty on Defendants to say anything more about compounding. Nor can this Complaint be saved by allegations that the prospectuses failed to opine about whether investments in the fund were suitable for particular types of investors. Under settled law, brokers, not mutual funds, have the legal duty to make these types of "suitability" determinations; indeed Defendants lack the type of customer information necessary even to form such opinions, and Plaintiffs cannot allege otherwise.

Well established law prohibits Plaintiffs from trying to manufacture a Securities Act claim by mischaracterizing or ignoring the Fund's actual public disclosures. Plaintiffs have constructed their entire complaint on just such mischaracterizations, and it therefore is ripe for dismissal.

## FACTUAL BACKGROUND

### A. The Inverse Government Long Bond Strategy Fund's Prospectuses Repeatedly Disclosed That The Fund Seeks Its Investment Objective On A Daily Basis.

Since its inception in 1995, the Fund[5] has been an "inverse" fund, which means that its investment objective has been (and still is) to produce investment returns that are the opposite (or

---

[3] FAC ¶38.

[4] 2007 Prosp. at 37; *accord* 2008 Prosp. at 50; 2009 Prosp. at 41.

[5] The Fund is part of the Rydex SGI family of funds, which includes more than 100 mutual funds and exchange traded products.

"inverse") of the performance on an underlying index.  *See* FAC ¶30.  Importantly, as Plaintiffs readily recognize, like "[m]ost inverse funds," the Fund is "designed to track a benchmark on a ***daily*** basis."  *Id.* ¶31 (emphasis added).

The Fund expressly disclosed that it intended to match the performance of its benchmark on a daily basis.  Indeed, each of the Fund prospectuses challenged by Plaintiffs specifically explained the Fund's investment objective of matching the inverse of the performance of the Long Treasury Bond on a daily basis.  Under the heading "MORE INFORMATION ABOUT THE FUNDS: BENCHMARKS AND INVESTMENTS", each prospectus explained that Rydex's benchmark funds, including the Fund, "seek to provide investment results that *either* match the performance of a specific benchmark on a daily basis *or* correlate to the performance of a specific benchmark over time."  2007 Prosp. at 65 (emphases added); 2008 Prosp. at 79 (same); 2009 Prosp. at 79 (same).  And the page of each prospectus that set forth the Fund's investment objective and strategy stated no less than *five times* that the Fund sought to match the inverse of the price movements on the Long Treasury Bond on a *daily* basis:

- "Unlike a traditional index fund, the Fund's objective is to perform, ***on a daily basis***, exactly opposite its benchmark . . . ."

- "The [Fund] seeks to provide total returns that inversely correlate to the price movements of a benchmark . . . .  The Fund's current benchmark is the inverse of the ***daily price movement*** of the Long Treasury Bond."

- "If the Fund meets its objective, the value of the Fund's shares will increase on a ***daily basis*** when the price of the Long Treasury Bond decreases."

- "When the price of the Long Treasury Bond increases, however, the value of the Fund's shares should decrease on a ***daily basis*** by an inversely proportionate amount."

- "[I]f the price of the Long Treasury Bond increases by 2%, the value of the Fund's shares should go down by 2% ***on that day***."

2007 Prosp. at 16 (emphases added); *accord* 2008 Prosp. at 28; 2009 Prosp. at 25.[6]

### B.    The Inherent Effects Of Compounding On A Daily Inverse Fund.

As just noted, each of the Fund's challenged prospectuses explained to investors that on days that the Fund "meets its objective," "if the price of the Long Treasury Bond increases by

---

[6] The Fund attempts to achieve this investment objective by "enter[ing] into short sales and swap transactions, and engag[ing] in futures and options transactions."  2007 Prosp. at 16.  Plaintiffs do not and cannot allege that the Fund failed to invest in these types of securities.

2%, the value of the Fund's shares should go down by 2% **on that day**." 2007 Prosp. at 16 (emphasis added). Importantly, however, the Fund *never* stated that it would attempt to match the inverse of the Long Treasury Bond's cumulative price movements *over time*. Indeed, attempting to match both the daily *and* cumulative change in the Long Treasury Bond's price--especially over a period of time such as the three-year putative class period--would have been inconsistent with the investment objective of "go[ing] down by 2%" on a day that the Long Treasury Bond "increases by 2%".

Any number of hypotheticals will illustrate this point. For example, assume that (1) the net asset value (*i.e.* price per share) of the Fund and the price of the Long Treasury Bond equal 100 at the beginning of Day 1; (2) the price of the Long Treasury Bond increases by 2% on Day 1 and 2% on Day 2; and (3) the Fund achieves its investment objective by declining 2% on both Day 1 and Day 2:

|  | **Start** | **End of Day 1** | **End of Day 2** | **Cumulative** |
|---|---|---|---|---|
| **Long Treasury Bond** | 100 | 102 | 104.04 | 4.04% |
| **Fund** | 100 | 98 | 96.04 | -3.96% |
| **Investment Objective Met** |  | Yes | Yes |  |

Under this scenario, the Fund would have *met* its investment objective on both Day 1 and Day 2, yet the Fund's cumulative returns would have diverged from the inverse of the cumulative price movement on the Long Treasury Bond.

This divergence is the basis of Plaintiffs' lawsuit. But as the above chart illustrates, and as Plaintiffs themselves acknowledge (*see* FAC ¶38), the divergence in this hypothetical is inherent in the Fund's stated investment objective and is caused by nothing more than the basic mathematical principle that 2% of a larger number (the price of the Long Treasury Bond at end of Day 1) is bigger than 2% of a smaller number (the value of the Fund at the end of Day 1). This principle--which applies to *every* mutual fund that seeks to track the inverse of a benchmark on a daily basis--is known as "compounding."

The effects of "compounding" on the Fund's cumulative performance over time compared to the benchmark's performance over time can manifest in several ways. By way of further example, if the price of the Long Treasury Bond increases from 100 to 102 on Day 1, but then decreases to 100 at the end of Day 2, it will have the same value as it had on the start of Day 1

(100).  Even if the Fund meets its investment objective on both Day 1 and Day 2, its share price

in this hypothetical would be *lower* than it was at the start of Day 1:

|  | Start | End of Day 1 | End of Day 2 | Cumulative |
|---|---|---|---|---|
| Long Treasury Bond | 100 | 102 | 100 | 0% |
| Fund | 100 | 98 | 99.92 | -.08% |
| Investment Objective Met |  | Yes | Yes |  |

Mathematical "compounding" also will cause greater divergence in cumulative returns

when the Long Treasury Bond's price movements become more volatile.  *See* FAC ¶32.  For

example, if the Long Treasury Bond's price were to increase by 6% on Day 1 and then lose 10%

on Day 2, and the Fund meets its investment objective on both days, the cumulative returns of the

Fund and its benchmark would diverge more significantly than in the prior hypotheticals:

|  | Start | End of Day 1 | End of Day 2 | Cumulative |
|---|---|---|---|---|
| Long Treasury Bond | 100 | 106 | 95.4 | -4.6% |
| Fund | 100 | 94 | 103.4 | 3.4% |
| Investment Objective Met |  | Yes | Yes |  |

These basic hypotheticals illustrate another fundamental aspect of the Fund's cumulative

returns over time:  depending on the direction and magnitude of the Long Treasury Bond's daily

price changes, the "compounding" effect can work either for or against an investor.  For example,

compounding helped investors in the first hypothetical because the cumulative returns on the

Fund (-3.96%) were greater than the inverse of the cumulative returns on the Long Treasury Bond

(-4.04%).  By contrast, compounding worked against investors in the second and third

hypotheticals because cumulative returns on the Fund were less than the inverse of the Long

Treasury Bond's cumulative price movement.  But the important point is that all of these

divergences over time are caused by the same basic mathematical principle of "compounding" the

daily returns of the Fund and its benchmark.

### C.    The Fund's Prospectuses Repeatedly Disclosed How Compounding Could Affect Its Cumulative Performance Over Time.

Beginning with the earliest of the allegedly misleading prospectuses (the one dated

August 1, 2007) the effects of mathematical compounding on the cumulative returns of the Fund

over time were--or undeniably should have been--clear to all of the Fund's actual or potential

investors, including Plaintiffs.  Indeed, not only did all of the allegedly misleading prospectuses

specifically discuss the effects of compounding, but the effect of compounding on the Fund's

performance over time was obvious from the historical return information contained in

shareholder reports sent to investors both before and during the putative class period.[7]

### 1. The Fund consistently alerted investors to the inherent effects of compounding.

In addition to fully and repeatedly disclosing the daily nature of the Fund's investment

objective, the Fund's disclosures specifically directed investors to consider the effects of

compounding. Each prospectus stated that the Fund is subject to a "principal risk" called

"Tracking Error Risk."[8] 2007 Prosp. at 16, 25; 2008 Prosp. at 28, 38; 2009 Prosp. at 25, 34.

Under the heading "Tracking Error Risk," each prospectus explained:

> because each Fund . . . is tracking the performance of its benchmark
> on a ***daily basis, mathematical compounding may prevent a Fund
> from correlating with the monthly, quarterly, annual or other
> period performance of its benchmark***. Tracking error may cause
> the Fund's performance to be less than you expect.

2007 Prosp. at 37 (emphasis added); 2008 Prosp. at 50 (same); 2009 Prosp. at 41 (same).[9] The

prospectuses and shareholder reports reiterated these disclosures in sections entitled

"**UNDERSTANDING COMPOUNDING & THE EFFECT OF LEVERAGE**" (in the

prospectuses) and "**A BRIEF NOTE ON COMPOUNDING OF RETURNS**" (in the

shareholder reports).[10] These compounding disclosures emphasized that it is "important to

understand the effects of compounding when investing in any mutual fund" (2007 Prosp. at 67;

2008 Prosp. at 80; 2009 Prosp. at 80), and "it is essential to understand the effect of mathematical

compounding on [the Fund's] returns" (2007 AR at 3; 2008 AR at 3; 2009 AR at 4; 2007 SAR at

---

[7] *See* 17 C.F.R. § 270.30e-1 (mandating that reports be sent to shareholders at least semi-annually). The Fund's prospectus explicitly incorporates the annual report into the registration statement. *E.g.*, 2007 Prosp. at 99.

[8] "Tracking Error Risk" refers to the risk that the Fund's performance will not "track" exactly the inverse of the Long Treasury Bond on a daily basis. *E.g.* 2007 Prosp. at 25.

[9] In paragraph 61 of their Complaint, Plaintiffs wrongly imply that this disclosure was not added to the Fund's prospectus until 2009. To the contrary, this disclosure is present in the 2007 and 2008 prospectuses. *See, e.g.,* 2007 Prosp. at 37; 2008 Prosp. at 50. Indeed, Plaintiffs themselves quote this very disclosure from the Fund's 2007 and 2008 prospectuses in their Complaint when they recount the purportedly misleading statements in those prospectuses. *See* FAC ¶42.

[10] 2007 Annual Report ("AR") at 3; Korol Decl. Ex. D; 2008 AR at 3, Korol Decl. Ex. E; 2009 AR at 4, Korol Decl. Ex. F; 2007 Semi-Annual Report ("SAR") at 3, Korol Decl. Ex. G; 2008 SAR at 3, Korol Decl. Ex. H; 2009 SAR at 4, Korol Decl. Ex. I.

3; 2008 SAR at 3; 2009 SAR at 4).  These disclosures also gave quantitative examples of how compounding could work and explained how the "examples demonstrate that over time, the cumulative percentage increase or decrease in the net asset value of a Fund may diverge significantly from the cumulative percentage increase or decrease in the multiple of the return of the index underlying a Fund's benchmark due to the compounding effect of losses and gains on the returns of the Fund."  2007 Prosp. at 67; 2008 Prosp. at 80; 2009 Prosp. at 80.  The shareholder reports also warned:  "any change in direction in an index will produce compounding that seems to work against an investor . . . [and] periods of high volatility in an underlying index will also cause the effects of compounding to be more pronounced, while lower volatility will produce a more muted effect."  2007 AR at 3; 2008 AR at 3; 2009 AR at 4; 2007 SAR at 3; 2008 SAR at 3; 2009 SAR at 4.

**2.      The effects of compounding were readily apparent from the Fund's historical returns.**

The fact that compounding could cause the Fund's cumulative returns over time to deviate from the inverse of the cumulative price movement of the Long Treasury Bond also was readily apparent from the historical return information contained in the annual reports that were incorporated in the Fund's registration statements, mailed to shareholders, and accessible on the Fund's and the SEC's website.[11]

As explained above, by 2007, the Fund had been pursuing the same investment objective-- *i.e.*, seeking to produce returns that were the inverse of the *daily* price movements of the Long Treasury Bond--for 12 years.  Plaintiffs do not even contest that the Fund was remarkably successful in meeting this investment objective.  Nor could they.  As the Fund's annual reports explained, during the putative class period alone, it achieved a daily correlation to its benchmark of between *94%* and *99%*.  *See* 2007 AR at 32; 2008 AR at 32; 2009 AR at 32.

However, the Fund's annual reports also reported, as required, its historical returns measured over periods of one year, five years and ten years (or since inception if newer than ten

---

[11]  *See* Inverse Government Long Bond Strategy - A Class *available at* http://www.rydex-sgi.com/products/mutual_funds/info/overview.rails?cusip=78355E429; http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0000899148&owner=exclude&count=40.

years).  Hence, the following table is in the 2007 annual report:

**AVERAGE ANNUAL TOTAL RETURNS FOR THE PERIOD ENDED 03/31/07**

| | Investor Class (03/03/95) | | | Advisor Class (08/01/03) | | |
|---|---|---|---|---|---|---|
| | ONE YEAR | FIVE YEAR | TEN YEAR | ONE YEAR | FIVE YEAR | TEN YEAR*** |
| INVERSE GOVERNMENT LONG BOND FUND | 1.66% | -5.37% | -3.50% | 1.17% | -5.84% | -3.96% |
| PRICE MOVEMENT OF LONG TREASURY BOND | 4.97% | 0.97% | 1.29% | 4.97% | 0.97% | 1.29% |
| LEHMAN LONG TREASURY BOND INDEX | 6.79% | 7.52% | 8.11% | 6.79% | 7.52% | 8.11% |

| | A-Class (03/31/04) | | | | C-Class (03/28/01) | | | |
|---|---|---|---|---|---|---|---|---|
| | ONE YEAR | ONE YEAR* | SINCE INCEPTION | SINCE INCEPTION* | ONE YEAR | ONE YEAR** | FIVE YEAR | SINCE INCEPTION |
| INVERSE GOVERNMENT LONG BOND FUND | 1.47% | -3.33% | 0.16% | -1.44% | 0.67% | -0.33% | -6.28% | -4.94% |
| PRICE MOVEMENT OF LONG TREASURY BOND | 4.97% | 4.97% | -3.30% | -3.30% | 4.97% | 4.97% | 0.97% | -0.03% |
| LEHMAN LONG TREASURY BOND INDEX | 6.79% | 6.79% | 3.88% | 3.88% | 6.79% | 6.79% | 7.52% | 6.45% |

As the table illustrates, the Fund's cumulative returns *over time* did not match the inverse of the cumulative price movement of the Long Treasury Bond *over time*.  For instance, since the inception of the A-Class shares of the Fund (*i.e.,* the class purchased by Plaintiffs), the cumulative price movement of the Long Treasury Bond was -3.30%.  2007 AR at 33.  The inverse of that, of course, is 3.30%.  The Fund's cumulative return, however, was far lower: -1.44%.  *Id.*[12]

These historical numbers would have made it crystal clear to any "reasonable investor" (*see* FAC ¶38) that the Fund's returns over time (as opposed to on a daily basis) could deviate significantly from the cumulative price change on the Long Treasury Bond over time (as opposed to on a daily basis).  Later annual reports made this same point.  For example, the Fund's March 2008 annual report stated that the cumulative price movement of the Long Treasury Bond for the prior one-year period was 2.95%, meaning that the inverse was -2.95%; the cumulative return on A-Class Shares over that period was **-**14.53%.  2008 AR at 33.  And, as explained above, a "reasonable investor" had to go no further than the Fund's prospectus to understand how and why compounding could cause this to occur in a daily inverse fund such as the Fund.

**D.    Plaintiffs Nevertheless Purchased Millions Of Dollars Of Fund Shares Pursuant To The Fund's 2007 And 2008 Prospectuses.**

Plaintiffs describe themselves as two "sophisticated" investors.  *See* Mot. to Appoint Rydex Litigation Group as Lead Pl. ("Lead Pl. Motion") at 7 (No. 12).  Plaintiffs made their first purchases of Fund shares in March 2008 (*i.e.,* after the issuance of the 2007 prospectus and three

---

[12] Returns noted with a "*" are calculated using the Fund's maximum sales charge of 4.75%.

shareholder reports).  Thereafter, both Plaintiffs began purchasing Fund shares in blocks of

several hundred thousand dollars.  *See* Ex's B and C to Lead Pl. Motion (Nos. 13-2, 13-3).

Indeed, in the face of the clear disclosures set forth above regarding both the Fund's daily

investment objective and the impact of compounding on the Fund's cumulative performance

compared to its benchmark, Plaintiffs not only began buying (and holding) Fund shares, but they

made approximately 30 different purchases of Fund shares between March and December 2008

for a total investment of approximately $6 million.  *Id.*

> **E.      Plaintiffs Held On To Their Shares Despite Numerous Additional Disclosures
> Demonstrating The Fund's Daily Investment Objective And The Impact Of
> Compounding On The Fund's Cumulative Performance.**

With the exception of one relatively small sale transaction by Plaintiff Rafton in

December 2009, Plaintiffs held on to all of their Fund shares from the date of purchase through at

least the filing of this lawsuit in March 2010.  *Id.*  Plaintiffs held onto their shares even though

they had the benefit of:  (1) the Fund's prospectus and shareholder reports effective at the time of

their initial purchases in March 2008; and (2) two years' worth of additional disclosures and

experience regarding both the Fund's daily investment objective and the impact of compounding

on the Fund's cumulative performance over time compared to that of its benchmark.

The Fund's disclosures discussed how the effects of compounding could be and were

magnified by volatility in the Fund's benchmark, like that which occurred during the 2008

economic collapse.  The Fund's 2007 annual report explained that "periods of high volatility in an

underlying index will also cause the effects of compounding to be more pronounced, while lower

volatility will produce a more muted effect".  2007 AR at 3.  And in 2008, the annual report

explained that the Long Treasury Bond encountered "a volatile decline" as the impact of the 2008

economic collapse took hold.  2008 AR at 32.  Thus, although for the year ended March 31, 2009,

the Fund still managed to achieve "a daily correlation of 94% to its benchmark of -100% of the

daily price movement of the Long Treasury Bond," the significant volatility in the Fund's

benchmark had a larger impact on the Fund's performance on a *cumulative* basis over time.  2009

AR at 32.  Specifically, the cumulative price movement of the Long Treasury Bond for that year-

long period was -2.29%, meaning that its inverse was 2.29%; on the other hand, the cumulative

return for the A-Class shares was -24.7%. *Id.* at 33.

Despite this clear-cut, real-time disclosure that the Fund's ongoing success on a *daily* basis of matching its benchmark did not translate into *cumulative* returns that matched the benchmark over time, especially in a volatile economic climate such as occurred in 2008, the "sophisticated" Plaintiffs elected to continue to hold all of their Fund shares.

**F.     FINRA And SEC Issued Notices To Brokers And Investors Regarding The Impact Of Compounding On The Cumulative Performance Of Inverse Investments.**

In June 2009, FINRA, which is the self-regulatory organization for broker-dealers, issued a regulatory notice (the "Broker Notice") to broker-dealers regarding leveraged and inverse "exchange-traded funds" ("ETFs").[13]  Then in August 2009, FINRA and the SEC issued an alert to investors about leveraged and inverse ETFs (the "Investor Notice").[14]  These Notices addressed inverse and leveraged ETFs because, unlike the Fund, such ETFs were relatively new investments that had yet to produce a lengthy track record of investment returns in spite of their growing popularity with investors.[15]

Like the Fund and other inverse mutual funds, many inverse (and leveraged) ETFs also try to perform opposite their benchmarks on a daily basis.  Therefore, both Notices explained that these ETFs "are designed to achieve their stated objectives on a daily basis.  Due to the effect of compounding, their performance over longer periods of time can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same time period." Ex. K at 2, *accord* Ex. L at 2.

Neither Notice purported to require any specific new risk disclosures or any other action by any mutual fund, including the Fund.[16]  Instead, the Broker Notice simply reminded *brokers*

---

[13] *See* Financial Industry Regulatory Authority, Regulatory Notice 09-31, *Non-Traditional ETFs: FINRA Reminds Firms of Sales Practice Obligations Relating to Leveraged and Inverse Exchange-Traded Funds* (June 2009), Korol Decl. Ex. K.

[14] U.S. Securities and Exchange Commission, *Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors* (Aug. 18, 2009), Korol Decl. Ex. L.

[15] Both notices also explained that ETFs are different from mutual funds because, among other reasons, "ETFs typically trade throughout the day on an exchange at prices established by the market." Ex. K at 2; Ex. L at 1.

[16] Plaintiffs' allegations regarding the actions taken by broker-dealers following the Broker Notice (*see* FAC ¶¶ 55-57) are entirely consistent with the fact that the Broker Notice applies to

that *they* had an obligation under FINRA rules to determine whether a leveraged or inverse ETF "is suitable for the specific customers" to whom *they* recommend the product.  Ex. K at 3. Likewise, the Investor Notice cautioned *investors* that "the best form of investor protection is to clearly understand leveraged or inverse ETFs before investing in them . . . read the prospectus . . . You should also consider seeking the advice of an investment professional . . . .  Only invest if you are confident the product can help you meet your investment objectives and you are knowledgeable and comfortable with the risks associated with these specialized ETFs."  Ex. L at 3.  Despite the issuance of these Notices--which Plaintiffs now feature prominently in their Complaint--the "sophisticated" Plaintiffs continued to hold their Fund shares.

G.    **The Fund Updated Its Daily-Investment- Objective And Compounding Disclosures In Its 2009 Prospectus And Supplement.**

In July 2009, the Trust updated the compounding-related disclosures in its annual prospectus.  In November 2009, the Trust also issued a supplemental disclosure regarding the effects of compounding on its thirteen benchmark mutual funds.[17]

Like its predecessors, the 2009 prospectus reiterated that several Rydex funds, including the Fund, "seek to provide investment results that match the opposite of the performance of a specific benchmark on a *daily* basis."  2009 Prosp. at 1.  The 2009 prospectus then explained that the returns of these funds "for periods longer than a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for that longer period."  *Id*. (emphasis in original).  The 2009 prospectus also explained that:

> The Funds should be utilized only by sophisticated investors or professional investment advisors who (a) understand the risks associated with the use of leverage; (b) understand the consequences of seeking investment results on a daily basis; (c) understand the risk of shorting; and (d) intend to actively monitor and manage their investments on a daily basis.

*Id.*  The Supplement reiterated how the effects of compounding could cause the returns of inverse funds to deviate from their benchmarks over time, while stating that the "Funds generally are

investment recommendations made by those broker-dealers, as opposed to prospectus disclosures made by mutual funds

[17] Prospectus Supplement, Nov. 17, 2009, Korol Decl. Ex. J ("Supplement" or "Nov. Supp.").

RYDEX DEFENDANTS' MOT. & MEM. ISO OF MOT. TO DISMISS FAC          10CV1171 LHK

1    intended to be used as short-term trading vehicles.  The Funds are not intended to be used by, and

2    are not appropriate for, investors who do not intend to actively monitor and manage their

3    portfolios."  Nov. Supp. at 1-2.

4        Despite the Fund's issuance of these new disclosures in its 2009 prospectus and

5    Supplement, the "sophisticated" Plaintiffs continued to hold their Fund shares with the sole

6    exception of Plaintiff Rafton's sale of a small fraction of his Fund shares in late December 2009.

7                                **PLAINTIFFS' ALLEGATIONS**

8        Rather than acknowledge that their alleged investment losses arise solely from the fact

9    that the Fund performed exactly as it disclosed it would perform, Plaintiffs filed this putative

10   class action lawsuit alleging that the Fund's 2007, 2008, and 2009 prospectuses and its November

11   2009 Supplement were materially misleading.  Plaintiffs base their claims entirely on the premise

12   that a reasonable investor who read the Fund's prospectuses would not have known that the

13   Fund's investment objective was to match its benchmark on a daily basis rather than over time,

14   and therefore the effects of compounding could cause the Fund's cumulative returns *over time* to

15   deviate significantly from the inverse of the cumulative price movement of the Long Treasury

16   Bond.  *See, e.g.*, FAC ¶¶38, 41.  Starting from this erroneous premise, Plaintiffs go on to allege

17   that the Fund's prospectuses were materially misleading because they failed to disclose (1)

18   various purported "facts" that would have informed investors that the effects of compounding

19   would cause the Fund's cumulative returns over time to deviate from the inverse of the

20   cumulative price movement of the Long Treasury Bond (*see id.* ¶¶38, 41-48, 67-68), and (2) that

21   the Fund was unsuitable for certain investors (*see id.* ¶¶46, 67).

22                             **THE GOVERNING LEGAL STANDARDS**

23       Both Sections 11 and 12(a)(2) of the Securities Act provide a cause of action to an

24   investor who purchases securities pursuant to a registration statement only if "(1) the registration

25   statement contained an omission or misrepresentation, and (2) [ ] the omission or

26   misrepresentation was material[.]"  *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996)

27   (quotation marks omitted); *see* 15 U.S.C. § 77k(a) and § 77*l*(a)(2).  The registration statements at

28   issue in this case are the Fund's 2007, 2008, and 2009 prospectuses.

To survive a motion to dismiss their Section 11 and 12(a)(2) claims, Plaintiffs' Complaint must "include sufficient allegations to enable a judgment that the claim has enough possible merit to warrant the protracted litigation likely to ensue from denying a motion to dismiss." *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 574 (7th Cir. 2009) (Posner, J.) (affirming dismissal of Section 11 claim) *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Although on a Rule 12(b)(6) motion a court ordinarily accepts as true the allegations of a complaint, the Court "need not accept as true allegations that contradict matters properly subject to judicial notice or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Lopez v. E Trade Bank*, No. 10-CV-01826-LHK, 2010 WL 3325627, at *2 (N.D. Cal. Aug. 20, 2010) (internal quotations omitted); *accord In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1277 (E.D. Wash. 2007) (granting motion to dismiss Securities Act claims).  This analysis is especially warranted in a putative securities class action, where, as the U.S. Supreme Court expressly has recognized, permitting "a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence . . . . tend[s] to transform a private securities action into a partial downside insurance policy." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347-48 (2005) (internal citations and quotations omitted).

In this Circuit, it is well-settled that on a motion to dismiss a court may consider both the entirety of the documents that Plaintiffs allege were materially misleading as well as any other documents filed with the SEC.  *See* Defendants' Joint Request for Judicial Notice at 1.  Thus, any claim based on an alleged misrepresentation or omission that is contradicted by those documents or that rests upon a mischaracterization of those documents must be dismissed.  *See, e.g., Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009) (affirming the dismissal of Section 11 claim because the plaintiff's "allegations simply misconstrue the language in the registration statement"); *In re Stac*, 89 F.3d at 1406 (affirming the dismissal of Section 11 claim because the prospectus disclosed the very risks that plaintiffs claimed were concealed); *In re Wells Fargo Mortgage-Backed Certificates Litig.*, No. 09-CV-01376-LHK, slip op. at 6 (N.D. Cal. Oct. 5,

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2010) (dismissing Securities Act claim because the complaint mischaracterized the disclosures in the prospectus).

"The focus of the securities laws is on the disclosure of facts." *Borow v. nView Corp.*, 829 F. Supp. 828, 838 (E.D. Va. 1993). Indeed, "once the facts are disclosed, a failure to articulate adverse inferences from or pejorative descriptions of those facts is not materially deceptive." *Klamberg v. Roth*, 473 F. Supp. 544, 552 (S.D.N.Y. 1979). As the Ninth Circuit has explained, "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *accord Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 7 (2d Cir. 1996) (affirming dismissal of Securities Act claims because "the prospectuses implicitly and clearly communicate" an alleged omission without the "specific statement" demanded by plaintiffs). The key is whether the alleged omissions "create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody,* 280 F.3d at 1006; *accord Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 211 (2d Cir. 1980) (explaining that a disclosure is not misleading merely because its "quality" could have been improved).

It is equally well-settled that Plaintiffs cannot ignore relevant parts of a prospectus simply because they disagree with its "textual organization". *Valley Nat. Bank of Az. v. Trustee for Westgate-California Corp.*, 609 F.2d 1274, 1282 (9th Cir. 1979) (rejecting plaintiff's claim that a disclosure document was misleading because it purportedly "buried" disclosures). Even if the offering document is "long and tedious", investors are responsible for all of its disclosures. *Hecker v. Micron Tech., Inc.*, 32 F. Supp. 2d 1193, 1197 (D. Idaho 1997); *accord La Pietra v. RREEF America L.L.C.*, 2010 WL 3629597, at *6 (S.D.N.Y. Sept. 16, 2010) (finding it "reasonable to hold such an investor responsible for knowledge of the disclosures in a fund's prospectus" even though the prospectus was issued four to five years before the putative class began).

An alleged omission of material fact is actionable only if the issuer had a duty to disclose the omitted information. *See, e.g.*, *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052 (9th Cir. 1993); *In re Thornburg Mortg., Inc. Sec. Litig.,* 683 F. Supp. 1236, 1250

(D.N.M. 2010) ("Alleged omissions create another hurdle for the plaintiff.  Unlike statements, omissions are actionable only if the plaintiff can establish that the defendant had a duty to disclose the omitted information.").  In this context, a duty to disclose arises only if: (1) required by an affirmative disclosure obligation; or (2) disclosing the omitted fact was "necessary to make the statements [in the registration statement] not misleading."  15 U.S.C. § 77k(a); *see, e.g., Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 608, 612 (6th Cir. 2005) (affirming dismissal of Section 11 class action brought by mutual fund investors); *see also Freidus v. ING Groep N.V.*, 2010 WL 3554097, at *8 (S.D.N.Y. Sept. 14, 2010) ("Securities Act Sections 11 and 12 do not require an offering participant to disclose information merely because a reasonable investor would very much like to know it.") (internal citations and quotations omitted).

Finally, if the Court concludes that Plaintiffs adequately allege that the prospectuses contained an untrue statement of fact or omitted to state a fact that Defendants were required to disclose, then the Court next must determine whether the alleged omission was "material."  *See McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876 (9th Cir. 1994) ("Materiality is a separate inquiry . . . .").  A misstatement or omission is not material unless there is a "*substantial* likelihood" that it "would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information" available to investors.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (emphases added); *see In re Cutera Sec. Litig.,* 610 F.3d 1103, 1110 (9th Cir. 2010) (affirming dismissal of securities fraud claim for lack of materiality).

## ARGUMENT

### I.  THE FUND'S REGISTRATION STATEMENTS CONTAINED NO ACTIONABLE MISSTATEMENTS OR OMISSIONS.

#### A.  Contrary To Plaintiffs' Core Assertion, The Fund Fully And Repeatedly Disclosed That It Was Not A "Simple Directional Investment" That Would Match The Cumulative Performance Of Its Benchmark Over "Long Periods Of Time".

As noted above, the core of Plaintiffs' Complaint is their assertion that the Fund's 2007, 2008 and 2009 prospectuses represented that the Fund was a "simple directional investment" that would match the inverse of the cumulative price movement on the Long Treasury Bond over "long periods of time."  FAC ¶41.  Plaintiffs' assertion could not be further from the truth.  The

Fund's prospectuses nowhere even hint, let alone state, that the Fund was a "simple directional investment" that would even attempt to match the cumulative price movement of its benchmark over "long periods of time".[18]  In fact, as set forth above (at p. 3), each of these prospectuses said precisely the opposite, stating no less than *five times* that the Fund sought to match the inverse of the Long Treasury Bond's price movement on a *daily basis*.  *See* 2007 Prosp. at 16; 2008 Prosp. at 28; 2009 Prosp. at 25.

These disclosures are flatly inconsistent with Plaintiffs' misrepresentation claim, because as explained above, this daily goal is inconsistent with a goal of matching the inverse of the benchmark over "long periods of time."  A "reasonable investor" (*see* FAC ¶38) who read these disclosures would, without more, understand these facts and conclusions.  *See, e.g., Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 334 (S.D.N.Y. 1993) ("A reasonable investor will not be deceived by nondisclosure of inferences if he or she can draw whatever inferences might be appropriate based on disclosed facts.").

But there was much more in the prospectuses to make these points abundantly clear.  Specifically, each prospectus also directed investors to a "Tracking Error Risk" disclosure, which explained that because the Fund "is tracking the performance of its benchmark on a ***daily basis***, *mathematical compounding may prevent a Fund from correlating with the monthly, quarterly, annual or other period performance of its benchmark.*"  2007 Prosp. at 37 (emphasis added); 2008 Prosp. at 52 (same); 2009 Prosp. at 41 (same).  The prospectuses also cautioned that "[t]racking error may cause the Fund's performance to be less than you expect."  *Id.*

This disclosure was then amplified by additional disclosures and explanations of compounding provided to investors at least ten times during the putative class period.  2007 Prosp. at 67; 2008 Prosp. at 80; 2009 Prosp. at 8; *see also* 2007 AR at 3; 2008 AR at 3; 2009 AR at 4; 2007 SAR at 3; 2008 SAR at 3; 2009 SAR at 4; Nov. Supp. at 1-2.  As discussed *supra* (pp. 6-7) these disclosures not only told investors that they needed to "understand the effects of

---

[18] Indeed, Plaintiffs go even further and allege that the Fund "promised" that it would "increase in value" over *any* time period, no matter how long, during which the price of the Long Treasury Bond declined.  FAC ¶38.  In fact, the Fund never "promised" investors any such thing; instead, the prospectuses explain that the Fund would *attempt* to match the inverse of the daily price movements of the Long Treasury Bond.

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

RYDEX DEFENDANTS' MOT. & MEM. ISO OF MOT. TO DISMISS FAC                    10CV1171 LHK

compounding" but also provided numerical examples to "demonstrate that over time, the cumulative percentage increase or decrease in the net asset value of a Fund may diverge significantly from . . . the return of the index underlying a Fund's benchmark due to the compounding effect of losses and gains on the returns of the Fund." 2007 Prosp. at 67; 2008 Prosp. at 80; 2009 Prosp. at 80.

And if these disclosures were not enough to convey to a reasonable investor that the Fund was *not* attempting to match the inverse of the cumulative change in price of the Long Treasury Bond over "long periods of time," then the annual reports sent to Fund investors made this point crystal clear.  Specifically, those reports showed that while the Fund was remarkably successful in matching the inverse of the Long Treasury Bond's price movement on a daily basis, over time the cumulative returns of the Fund did not come close to matching the inverse of the cumulative price movement of the Long Treasury Bond.  *See* 2007 AR at 33; 2008 AR at 33; 2009 AR at 33.

These express and repeated disclosures made clear to any "reasonable investor" who read them that the Fund should *not* be expected to match the cumulative returns of its benchmark over time.  Thus, Plaintiffs' core allegation--that the Fund portrayed itself as a "simple directional investment" that would match the inverse of the cumulative returns of the Long Treasury Bond over "long periods of time" (FAC ¶41)--not only fails as a matter of common sense and basic logic, but also as a matter of settled law within this Circuit.  *See Rubke*, 551 F.3d at 1164 (affirming the dismissal of allegations that "simply misconstrue the language in the registration statement"); *In re Verifone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (rejecting a claim that was based on an inference that could not fairly be drawn from the allegedly misleading disclosures); *Belodoff v. Netlist, Inc.*, No. 07-00677-MLGx, 2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) (dismissing Section 11 claim because the complaint's allegations of untrue statements or misleading omissions were contradicted by the disclosures themselves); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1106, 1115 (C.D. Cal. 2003) (dismissing claims because plaintiff's "problematic" allegations misconstrued prospectus disclosures); *Steckman v. Hart Brewing, Inc.,* No. 96-1077-JNK, 1996 WL 881659, at *4-*5 (S.D. Cal. Dec. 24, 1996) (same), *aff'd,* 143 F.3d 1293 (9th Cir. 1998).

Finally, Plaintiffs fare no better by asserting that the inclusion of annual return and fee information in the prospectuses "clearly impl[ied] that the Fund was an appropriate vehicle for long-term investing."  FAC ¶41.  The SEC regulations embodied in Form N-1A required the Fund to make these disclosures.  *See* 17 C.F.R. § 239.15A; Form N-1A, *Registration Form For Registered Open-End Management Investment Companies* (SEC 2052), at 10-11, *available at* http://www.sec.gov/about/forms/formn-1a.pdf, Korol Decl. Ex. M; *see also* Ex. N at 11-12.[19]  Thus, under Section 19 of the Securities Act, they cannot be misleading as a matter of law.  *See* 15 U.S.C. § 77s(a); *Spicer v. Chicago Bd. Options Exch.*, 1992 WL 380929, at *4 (N.D. Ill. Dec. 10, 1992) ("If [defendant] included the language . . . in good faith reliance on the SEC rule, then no liability follows.").

**B.**      **The Fund's Prospectuses Do Not Contain Any Materially Misleading Omissions Regarding Either The Fund's Daily Investment Objective Or The Effects Of Compounding.**

Once the complaint is stripped of the demonstrably false premise that the prospectuses affirmatively misrepresented the nature of the Fund and the implications of its investment objective, all that remains is a motley assortment of purported omissions.  *See* FAC ¶¶46-48.  But it is well-settled that "[t]o be actionable under the securities law, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see Hayden v. Walston & Co., Inc.*, 528 F.2d 901, 901 (9th Cir. 1975) (holding that a salesman's failure to disclose that he was not licensed to sell securities was not actionable because the omission did not "render his other statements misleading").  None of Plaintiffs' alleged omissions comes close to meeting this standard.

For example, Plaintiffs contend that the prospectuses' disclosures regarding the effects of compounding were not emphatic enough because they did not state that the Fund's performance

---

[19] For the Court's convenience, Defendants have attached both the current Form N-1A and the operative Form N-1A during the putative class period.  *See* Ex. M; Ex. N.  Mutual funds were required to comply with the current Form N-1A, effective March 2009, by January 1, 2010. *Enhanced Disclosure And New Prospectus Delivery Option For Registered Open-End Management Investment Companies*, Inv. Co. Act Rel. No. 28584, 74 Fed. Reg. 4546, 4574 (Jan. 26, 2009).  Both versions of the Form are substantively similar for purposes of this litigation.

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"over time" would "inevitably diverge" from the inverse of the returns on the Long Treasury Bond or that "[i]nverse correlation between the Fund and the price of the [Long Treasury Bond] beyond one-day holding periods would only occur in the rarest of circumstances, and inadvertently if at all." FAC ¶46. But these purported omissions would "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]" *only* if the prospectuses as written stated or implied that the Fund would match the inverse of the cumulative price movement on the Long Treasury Bond over time. As explained above, however, the prospectuses *never* portrayed the Fund that way. Thus, Plaintiffs are alleging that additional disclosures were necessary to correct a purportedly false impression that *never existed in the first place*. For that reason alone their omission claims fail as a matter of law and should be dismissed. *See, e.g., Rubke*, 551 F.3d at 1162 (affirming dismissal because the omission alleged in the complaint did not render the disclosures actually made materially misleading); *Brody*, 280 F.3d at 1006 (same); *Twinde v. Threshold Pharms. Inc.,* No. C 07-4972 CW, 2008 WL 2740457, at *7 (N.D. Cal. July 11, 2008) (dismissing Securities Act claims because defendants' disclosures did not purport to compare two clinical studies as plaintiffs had alleged); *In re FoxHollow Techs., Inc. Sec. Litig.*, No. C 06-4595 PJH, 2008 WL 2220600, at *23 (N.D. Cal. May 27, 2008) (holding that "defendants did not have a duty to disclose . . . that some of the senior executives might at some point be leaving the Company" because "defendants did not mislead investors into believing that any specific employee would work at FoxHollow in perpetuity").

Along the same lines, Plaintiffs allege that the "Tracking Error Risk" disclosure was misleading because it said that compounding "may" prevent the Fund from correlating with its benchmark over time, even though Plaintiffs believe such correlation over time is "extraordinarily unlikely." FAC ¶43; *see also id.* ¶¶47, 61. This allegation is precisely the type of after-the-fact nitpicking that courts consistently have held provides no ground for finding a material omission under the securities laws. For example, in *In re LeapFrog Enterprises, Inc. Securities Litigation*, this Court held that cautionary statements "are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than

RYDEX DEFENDANTS' MOT. & MEM. ISO OF MOT. TO DISMISS FAC                    10CV1171 LHK

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   'may' affect financial results."  527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007).  Similarly, in *Zeid*

2   *v. Kimberley*, this Court said it was "absurd" to claim that disclosures, read as a whole, were

3   misleading simply because they used the word "may" rather than the word "are."  930 F. Supp.

4   431, 437 (N.D. Cal. 1996).  Likewise, in *In re RAC Mortgage Inv. Corp., Sec. Litig.* the court

5   rejected as mere "quibbling about semantics" the claim that prospectuses were misleading

6   because "they indicated that fluctuating interest rates 'may' affect the value of RAC stock rather

7   than stating that they 'shall' affect such value."  765 F. Supp. at 864, 860 (D. Md. 1991); *see also*

8   *Belodoff v. Netlist, Inc.,* 2009 WL 1293690 at *8 (dismissing Securities Act claims because "this

9   appears to primarily be a dispute about the characterization of the facts rather than [a failure to

10  disclose] the facts themselves.").

11          Plaintiffs' complaints about the prospectuses' use of the word "may" are rendered even

12  weaker because the very FINRA Broker Notice upon which they rely also repeatedly uses

13  conditional language to describe the effects of compounding.  For example, in the Broker Notice,

14  FINRA stated, among other things, that "[d]ue to the effects of compounding, [leveraged or

15  inverse ETFs'] performance over longer periods of time ***can*** differ significantly from their stated

16  daily objective."  Ex. K at 1 (emphasis added).[20]  The repeated use of this conditional language by

17  FINRA confirms that there was nothing misleading in the prospectuses' use of the same terms.

18          Plaintiffs' attempt to downplay the importance of the "Understanding Compounding"

19  disclosure is similarly meritless.  Plaintiffs acknowledge the existence of this prospectus

20  disclosure, but allege that it should be ignored because it purportedly was not made "in relation

21  to" the Fund; instead, they allege that the disclosure only applied to other funds issued by the

22  Trust.  FAC ¶43.  Plaintiffs are flatly wrong.  The compounding disclosure applied to all the

23  benchmark mutual funds offered by the Trust[21] and is found in the section of the prospectuses

---

[20] *See also*, to the same effect, *id.* at 2 ("Due to the effect of compounding, their performance over longer period of time ***can*** differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time."); *id.* ("This effect ***can*** be magnified in volatile markets."); *id* ("The effects of mathematical compounding ***can*** grow significantly over time . . . ."); *id.* at 5 ("[D]ue to the complexity and structure of these funds, they ***may*** not perform over time in direct or inverse correlation to their underlying index.") (emphases added).

[21] *See* 2007 Prosp. at 65 (discussing five inverse benchmark and nine benchmark funds); *accord* 2008 Prosp. at 79 (same), 2009 Prosp. at 79 (same).

entitled "MORE INFORMATION ABOUT THE FUNDS: BENCHMARKS AND INVESTMENT METHODOLOGY." *E.g.* 2007 Prosp. at 65. Indeed, a substantively similar disclosure was found on page three of each of the reports sent to shareholders of the benchmark funds, including the Fund, during the putative class period. 2007 AR at 3; 2008 AR at 3; 2009 AR at 4; 2007 SAR at 3; 2008 SAR at 3; 2009 SAR at 4. And Plaintiffs do not and cannot point to anything in these disclosures, whether in the prospectuses or the shareholder reports, that suggests that they do not apply to the Fund. In fact, the very first sentence of the prospectus disclosure would directly refute any such suggestion, as it states that "[i]t is important to understand the effects of compounding when investing ***in any mutual fund***" (2007 Prosp. at 67 (emphasis added); 2008 Prosp. at 80 (same); 2009 Prosp. at 80 (same)) and, likewise, the shareholder reports warn investors to understand how compounding affects their investments in any of the Trust's benchmark funds (2007 AR at 3; 2008 AR at 3; 2009 AR at 4; 2007 SAR at 3; 2008 SAR at 3; 2009 SAR at 4). Furthermore, the warning that a "cumulative percentage increase or decrease in the net asset value of a fund may diverge significantly from the cumulative percentage increase or decrease in the fund's benchmark due to the compounding effect of losses and gains" clearly applied to all of the Trust's benchmark funds. 2007 Prosp. at 67 (emphases added); 2008 Prosp. at 80; 2009 Prosp. at 80.

Rather than focus on the disclosures themselves, Plaintiffs appear to suggest that they should be ignored because they were not specifically referred to on the page of the prospectuses that addressed the objectives, investment strategies, and principal risks of the Fund. *See* FAC ¶¶43, 58. But there can be no doubt that any reasonable investor who read the prospectuses' description of the Fund would have known that a disclosure about compounding was relevant to an investment in the Fund. Indeed, the "Tracking Error Risk" disclosure--which Plaintiffs do not dispute was referred to on the page of the prospectus that specifically addresses the Fund--itself discusses the effects of compounding. 2007 Prosp. at 37; 2008 Prosp. at 50; 2009 Prosp. at 41.

In sum, when the Fund's disclosures are properly read as a whole, Plaintiffs' claims must be dismissed because the disclosures fully and fairly informed investors about the implications of pursuing the Fund's investment objective, including, in particular, the potential effects of

compounding on the Fund's cumulative returns versus its benchmark over "long periods of time." *See In re Hyperion Sec. Litig.,* 1995 WL 422480, \*5 (S.D.N.Y. July 14, 1995) (dismissing Securities Act claims where issuer's "strategy and risks were either disclosed or truthfully represented"), *aff'd sub. nom.*, *Olkey v. Hyperion 1999 Term Trust,* 98 F.3d 2 (2d Cir. 1996).

**C.    All Claims Based On The 2009 Prospectus And Supplement Similarly Fail.**

Plaintiffs present no unique allegations about the disclosures made in the Fund's 2009 prospectus.[22]  Instead, Plaintiffs at least implicitly acknowledge that the additional disclosures cured at least some of the concerns they had with the 2007 and 2008 prospectuses.  *Compare* FAC ¶46 (alleging six purportedly actionable omissions in the 2007 and 2008 prospectuses) *with id.* ¶67 (alleging only three purportedly actionable omissions in the 2009 prospectus).  But they allege that the additional disclosures in 2009 did not go far enough, and thus some of the allegations they made with respect to the 2007 and 2008 prospectuses purportedly still apply to the 2009 disclosures.[23]

For the same reasons explained above, these claims fail.  Like Plaintiffs' claims with respect to the 2007 and 2008 prospectuses, all of these claims rest on the demonstrably false premise that the Fund represented that it would match the inverse of the cumulative price movements of the Long Treasury Bond over time.  Moreover, they wrongly ignore disclosures that address the precise compounding effect that Plaintiffs allege was not disclosed.  Accordingly, all claims based on the 2009 prospectus and November 2009 Supplement should be dismissed.[24]

---

[22] Plaintiffs cannot state a securities fraud claim by doing nothing more than "seiz[ing] upon disclosures made in a later [prospectus] and alleg[ing] that they should have been made in earlier ones."  *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.).  Courts have recognized that under Federal Rule of Evidence 407 (subsequent remedial measures), later disclosures should not even be considered when analyzing whether earlier disclosures were materially misleading at the time they were made.  *See, e.g., Malone v. Microdyne Corp.*, 26 F.3d 471, 480 (4th Cir. 1994); *Krouner v. American Heritage Fund, Inc.*, 899 F. Supp. 142, 147 (S.D.N.Y. 1995).

[23] Plaintiffs allege that the 2009 prospectuses continued to portray the Fund as appropriate for "long term investing" (FAC ¶59); continued to mislead investors by using the word "may" (*id.* ¶¶60-61); and failed to include some of the same details about the effects of compounding that allegedly rendered the 2007 and 2008 prospectuses misleading (*id.* ¶¶67-68).

[24] Plaintiffs' Section 11 claim against Defendant Goldman also fails because he did not sign the allegedly misleading registration statements and does not fall within any of the other categories of potential defendants.  *See* 15 U.S.C. § 77k(a); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 576 (S.D.N.Y. 1991) ("[B]ecause [individual defendants] do not fall within the

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**D.      Alleged Omissions About The Suitability Of The Fund Are Not Actionable.**

Plaintiffs' remaining alleged omissions concern the prospectuses' purported failure to opine on whether the Fund was suitable for certain types of investors.  *See* FAC ¶46.  Like any other omission, the suitability disclosures that Plaintiffs allege the prospectuses should have contained are actionable only if they were either necessary to make another disclosure not misleading or a statute or regulation required the disclosures to be included in the prospectus.  *See, e.g.,* 15 U.S.C. § 77k(a).  Neither requirement is satisfied here.

*First*, Defendants' opinion on the suitability of the Fund for Plaintiffs or any other potential investors was not necessary to make other disclosures not misleading.  Much like the other omissions alleged in the Complaint, the alleged failure to make the suitability disclosures detailed in the Complaint could be misleading only if the prospectuses portrayed the Fund as a "simple directional investment" that would match the inverse of the cumulative price movement on the Long Treasury Bond over "long periods of time."  FAC ¶41.  But for the numerous reasons demonstrated above, the prospectuses would have led any investor who read them to precisely the opposite conclusion.  Therefore, the failure to include these suitability disclosures did not render the prospectuses misleading.[25]

*Second,* no statute or rule requires a mutual fund to opine about the types of investors for whom the fund is suitable.  A mutual fund's disclosure obligations are contained in SEC Form N-1A.  *See, e.g.*, *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010).  While Form N-1A clearly gives a mutual fund the *option* to provide information regarding the types of investors who should invest in the Fund, it plainly does not *require* a mutual fund to make such a

enumerated categories of persons who can be sued under Section 11 . . . Plaintiffs' Section 11 claims against these Defendants are dismissed with prejudice.").  Likewise, Plaintiffs' Section 15 claims against Defendants Bonos, Byrum, Goldman, Verboncoeur, and PADCO fail for the reasons articulated in the Independent Trustees' Motion including that Plaintiffs fail to sufficiently plead either (i) a primary violation of Sections 11 and 12(a)(2) or (ii) that any of these defendants exercised actual power or a control over a primary violator.  *See id.* at 10-12.

[25] Moreover, the alleged omissions about suitability are immaterial in light of the Fund's investment objective, its disclosures about compounding, and its historical returns.  *See, e.g.*, *Sable*, 819 F. Supp. at 334 ("A reasonable investor will not be deceived by nondisclosure of inferences if he or she can draw whatever inferences might be appropriate based on disclosed facts.").

RYDEX DEFENDANTS' MOT. & MEM. ISO OF MOT. TO DISMISS FAC          10CV1171 LHK

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

disclosure.  *See* Ex. M at 16 ("A Fund ***may*** . . . describe the types of investors for whom the Fund is intended . . . .) (emphasis added); Ex. N at 10 (same).[26]

Rather than impose a duty on mutual funds to opine about whether a particular mutual fund is suitable for a particular investor, the securities laws impose this important responsibility upon brokers.  Indeed, the very Broker Notice Plaintiffs cite explains that FINRA rules require brokers to "determine that the product is suitable for the specific customers to whom it is recommended."  Ex. K at 3; *see also* NASD Conduct Rule 2310 (Recommendations to Customers (Suitability)).

This allocation of responsibility between funds and brokers is consistent with the nature of suitability determinations.  As the Broker Notice explains, a suitability determination requires a broker to "obtain information concerning the customer's financial status, tax status, investment objectives and 'such other information used or considered to be reasonable by such member . . . in making recommendations to the customer.'"  Ex. K at 3 *quoting* NASD Conduct Rule 2310.  In other words, the "customer-specific suitability analysis depends on the investor's particular circumstances."  *Id.*  The Rydex Defendants, like other mutual funds complexes, do not receive this information regarding Plaintiffs or any of the Fund's investors.  Indeed, funds often do not even know the identity of their investors.[27]  Brokers, however, have (or at least are required by law to have) a personal relationship with their customers, and thus they are the ones who are in by far the best position to obtain this information and undertake this important "customer-specific" suitability analysis.  There simply is no basis in the law to impose a duty on mutual funds to offer suitability opinions in their prospectuses.

---

[26] To the extent that Plaintiffs attempt to rely on the Broker Notice to support their suitability theory, that approach also fails.  FINRA regulates broker-dealers, not mutual funds.  Thus, as other courts consistently have recognized, a FINRA notice does not alter a mutual fund's disclosure obligations.  *See, e.g., Donovan v. American Skandia Life Assurance Corp.*, 96 Fed. Appx. 779, 781 (2nd Cir. 2004) (affirming dismissal of Section 11 claims and stating that "[b]y its terms, NASD Notice 99-35 applies only to registered representatives recommending the purchase of a variable annuity; it does not require annuity issuers to include a warning in a prospectus or other offering documents"); *see also In re VeriFone Sec. Litig.,* 11 F.3d at 870.

[27] For example, many brokers have what are known as "omnibus" accounts with mutual funds.  Transactions by all of a broker's customers are recorded in the broker's omnibus account, and thus a fund may not even know the identity of the customers who purchase its shares.

DECHERT LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**CONCLUSION**

2        This is a case that should go no further than the pleading stage.  The Fund always has

3   performed exactly as was disclosed and as was designed, *i.e.*, on each day it was managed in an

4   attempt to ensure that its investments performed inversely to the daily price movement of the

5   Long Treasury Bond.  Each of the Fund's prospectuses stated, among other express disclosures,

6   that "the Fund's objective is to perform, on a *daily* basis, exactly opposite its benchmark, the

7   Long Treasury Bond."  Moreover, the disclosures described the "compounding" that is inherent in

8   this structure and operation of the Fund and its impact on the Fund's cumulative performance

9   versus its benchmark, in both plain prose and in the historical return information provided to

10  shareholders.  The very foundation of this lawsuit is therefore without merit, and will not support

11  any of the assorted allegations Plaintiffs have built into their complaint.

12       Accordingly, for the foregoing reasons and because amendment would be futile,

13  Plaintiffs' First Amended Class Action Complaint should be dismissed with prejudice.

14  Dated:  October 8, 2010                          DECHERT LLP
                                                      MATTHEW L. LARRABEE
15                                                    DAVID A. KOTLER
                                                      MURIEL M. KOROL
16
                                                      By:_____/S/_____
17                                                        MATTHEW L. LARRABEE
                                                          One Maritime Plaza, Suite 2300
18                                                        San Francisco, California  94111-3513
                                                          Telephone:  415.262.4500
19                                                        Facsimile:   415.262.4555
                                                          matthew.larrabee@dechert.com
20
                                                          Counsel for Defendants
21                                                        RYDEX SERIES FUNDS; PADCO
                                                          ADVISORS INC. d/b/a RYDEX
22                                                        INVESTMENTS, INC.; RYDEX
                                                          DISTRIBUTORS, INC.; NICK BONOS;
23                                                        MICHAEL P. BYRUM; RICHARD M.
                                                          GOLDMAN; and CARL G.
24                                                        VERBONCOEUR

25

26

27

28