ALAN W. SPARER (No. 104921)
MARC HABER (No. 192981)
KEVIN H. LEWIS (No. 197421)
JAMES S. NABWANGU (No. 236601)
SPARER LAW GROUP
100 Pine Street, 33rd Floor
San Francisco, California  94111-5128
Telephone:     415/217-7300
Facsimile:     415/217-7307
asparer@sparerlaw.com
mhaber@sparerlaw.com
klewis@sparerlaw.com
jnabwangu@sparerlaw.com

Attorneys for RYDEX LITIGATION GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES RAFTON, TRUSTEE OF THE JAMES AND CYNTHIA RAFTON TRUST,<br><br>                    Plaintiff,<br><br>          v.<br><br>RYDEX SERIES FUNDS; PADCO ADVISORS INC. d/b/a RYDEX INVESTMENTS, INC.; RYDEX DISTRIBUTORS, INC.; RICHARD M. GOLDMAN; CARL G. VERBONCOEUR; JOHN O. DEMARET; NICK BONOS; MICHAEL P. BYRUM; COREY A. COLEHOUR; J. KENNETH DALTON; WERNER E. KELLER; THOMAS F. LYDON; PATRICK T. MCCARVILLE; ROGER SOMERS; and DOES 1 through 25, inclusive,<br><br>                    Defendants. | No. 10 CV 01171 LHK<br><br>Action Filed:  March 19, 2010<br><br><br>PLAINTIFFS' OPPOSITION TO THE RYDEX DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT<br><br>Date:      December 16, 2010<br>Time:      1:30 p.m.<br>Dept:      Courtroom 4, 5th Floor<br>Judge:     Hon. Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DETERMINED

INTRODUCTION ........................................................................................................... 1

STATEMENT OF RELEVANT FACTS ........................................................................ 2

    A.    Defendants Marketed The Fund As A Way To Invest In
         Anticipation Of Rising Interest Rates. .......................................... 2

    B.    Compounding Prevents The Fund From Tracking Its
         Benchmark For Periods Longer Than A Single Day. .................... 4

    C.    The Prospectuses' Disclosures Regarding Compounding. ............ 5

    D.    The Prospectuses' Disclosures Regarding Compounding Were
         False And Misleading. ..................................................................... 7

    E.    Securities Regulators Highlight The Undisclosed Risks Of
         Leveraged And Inverse Funds. ....................................................... 8

    F.    The 2009 Prospectus and Supplements. ...................................... 10

    G.    The 2009 Registration Statement Was False and Misleading. .... 12

    H.    The False and Misleading Statements Caused Plaintiff's Losses. ... 12

ARGUMENT .............................................................................................................. 12

I.    LEGAL STANDARD ....................................................................................... 12

    A.    Rule 8(a)(2)'s Notice Pleading Standard Governs This Motion. .... 12

    B.    Pleading Requirements For Section 11 And 12(a)(2) Claims. ...... 13

II.   THE PROSPECTUSES MATERIALLY MISREPRESENTED THE NATURE
    AND RISKS OF THE FUND. .......................................................................... 15

    A.    The Prospectuses Misrepresented The Fund As Appropriate For
         Investors Who Expected The Price Of The Long Treasury Bond
         To Decrease Over Time. ................................................................ 15

    B.    The Prospectuses' Misstatements and Omissions Regarding The
         Appropriateness Of The Fund Are Material. .............................. 17

III.  THE PROSPECTUSES' STATEMENTS REGARDING THE
    COMPOUNDING EFFECT ARE MATERIALLY MISLEADING. ................ 18

A.   The Prospectuses Did Not Adequately Disclose The Compounding Effect As It Relates To The Fund. ........ 18

B.   The Prospectuses' Boilerplate Statements Regarding The Compounding Effect Did Not Disclose The Risks Faced By Investors In The Fund. ........ 20

1.   Statement That Fund Tracks On A "Daily Basis" Is Insufficient. ........ 20

2.   Disclosure Regarding "Tracking Error" Is Insufficient. ........ 21

3.   Note On Compounding Dealt Solely With Leverage. ........ 22

4.   Returns Listed In Annual Reports Do Not Disclose Compounding Effect. ........ 23

CONCLUSION ........ 24

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**CASES**            **Page**

*Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009)    13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)    12, 13

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002)    18

*Credit Suisse First Boston Corp. v. ARM Fin. Group*, 2001 U.S. Dist. LEXIS 3332 (S.D.N.Y. Mar. 28, 2001)    22

*Denny v. Barber*, 576 F.2d 465 (2d. Cir. 1978)    19

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995)    14

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997)    20

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995)    13

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)    13

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989)    24

*In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991)    14, 17, 21

*In re Daou Sys., Sec. Litig. Inc.*, 411 F.3d 1006 (9th Cir. 2005)    13

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86 (D. Mass. 2010)    20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311 (S.D.N.Y. 2009)    19

*In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007)    21

*In re Stac Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996)    14

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994)    14, 17

*Krouner v. American Heritage Fund, Inc.*, 899 F. Supp. 142 (S.D.N.Y. 1995)    19

*Malone v. Microdyne Corp.*, 26 F.3d 471 (4th Cir. 1994)    19

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576 (2d Cir. 1990)    14

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879 (9th Cir. 2008)    13, 14, 17, 24

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)    21

*White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982                22
(E.D. Wis. 2002)

*Zeid v. Kimberley*, 930 F. Supp 431 (N.D. Cal. 1996).                          21, 22

## STATUTES & RULES

15 U.S.C.
  §77*l*                                                                13
  §77k(a)                                                               13

Securities Exchange Act of 1934 §10(b)                                            21

Securities Act of 1933
  §§11, 12(a)(2), 15                                                      1
  §§11, 12(a)(2)                                                       14, 19
  §11                                                                   13

Fed. R. Civ. P.
  8(a)(2)                                                               12
  9(b)                                                                  21

Fed. R. Evid. 407                                                                 19

1

**STATEMENT OF ISSUES TO BE DECIDED**

2

     Should the Rydex Defendants' Motion to Dismiss be denied where the Rydex Inverse

3

Government Long Bond Prospectuses falsely stated that the fund was appropriate for "Investors

4

who expect the value of the Long Treasury Bond to go down and want investment gains when it

5

does so," while in fact the undisclosed compounding effect prevented the fund from tracking the

6

inverse movements of its benchmark for longer than a single day?

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2        The Rydex Inverse Government Long Bond Strategy Fund (the "Fund") was sold to Lead

3    Plaintiffs James Rafton and James Darst, Jr. (collectively, "Plaintiffs") and other investors as a

4    way to profit from or hedge against increases in interest rates over time.  The Fund's 2007, 2008

5    and 2009 Prospectuses falsely stated that the Fund was designed for investors who anticipate that

6    the price of the 30-Year U.S. Treasury Bond (the "Long Treasury Bond") would go down.  In

7    other words, as the benchmark Long Treasury Bond price fell, the Fund's value should have

8    increased over time.  However, because of an undisclosed mathematical compounding effect, the

9    Fund did not and could not track the inverse price movements of its benchmark for periods

10   longer than a single day.  Investors who held Fund shares over long periods of time inevitably

11   would suffer losses.  The First Amended Complaint (the "FAC") therefore asserts claims against

12   Defendants for making untrue statements and omissions of material fact in the Prospectuses in

13   violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.

14        First, the FAC alleges that Defendants misstated who was an appropriate investor for the

15   Fund.  Defendants not only marketed the Fund as a way to invest on anticipated interest rate

16   increases over time, they structured the fees of the Fund so as to discourage investors from

17   trading the Fund short-term.  Indeed, the fees associated with buying and selling Class-A shares,

18   like those owned by Plaintiffs, was so high that short-term trading virtually guaranteed that

19   investors would lose money. It was not until after securities regulators warned brokers and

20   investors that inverse funds were unsuitable for investors who intended to hold the shares for

21   longer than a single day that Defendants acknowledged in a Prospectus supplement that the Fund

22   was only appropriate as a short-term trading vehicle.  Defendants argue that they have no

23   obligation to say that the Fund is appropriate only for short-term investors.  But by describing

24   and structuring the Fund as a long-term investment vehicle, Defendants took on the responsibility

25   accurately to describe who the Fund is appropriate for.

26        Second, the FAC alleges that the Prospectuses failed adequately to disclose that the

27   mathematical compounding effect would cause the Fund to deviate from the inverse of

28   movements in its benchmark, especially during periods of increased volatility.  Defendants'

PLTFS' OPP TO RYDX DEFENDANT'S MOTION TO DISMISS          No. 10 CV 01171 LHK

1    motion to dismiss relies on boilerplate disclosures that either do not address compounding,

2    address compounding only in the context of leverage (which the Fund did not use) or state

3    merely that compounding "may" have an effect when in truth it was mathematically certain to

4    cause the Fund to lose money over long periods of time.

5                         **STATEMENT OF RELEVANT FACTS**

6

7  **A.   Defendants Marketed The Fund As A Way To Invest In Anticipation Of Rising
        Interest Rates.**

8           "Inverse" funds are mutual funds that are designed to move inversely with a benchmark

9    or index.  FAC ¶30.  When the price of the benchmark decreases, the price of the fund should

10   increase by the same percentage.  Because of this feature, inverse funds usually are marketed as a

11   way for investors to profit from or hedge their exposure against a falling price in the benchmark.

12   *Id.*  The Fund is constructed to be inversely correlated to the price of the Long Treasury Bond.

13   *Id.*  Since the Long Treasury Bond price moves opposite to changes in interest rates, the Fund is

14   supposed to allow investors to profit from interest rate increases.  As the Fund states in its 2007

15   Annual Report, "[a]n investor benefits from Rydex Inverse Government Long Bond Fund in a

16   rising interest rate environment."  2007 Annual Report at 32.[1]

17          Throughout the Class Period, Defendants actively marketed the Fund as a way to take

18   advantage of anticipated falling Long Treasury Bond prices.  The Fund's objective was "to

19   provide total returns that inversely correlate to the price movements of a benchmark for U.S.

20   Treasury debt instruments or futures contracts on a specified debt instrument."  2007 Prospectus

21   at 16; 2008 Prospectus at 28; 2009 Prospectus at 25; FAC ¶¶39, 40, 59.  The Prospectuses

22   expressly represented that the Fund was an appropriate vehicle for investors who expected falling

23   bond prices:

24

25

26

27   _____

28          [1]For the convenience of the Court, citations to all annual reports, prospectuses and
     prospectus supplements refer to the documents attached to the Muriel M. Korol Declaration.

"INVESTOR PROFILE

> **Investors who expect the value of the Long Treasury Bond to go down and want investment gains when it does so**. These investors must also be willing to bear the risk of equal losses if the value of the Long Treasury Bond goes up." (2007 Prospectus at 16; 2008 Prospectus at 28; 2009 Prospectus at 25; FAC ¶¶39, 40, 59 (emphasis added))

The Prospectuses did not state that because of the effects of mathematical compounding the Fund was only appropriate for investors who expect the value of the Long Treasury Bond to go down *on that day*. Nor did the Prospectuses state that investors benefit from the Fund in a rising interest rate environment *but only on that day*.

The fee structure of the Fund as well as the information provided in the Prospectuses make clear that Defendants designed the Fund so that investors would hold the shares for long periods of time. First, the Fund sells "A-Class" shares (the shares purchased by Plaintiffs) that have a 4.75% sales charge or "load" on each purchase and "C-Class" shares that have no up-front load.[2] 2007 Prospectus at 54; 2008 Prospectus at 75. In return for paying the load, A-Class investors pay lower annual fees and expenses. As of 2008, the annual fees and expenses were approximately 0.6% lower for A-Class investors than C-Class investors. *See* 2008 Prospectus at 75. This means that A-Class investors who did not receive a reduced sales charge would have to hold shares for *nearly eight years* before they would break even compared to C-Class investors.

The Prospectuses make this point in the comparison of "Fund Fees and Expenses." *See, e.g.*, 2008 Prospectus at 77. The Prospectus states that at the end of one year an A-Class investor who invested $10,000 would pay a cumulative $845 in fees and expenses (8.45%), while a C-Class investor who holds onto his shares would pay $445 (4.45%) over the same period. *Id.* The chart in the 2008 Prospectus shows that A-Class investors will only have paid less in fees and expenses than C-Class investors after approximately 10 years. *Id.* The existence of A-Class shares makes no sense for a Fund purportedly designed to be held only for a single day.

---

[2]The sales charge may be reduced or waived for some purchases, such as investors who invest larger amounts. *See, e.g.*, 2007 Prospectus at 76.

PLTFS' OPP TO RYDX DEFENDANT'S MOTION TO DISMISS          No. 10 CV 01171 LHK

Second, the Fund penalizes investors who sell their shares within a year or a year and a half, depending on the class of shares. The Prospectuses warn certain A-Class investors that "if you sell your shares within 18 months of purchase, you will normally have to pay a 1.00% contingent deferred sales charge . . . ." 2007 Prospectus at 60 n.4; 2008 Prospectus at 74 n.4; 2009 Prospectus at 72 n.4. Similarly, C-Class investors who sell their shares in "the first year following purchase" likewise must pay a 1.00% deferred sales charge. 2007 Prospectus at 60 n.3; 2008 Prospectus at 74 n.3; 2009 Prospectus at 72 n.3. These economic disincentives to selling A- and C-Class shares before 18 months or one year, respectively, tell investors in the strongest possible terms that they should expect to hold their shares for at least that long.

Third, the Prospectuses show the Fund's returns over the past one year, five years, and since inception. *See, e.g.*, 2007 Prospectus at 52; FAC ¶41. By including this data, Defendants imply that the Fund is an appropriate vehicle for long-term investing.

**B.     Compounding Prevents The Fund From Tracking Its Benchmark For Periods Longer Than A Single Day.**

Most inverse funds are designed to track a benchmark on a daily basis. The Fund is no different, as the Fund's investment objective is to track "the inverse of the daily price movement of the Long Treasury Bond." 2007 Prospectus at 16; FAC ¶39.

The daily tracking necessarily implicates a mathematical "compounding" effect that causes an inverse fund's price to deviate from the inverse movement of its benchmark for periods longer than a single day. FAC ¶31. Using a two-day example, if the benchmark goes from 100 to close at 101 on the first day and back to 100 on the next, an inverse fund tracking that benchmark daily would lose 0.02% even though the benchmark stays even over that period. *Id*. Volatility increases the compounding effect. If the same benchmark moves up to 110 the first day but then back down to 100 on the next day, the inverse fund loses 1.82% over that same two day period. FAC ¶32.

This compounding effect means that unless the benchmark consistently falls, it is virtually a mathematical certainty that an inverse fund will lose money over the long term. The longer the period of time and the more volatile the benchmark, the worse the inverse fund's

1  relative performance will be.  For these reasons, inverse funds are not appropriate trading

2  vehicles for investors seeking to hold the investment for long periods of time.  FAC ¶33.

3  **C.      The Prospectuses' Disclosures Regarding Compounding.**

4            Even as Defendants marketed and structured the Fund as an appropriate investment

5  vehicle for investors who believed that interest rates were likely to rise over time, Defendants

6  failed to warn investors that the effects of compounding would make it a virtual certainty that the

7  Fund would underperform its benchmark over long periods.  In the 2007 and 2008 Prospectuses,

8  the only warning expressly dealing with the effects of compounding as it relates to the Fund is a

9  single sentence in a paragraph describing all the reasons that the Fund may fail to track the

10  performance of its benchmark.  The Prospectuses first list all of the potential causes for such a

11  "tracking error," stating that "Fund expenses, imperfect correlation between the Fund's

12  investments and those of its benchmark, rounding of share prices, changes to the benchmark,

13  regulatory policies, high portfolio turnover rate and leverage all contribute to tracking error."

14  2007 Prospectus at 37; 2008 Prospectus at 50; FAC ¶42.  Then the Prospectuses state that

15  because this Fund and other Rydex funds track a benchmark on a daily basis, "mathematical

16  compounding may prevent a Fund from correlating with the monthly, quarterly, annual or other

17  period performance of its benchmark."  2007 Prospectus at 37; 2008 Prospectus at 50; FAC ¶42.

18  That is the only disclosure of compounding as it relates to inverse funds like the Fund.  The

19  discussion of tracking error does not explain how compounding will cause the Fund to fail to

20  track.  Nor does the "tracking error" discussion state how large an effect compounding may have.

21  The statement does not even warn that compounding will necessarily cause the Fund to

22  underperform its benchmark over time.  It merely notes that a tracking error is possible.

23            The Prospectuses do contain additional disclosures about the effects of compounding.

24  However, those warnings expressly reference only the other Rydex funds that are leveraged[3] and

25  the discussion focuses exclusively on how leverage causes the compounding effect.  As a

26  preliminary matter, it is important to note that Defendants made it difficult for investors to

27  _____

28            [3]A leveraged fund will return a multiple of the price movement.  For example, a 1.5x fund
     will return 150% of the performance of its benchmark.

PLTFS' OPP TO RYDX DEFENDANT'S MOTION TO DISMISS          No. 10 CV 01171 LHK

1  determine what information in the Prospectuses is relevant to each fund by using omnibus

2  registration statements that covered dozens of funds with entirely different objectives and risks.[4]

3  Because of this, the additional discussion of compounding and leverage is 40 pages removed

4  from the discussion of each fund's risks. *See* 2007 Prospectus at 25, 67.

5       Nonetheless, it is clear that this additional discussion of compounding relates solely to

6  leveraged funds. First, the section itself is entitled "Understanding Compounding and *the Effect*

7  *of Leverage*." 2007 Prospectus at 67; 2008 Prospectus at 80 (emphasis added). Second, that

8  section is referenced only in the discussion of leveraged funds. The Prospectuses contain a

9  summary page for each fund. *See, e.g*., 2007 Prospectus at 16 (summary page for the Fund).

10  While the summary pages for leveraged funds refer investors to the discussion of the effects of

11  compounding, this discussion was not referenced in relation to non-leveraged funds. The

12  summary page for the Russell 2000 1.5x Strategy Fund states "For more information about the

13  effects of leverage, please see 'Understanding Compounding And The Effect Of Leverage.'"

14  2007 Prospectus at 9. The summary page for the Fund contains no such reference. 2007

15  Prospectus at 16.

16       Third, the discussion of compounding itself clearly focuses on the effects of leverage:

17       "UNDERSTANDING COMPOUNDING & THE EFFECT OF
18       LEVERAGE

19       "It is important to understand the effects of compounding when
20       investing in any mutual fund, especially funds that use leverage as
         part of their investment strategy. **The impact of leverage on a**
21       **fund will generally cause the fund's performance to not match**
         **the performance of the index underlying the fund's benchmark**
22       **over a period of time greater than one day**. The following simple
         examples provide an illustration:

23       "EXAMPLE A: Assume you invest $100 in Fund A, a typical
24       index fund that seeks to match the performance of its underlying
         index. If the index increases 10% on day one, the value of your
25       shares in Fund A would be expected to increase $10 (10% of $100)

26  ─────────────────────────
       [4]For example, the 2007 Prospectus was filed as part of a 965-page document that related
27  to over 30 separate funds. The prospectus submitted by Defendants is only a portion of that
     document. The 2007 Prospectus itself is 100-plus pages in the middle of the 955-page document
28  and covered approximately 17 different Rydex funds. *See* Declaration of Marc Haber Ex. A.

to $110.  The next day, if the index decreases 10%, the value of your shares in Fund A would be expected to decrease $11 (10% of $110) to $99.

"EXAMPLE B: Assume you invested $100 in Fund B, a fund that seeks to return 200% of the performance of its underlying index.  If the index increases 10% on day one, the value of your shares in Fund B would be expected to increase $20 (20% of $100) to $120.  The next day, if the index decreases 10%, the value of your shares in Fund B would be expected to decrease $24 (20% of $120) to $96.

"Because of the effect of compounding, in each case the value of your investment declined even though the index went up 10% on day one and down 10% on day two.  **However, the effect of compounding was more pronounced when combined with leverage** (Example B).

"**The examples demonstrate that over time, the cumulative percentage increase or decrease in the net asset value of a fund may diverge significantly from the cumulative percentage increase or decrease in the multiple of the return of the index underlying a fund's benchmark due to the compounding effect of losses and gains on the returns of the fund.** It is also expected that a fund's use of consistently applied leverage will cause the fund to underperform the compounded return of twice its benchmark in a trendless or flat market."  (2007 Prospectus at 67; 2008 Prospectus at 80; FAC ¶44 (emphasis added))

**D.      The Prospectuses' Disclosures Regarding Compounding Were False And Misleading.**

Paragraph 46 of the FAC alleges that the 2007 and 2008 Prospectuses were false and misleading because they failed to disclose that:

- Inverse correlation between the Fund and the price of the 30-year U.S. Treasury Bond  beyond one-day holding periods would only occur in the rarest of circumstances, and inadvertently if at all;

- Fund performance over time would inevitably diverge on an increasing basis from the inverse of the performance of the price of 30-year U.S. Treasury Bond;

- The Fund is unsuitable for investors who plan to hold it for longer than one trading session, particularly in volatile markets;

- The Fund was not intended or appropriate for investors who do not actively monitor and manage their portfolios on a daily basis;

- Because of compounding, for periods longer than a day, the path or trend of the benchmark is at least as important to the Fund's return as the cumulative return of the benchmark over that period; and

- While the Fund appears to offer a straightforward way to profit from or hedge against decreases in the price of the 30-year U.S. Treasury Bond, such objectives are not attainable through the Fund except in extraordinarily rare circumstances.

The FAC alleges that, taken as a whole, the 2007 and 2008 Prospectuses failed to disclose that the Fund is altogether inappropriate for periods longer than a single day regardless of an investor's expectations for the Long Treasury Bond's price.  FAC ¶47.  These Prospectuses did not disclose that mathematical compounding would almost certainly prevent the Fund from tracking its benchmark over a period of time greater than one day.  *Id.*  Indeed, the Prospectuses failed to inform investors that over long periods of time an investment in the Fund would eventually lead to losses unless the price of the Long Treasury Bond fell consistently.  FAC ¶18.

E.   **Securities Regulators Highlight The Undisclosed Risks Of Leveraged And Inverse Funds.**

In the Summer of 2009, the securities industry regulators recognized that neither investors nor even the securities professionals who sell securities understood how compounding affects leveraged and inverse funds.  FAC ¶49.  On June 11, 2009, FINRA issued a Regulatory Notice to brokerage firms, in which it warned that sales materials related to leveraged and inverse funds "must be fair and accurate."  *Id.*  FINRA specifically cautioned that:

> "**Due to the effects of compounding, their performance over longer periods of time can differ significantly from their stated daily objective.  Therefore, inverse and leveraged ETFs that are reset daily typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets.**
>
> \*     \*     \*     \*
>
> "Most leveraged and inverse ETFs 'reset' daily, meaning that they are designed to achieve their stated objectives on a daily basis. **Due to the effect of compounding, their performance over longer periods of time can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time.**

\*          \*          \*          \*

"**This effect can be magnified in volatile markets**.  Using a two-day example, if the index goes from 100 to close at 101 on the first day and back down to close at 100 on the next day, the two-day return of an inverse ETF will be different than if the index had moved up to close at 110 the first day but then back down to close at 100 on the next day.  In the first case with low volatility, the inverse ETF loses 0.02 percent; but in the more volatile scenario the inverse ETF loses 1.82 percent.  **The effects of mathematical compounding can grow significantly over time, leading to scenarios such as those noted above.**" (Declaration of Muriel M. Korol ("Korol Decl.") Ex. K (Regulatory Notice 09-31); FAC ¶49 (emphases added))

On August 18, 2009, the SEC likewise expressed its concern that investors did not understand how leveraged and inverse funds worked:

"The SEC staff and FINRA are issuing this Alert because **we believe individual investors may be confused about the performance objectives of leveraged and inverse exchange-traded funds (ETFs).**  Leveraged and inverse ETFs typically are designed to achieve their stated performance objectives on a daily basis.  Some investors might invest in these ETFs with the expectation that the ETFs may meet their stated daily performance objectives over the long term as well.  **Investors should be aware that performance of these ETFs over a period longer than one day can differ significantly from their stated performance objectives.**"

\*          \*          \*          \*

"Most leveraged and inverse ETFs 'reset' daily, meaning that they are designed to achieve their stated objectives on a daily basis.  **Their performance over longer periods of time—over weeks or months or years—can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time.  This effect can be magnified in volatile markets.**"

\*          \*          \*          \*

"**While there may be trading and hedging strategies that justify holding these investments longer than a day, buy-and-hold investors with an intermediate or long-term horizon should carefully consider whether these ETFs are appropriate for their portfolio.**  As discussed above, because leveraged and inverse ETFs reset each day, their performance can quickly diverge from the performance of the underlying index or benchmark.  In other words, **it is possible that you could suffer significant losses even if the long-term performance of the Index showed a gain.**" (Korol Decl. Ex. L (Leveraged and Inverse ETFs: Specialized

Products with Extra Risks for Buy-and-Hold Investors); FAC ¶¶52-54 (emphasis added))

In response to these notices, firms across Wall Street changed their practices with regard to the sale of leveraged and inverse funds.  In July 2009, Edward Jones & Co. halted the sale of these funds, calling them "one of the most misunderstood and potentially dangerous types of ETFs."  FAC ¶55.  UBS did likewise.  FAC ¶56.  Charles Schwab warned its clients that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting.  Proceed with extreme caution."  FAC ¶57.

**F.      The 2009 Prospectus And Supplements.**

The 2009 Prospectus, filed after the red flags raised by FINRA and the SEC, still misstates the risk by warning only that Fund returns "may be" uncorrelated to the benchmark for periods longer than a single day.  FAC ¶61.  However, the 2009 Prospectus does warn that:

> "The Funds should be utilized only by sophisticated investors or professional investment advisors who (a) understand the risks associated with the use of *leverage*; (b) understand the consequences of seeking investment results on a *daily basis*; (c) understand the risk of *shorting*; and (d) intend to actively monitor and manage their investments on a daily basis."  (2009 Prospectus at 1; FAC ¶60)

Defendants could have included additional warnings about the effects of compounding on its inverse funds similar to the warnings that were included for leveraged funds.  FAC ¶62.  Instead, in the 2009 Prospectus the effects of compounding were referenced in the summary page only of each leveraged fund.  *Id.* n. __.  Moreover, like the 2007 and 2008 Prospectuses, the discussion of compounding in the section "Understanding Compounding and the Effect of Leverage" focuses only on leveraged funds and does not explain how the same issue impacts unleveraged inverse funds.  *Id.*  The Fund continued to disincentivize short-term trading by charging A-Class shareholders as much as a 4.75% up-front load and a 1.00% sales charges for selling shares for certain sales.  2009 Prospectus at 72.

On August 7, 2009, Defendants issued a supplement to the 2009 Prospectus that consisted solely of three graphs added to the "Understanding Compounding and the Effect of Leverage" section.  FAC ¶64.  All three graphs illustrate how leverage and compounding can cause a fund to underperform its benchmark over time.  None of the graphs disclosed how the same is true of an unleveraged inverse fund.  *Id.*

Finally, on November 17, 2009, Defendants issued another supplement to the 2009 Prospectus ("November 2009 Supplement") that for the first time expressly explained that compounding impacts unleveraged inverse funds in a way that makes them appropriate only for short-term trading.  FAC ¶65.  The November 2009 Supplement states, in part:

> "**The Funds generally are intended to be used as short-term trading vehicles. The Funds are not intended to be used by, and are not appropriate for, investors who do not intend to actively monitor and manage their portfolios**.  Each of the Inverse Funds pursues daily investment goals that are inverse to the performance of its benchmark, a result opposite of most mutual funds.  The Daily Leveraged Funds are different from other mutual funds, in that they pursue **daily leveraged** investment goals. The Weakening Dollar 2x Strategy Fund pursues both daily leveraged and daily inverse investment goals.  The Daily Leveraged Funds and Leveraged Funds are riskier than alternatives that do not use leverage, because they magnify the performance of the benchmark on an investment.  **Finally, because the Daily Leveraged Funds and Inverse Funds seek daily leveraged and daily inverse investment results, respectively, the return of a Daily Leveraged or Inverse Fund for a period longer than a full trading day will be the sum of the series of daily leveraged or inverse returns for each trading day during the relevant period.  As a consequence, especially in periods of market volatility, the path or trend of the benchmark during the longer period may be at least as important to the Daily Leveraged Fund's or Inverse Fund's return for the longer period as the cumulative return of the benchmark for the relevant longer period**.  Further, the return for investors that invest for periods of less than a full trading day or for a period different than a trading day will not be the product of the return of the Daily Leveraged Fund's or Inverse Fund's stated goal and the performance of the target index for the full trading day."  (November 2009 Supplement at 1-2; FAC ¶65 (some emphasis added))

**G.     The 2009 Registration Statement Was False And Misleading.**

Although Defendants disclosed more information in the 2009 Prospectus, Paragraph 67 of the FAC alleges that it likewise was false and/or misleading because it still failed to disclose that:

- Inverse correlation between the Fund and the price of the 30-year U.S. Treasury Bond over time would only occur in the rarest of circumstances, and inadvertently if at all;

- Fund performance over time would inevitably diverge on an increasing basis from the inverse of the performance of the price of the 30-year U.S. Treasury Bond; and

- The Fund is unsuitable for investors who plan to hold it for longer than one trading session, particularly in volatile markets;

**H.     The False And Misleading Statements Caused Plaintiff's Losses.**

Because of the undisclosed compounding effect, the Fund failed to deliver the returns investors would expect.  FAC ¶38.  In fact, during the Class Period the Fund lost value, even though the benchmark price of the Treasury Long Bond fell.  For example, between March 20, 2008 and February 22, 2010, the price of the Treasury Long Bond fell by 4.91%.  Due in large part to the compounding effect, the Fund price *fell* over the same period by 11.29%.  *Id.*  Investors lost money over this period despite the fact that they correctly anticipated a decrease in the price of the U.S. Treasuries and invested in a security that promised to increase in value when the price of those securities declined.

**ARGUMENT**

**I.     LEGAL STANDARD.**

**A.     Rule 8(a)(2)'s Notice Pleading Standard Governs This Motion.**

Because the FAC does not allege fraud, the "notice pleading" requirement of Rule 8(a)(2) of the Federal Rules of Civil Procedure governs.  According to Rule 8(a)(2), complaints must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, the Supreme Court held that Rule 8(a) does not require "detailed factual allegations."  550 U.S. 544, 555 (2007).  Rather, a complaint must plead "enough facts to state a claim that is plausible on its face."  *Id.* at 570.

-12-

1    The Supreme Court clarified the contours of the "plausibility" requirement in *Ashcroft v.*

2  *Iqbal*, holding that "[a] claim has facial plausibility when the plaintiff pleads factual content that

3  allows the court to draw the reasonable inference that the defendant is liable for the misconduct

4  alleged." __ U.S. __, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a

5  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

6  unlawfully." *Id.*  Notably, courts cannot at this stage dismiss a complaint simply because it does

7  not *believe* a plaintiff's allegations.  *Twombly*, 550 U.S. at 556 ("'Rule 12(b)(6) does not

8  countenance … dismissals based on a judge's disbelief of a complaint's factual allegations'")

9  (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).  Indeed, even if a complaint "strikes a

10  savvy judge that actual proof of [its] facts is improbable" and "'that a recovery is very remote

11  and unlikely',," all *Twombly* requires is "enough fact to raise a reasonable expectation that

12  discovery will reveal evidence" of wrongdoing.  *Id.*  Plaintiffs must only "nudge[] their claims

13  across the line from conceivable to plausible." *Id.* at 570.

14    **B.    Pleading Requirements For Section 11 and 12(a)(2) Claims.**

15    Section 11 of the Securities Act imposes liability on the issuer of a security, as well as

16  any person who signed the registration statement and/or served as a director of the issuer, if the

17  registration statement: (1) contained an untrue statement of a material fact; (2) omitted to state a

18  required material fact; or (3) omitted to state a material fact necessary to make the statements

19  therein not misleading.  *See* 15 U.S.C. §77k(a).  To establish a *prima facie* case of a Section 11

20  violation, a plaintiff need only show that a prospectus "contained an omission or

21  misrepresentation" and that the "omission or misrepresentation was material . . . ." *In re Daou*

22  *Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citation omitted).   "[L]iability against

23  the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther

24  defendants bear the burden of demonstrating due diligence." *Herman & MacLean v. Huddleston*,

25  459 U.S. 375, 382 (1983) (footnote omitted).

26    Similarly, Section 12(a)(2) imposes liability on anyone who offers or sells a security "by

27  means of a prospectus or oral communication" which includes an untrue statement or omission of

28  a material fact.  15 U.S.C. §77*l*; *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995).  "Section 12(a)(2)

-13-

1   is a virtually absolute liability provision," even for innocent misstatements.  *Miller v. Thane Int'l,*

2   *Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (citation and internal quotation marks omitted).

3          In analyzing whether or not a Prospectus contains false or misleading statements, the

4   Ninth Circuit has recognized that:

5          "[A]n issuer's public statements cannot be analyzed in complete
           isolation. 'Some statements, although literally accurate, can
6          become, through their context and manner of presentation, devices
           which mislead investors. For that reason, the disclosure required by
7          the securities laws is measured not by literal truth, but by the
           ability of the material to accurately inform rather than mislead
8          prospective buyers.'"  (*In re Convergent Techs. Sec. Litig.*, 948
           F.2d 507, 512 (9th Cir. 1991) (quoting *McMahan & Co. v.*
9          *Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)))

10

11         For both Sections 11 and 12(a)(2), a misstatement or omission is material if "it would

12  have misled a reasonable investor about the nature of his or her investment."  *Kaplan v. Rose*, 49

13  F.3d 1363, 1371 (9th Cir. 1994).  An omitted fact is material if "the disclosure of the omitted fact

14  would have been viewed by the reasonable investor as having significantly altered

15  the 'total mix' of information made available."  *Miller*, 519 F.3d at 889 (quoting *Basic Inc. v.*

16  *Levinson*, 485 U.S. 224, 231-32, (1988) (internal quotation marks omitted)).

17         Materiality is a mixed question of law and fact that usually cannot be resolved on a

18  motion to dismiss.  *See Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995).  "The

19  'materiality' of an omission is a fact-specific determination that should ordinarily be assessed by

20  a jury."  *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citation omitted).  Courts

21  should not grant a motion to dismiss on the ground of materiality unless "the adequacy of the

22  disclosure or the materiality of the statement is so obvious that reasonable minds [could] not

23  differ . . . ."  *Fecht*, 70 F.3d at 1081 (citation and internal quotation marks omitted).

24

25

26

27

28

**II.     THE PROSPECTUSES MATERIALLY MISREPRESENTED THE NATURE AND RISKS OF THE FUND.**

    **A.     The Prospectuses Misrepresented The Fund As Appropriate For Investors Who Expected The Price Of The Long Treasury Bond To Decrease Over Time.**

There is no dispute that the Fund is an entirely inappropriate investment vehicle for long-term investing.  Defendants concede that "the Fund's basic nature—the way the Fund inherently must operate and perform" (Mot. at 1) prevents it from correlating with the inverse of the Long Treasury Bond over time.  Defendants further concede that the Fund's intrinsic inability consistently to track the inverse price movements of its benchmark over time is an unavoidable function of mathematical compounding.  *Id.* at 4-5.

Because of this, FINRA warned securities professionals in 2009 that inverse funds typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets.  Korol Decl. Ex. K (Regulatory Notice 09-31); FAC ¶49.  Brokerage firms either stopped selling these kinds of funds to individual investors or sent specific warning to their clients to "[p]roceed with extreme caution."  FAC ¶¶56-57.

After the regulators raised red flags regarding the marketing of inverse funds, Defendants themselves added additional warnings to the Fund's prospectus, cautioning that the Fund was only appropriate for investors who "understand the consequences of seeking investment results on a daily basis" and who "intend to actively monitor and manage their investments on a daily basis."  2009  Prospectus at 1; FAC ¶60.  Finally, on November 19, 2009, Defendants admitted that "[t]he Funds generally are intended to be used as short-term trading vehicles."  Nov. 2009 Prospectus Supplement at 1-2.

Despite all of this, throughout the Class Period, the Prospectuses described and structured the Fund as an appropriate trading vehicle for long-term investors.  In the Fund's "Investor Profile," the Prospectuses state the Fund is appropriate for "[i]nvestors who expect the value of the Long Treasury Bond to go down and want investment gains when it does so."  2007 Prospectus at 16; 2008 Prospectus at 28; 2009 Prospectus at 25; FAC ¶¶39, 40, 59.  Similarly, the

-15-

Fund's 2007 Annual Report states that "[a]n investor benefits from Rydex Inverse Government Long Bond Fund in a rising interest rate environment." 2007 Annual Report at 32.

These statements are false. The Fund's true "investor profile" is investors who expect the value of the Long Treasury Bond to go down *on that day*. Investors only benefit from the Fund over the short term, or if the price of the Long Treasury Bond consistently falls. Over longer periods of time, or with increased volatility, investors eventually will lose money. The Prospectuses failed to inform investors that the Fund is inappropriate for investors who plan to hold it for longer than one trading session or who do not actively monitor and manage their portfolios on a daily basis.[5]

Despite the fact that the Fund is only appropriate as a short-term trading vehicle, Defendants structured the Fund's fees in order to make short-term trading entirely uneconomical. The Fund sells (and Plaintiffs purchased) "A-Class" shares that include up to a 4.75% sales charge. It is difficult to imagine a scenario in which it would make sense to purchase shares with that level of fees attached to it for short-term trading. Instead, by charging A-Class shareholders lower management fees, the up front load is designed to encourage investors hold the shares for years. In fact, it would take eight years for A-Class investors to recoup the costs of the up-front 4.75% sales charge through lower management fees. However, over that time-frame, the compounding effect is likely to have ensured that the investor will have lost money. The A-Class shares are literally inappropriate for anyone.

At the same time, the Fund affirmatively discourages investors from selling shares for at least a year. The Prospectuses warn that certain A-Class investors must pay a "1.00% contingent deferred sales charge" for sales within 18 months of purchase. *See, e.g.*, 2008 Prospectus at 74 n.4. All C-Class investors likewise must pay a 1.00% deferred sales charge for sales within a year of purchase. *See, e.g., id.* at 74 n.3. These disincentives to sell shares are entirely inconsistent with Defendants' belated admission that the Fund is only appropriate as a short-term

---

[5]The 2009 Prospectus contained the same affirmative misstatements as the 2007 and 2008 Prospectuses. However, the 2009 Prospectus did warn investors that the Fund was only appropriate for investors who monitored the Fund on a daily basis.

PLTFS' OPP TO RYDX DEFENDANT'S MOTION TO DISMISS                    No. 10 CV 01171 LHK

1    trading vehicle.  Defendants cannot legitimately claim that the Fund was designed to be a short-

2    term trading vehicle while simultaneously punishing investors for undertaking short-term trading.

3         Finally, the Prospectuses, without any warnings regarding the short-term nature of the

4    investment, tout the Fund's returns over a period of years.  Through this unqualified inclusion of

5    this information in the Prospectuses, Defendants clearly implied that the Fund was a proper

6    vehicle for long-term investing.  Taken together, the statements in the Prospectuses together with

7    the fee structure of the Fund and the omitted information that the Fund was only appropriate for

8    short-term investors, amounted to "'devices which mislead investors.'"  *In re Convergent Tech.*

9    *Sec. Litig.*, 948 F.2d at 512 (quoting *McMahan & Co.*, 900 F.2d at 579).

10

11        **B.    The Prospectuses' Misstatements And Omissions Regarding The
                  Appropriateness Of The Fund Are Material.**

12        Because of the misstatements and omissions regarding whom the Fund was appropriate

13   for, the Prospectuses "would have misled a reasonable investor about the nature of his or her

14   investment."  *Kaplan*, 49 F.3d at 1371.  The omitted fact—that the Fund was only appropriate as

15   a short-term trading vehicle—is material because "the disclosure of the omitted fact would have

16   been viewed by the reasonable investor as having significantly altered the 'total mix' of

17   information made available."  *Miller*, 519 F.3d at 889 (quoting *Basic Inc.*, 485 U.S. at 231-32)

18   (internal quotation marks omitted)).

19        Defendants mistakenly assert that the omission of the fact that the Fund was suitable only

20   for short-term investors who actively manage their portfolios on a daily basis is not actionable

21   because there was no statutory or other obligation that "required the disclosures to be included in

22   the prospectus."  Mot. at 23-24.  This argument ignores the fact that Defendants voluntarily took

23   on the obligation to describe whom the Fund is intended for.  The Investor Profile states that the

24   Fund is appropriate for "[i]nvestors who expect the value of the Long Treasury Bond to go down

25   and want investment gains when it does so."  2007 Prospectus at 16; 2008 Prospectus at 28; 2009

26   Prospectus at 25; FAC ¶¶39, 40, 59.

27        Defendants identified an investor profile, promised that investors would benefit from the

28   Fund in a rising interest rate environment and put in place a fee structure that penalized investors

-17-

1   for using the Fund as a short-term trading vehicle.  Having done all of that, Defendants cannot

2   now disclaim any responsibility for accurately stating the appropriate use of and investors for the

3   Fund.  "[U]pon choosing to speak, one must speak truthfully about material issues."  *Caiola v.*

4   *Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

5          Defendants also argue that the information in the Prospectuses regarding annual returns

6   and fees cannot be materially misleading because SEC regulations required the Fund to make

7   such disclosures.  Mot. at 18.  This argument misses the point.  Nothing required the Fund to

8   charge a high up-front load or a deferred charge for sales within 18 months or one year.  By

9   including such fees, Defendants actively discouraged short term trading despite the fact that, as

10  everyone (including Defendants) now acknowledge, the Fund is only appropriate as a short-term

11  trading vehicle.  Moreover, the fact that the SEC requires prospectuses to contain information

12  about a fund's returns over longer periods of time does not excuse a presentation that misleads

13  investors about the propriety of holding shares of the Fund long-term.  Defendants could have

14  included in earlier prospectuses the cautionary language that it added in November 2009:  "The

15  Funds generally are intended to be used as short-term trading vehicles."  November 2009

16  Supplement at 1.  Their failure to include this statement and other warnings regarding

17  compounding, in light of the affirmative statements regarding who the Fund is intended for and

18  the fee structure that penalized short-term trading, made the Prospectuses materially misleading.

19

20  **III.    THE PROSPECTUSES' STATEMENTS REGARDING THE COMPOUNDING
         EFFECT ARE MATERIALLY MISLEADING.**

21      **A.    The Prospectuses Did Not Adequately Disclose The Compounding Effect As
            It Relates To The Fund.**

22

23          The FAC also alleges that the Prospectuses failed adequately to disclose the impact that

24  the compounding effect would have on the Fund's returns over time.  The Prospectuses did not

25  disclose that beyond one-day periods the Fund would not correspond to the inverse of

26  movements in the price of the Long Treasury Bond, that over time the Fund would inevitably

27  diverge from its benchmark, and that the compounding effect increases with volatility.  FAC

28  ¶¶46-47.

1     Defendants do not dispute that compounding necessarily has these effects on the Fund's

2  performance, nor could they.  Securities regulators warned investors of these facts in the Summer

3  of 2009, when FINRA issued a notice stating that because of compounding, a fund's

4  "performance over longer periods of time can differ significantly from the performance (or

5  inverse of the performance) of their underlying index or benchmark during the same period of

6  time," and that "[t]his effect can be magnified in volatile markets."  Korol Decl. Ex. K; FAC ¶49.

7  By November 2009, Defendants themselves acknowledged this, stating in a prospectus

8  supplement that for inverse funds the return "will be the sum of the series of daily . . . inverse

9  returns for each trading day during the relevant period" and that "in periods of market volatility,

10  the path or trend of the benchmark during the longer period" can be as important to the Fund's

11  return "for the longer period as the cumulative return of the benchmark for the relevant longer

12  period."  November 2009 Supplement at 1; FAC ¶65.

13     Disclosure of these risks by the regulators and Defendants only after the fact is the

14  strongest possible evidence that the Prospectuses were false and misleading in ways that truly

15  mattered.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y.

16  2009) (denying motion for summary judgment where cautionary language in prospectus and

17  registration statement failed to disclose specific material risks).[6]

18

19

20

21  _____

22     [6]Defendants argue that courts cannot even consider subsequent disclosures in determining
whether a prior prospectus was misleading.  Mot. at 22 n.22.  Defendants do not cite any
controlling authority for this proposition.  Moreover, the cases that Defendants do cite are
23  inapposite.  In *Denny v. Barber*, the court refused to consider the later disclosures because it
constituted "fraud by hindsight."  576 F.2d 465, 470 (2d Cir. 1978) ("[G]reater clairvoyance in
24  1973 might have led to a realization that foreign governments and enterprises might encounter
difficulties . . .").  No such clairvoyance was necessary here, as the compounding effect always
25  was present.  The other two cases cited by Defendants relied on Federal Rule of Evidence 407.
*Malone v. Microdyne Corp.*, 26 F.3d 471, 480 (4th Cir. 1994) ("[S]ubsequent measures is not
26  admissible 'to prove negligence or culpable conduct in connection with the event'"); *Krouner v.
American Heritage Fund, Inc.*, 899 F. Supp. 142, 147 (S.D.N.Y. 1995).  Claims under Sections
27  11 and 12(a)(2) do not require proof of negligence or culpable conduct and the subsequent
disclosures are not cited for that purpose.  Instead, they demonstrate that the prior disclosures
28  were inadequate.

**B.     The Prospectuses' Boilerplate Statements Regarding The Compounding Effect Did Not Disclose The Risks Faced By Investors In The Fund.**

Vague, boilerplate disclosures are insufficient to warn investors of existing risks.  The "bespeaks caution" doctrine that Defendants rely on here applies only to affirmative, forward-looking statements and not statements about "present factual conditions."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997).  The statements regarding the compounding effect are not about the future, but rather a description of the present status of the Fund.  In other words, the Prospectuses "made distinct claims about the posture of the Fund[s], [their] investment strategies and the rules under which [they] would operate."  *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 92 (D. Mass. 2010).  Prospectuses either must disclose the facts as they exist or, as here, they are materially misleading.

Moreover, courts do not allow generic warnings to cure otherwise misleading statements.  "[V]ague, boilerplate language in the prospectuses warning that the Fund is not guaranteed to meet its goals did not disclose the risky nature of the Fund's investments with sufficient clarity as to 'bespeak caution . . . .'"  *Id*. at 93 (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 729 (2d Cir. 1998)).  The statement that compounding may affect an investor's returns over time is precisely the kind of boilerplate that courts find inadequate.

Defendants point to four categories of statements in the Prospectuses and annual reports that they claim render the Prospectuses not materially misleading.  These selectively quoted or affirmatively misquoted statements individually and collectively failed to disclose either the implications of the compounding effect on inverse funds or how the compounding effect makes the Fund entirely inappropriate for long term investors.

**1.     Statement That Fund Tracks On A "Daily Basis" Is Insufficient.**

First, Defendants argue that a "reasonable investor" would understand that the Fund's goal of tracking its benchmark on a "daily basis" is "inconsistent with a goal of matching the inverse of the benchmark" over longer periods of time.  Mot. at 16.  However, there is nothing obvious about the fact that an unleveraged inverse fund that tracks the inverse of a benchmark on a daily basis will fail to do so for longer periods of time.  In fact, it is clear that investors were not

-20-

1    aware of this feature of the Fund.  In 2009, FINRA, the SEC and large brokerage firms were so

2    concerned that even brokers did not understand how inverse funds worked that they had to

3    specifically warn them of the impact of compounding.

### 2.    Disclosure Regarding "Tracking Error" Is Insufficient.

5           Second, Defendants argue that the Prospectuses' disclosures relating to "Tracking Error

6    Risk" make clear the compounding effect.  Mot. at 16.  Defendants are incorrect.  This disclosure

7    merely says that because this Fund and other Rydex funds track a benchmark on a daily basis,

8    "mathematical compounding *may* prevent a Fund from correlating with the monthly, quarterly,

9    annual or other period performance of its benchmark."  *See, e.g.*, 2007 Prospectus at 37

10   (emphasis added); FAC ¶42.  The disclosure does not state what everyone now concedes—that

11   mathematical compounding makes it impossible for the Fund to track the benchmark over time.

12          Defendants argue that the distinction between the statement that the Fund "may not" and

13   "cannot" track the benchmark is "after-the-fact nitpicking."  Mot. at 19.  Courts do not agree with

14   this assessment.  The Ninth Circuit has held that "'[t]o warn that the untoward may occur when

15   the event is contingent is prudent; to caution that it is only possible for the unfavorable events to

16   happen when they have already occurred is deceit.'"  *In re Convergent Techs. Sec. Litig.*, 948

17   F.2d 507, 515 (9th Cir. 1991) (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544

18   (5th Cir. 1981)).  Put differently, "'[t]he doctrine of bespeaks caution provides no protection to

19   someone who warns his hiking companion to walk slowly because there might be a ditch ahead

20   when he knows with near certainty that the Grand Canyon lies one foot away.'"  *Rombach v.*

21   *Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (quoting *In re Prudential Sec. Inc. P'ships Litig.*, 930 F.

22   Supp. 68, 72 (S.D.N.Y. 1996).  That the Fund would not track over time was not contingent, it

23   was a certainty.  It was not a future possibility, it was a present reality.  Therefore, the statement

24   that compounding "may" cause the Fund not to correlate with the benchmark provides

25   Defendants no protection.[7]

26   _____

27          [7]The cases cited by Defendants in support of this argument from this District are
     inapposite.  *In re Leapfrog Enterprises, Inc. Securities Litigation* dealt with alleged securities
     fraud violations under Section 10(b) of the Exchange Act and therefore was subject to the
     heightened pleading standards under FRCP 9(b).  527 F. Supp. 2d 1033, 1037 (N.D. Cal. 2007).

28   *Zeid v. Kimberley* likewise alleged Section 10(b) violations that subjected it to the heightened

This disclosure also was inadequate because it failed to inform investors of the magnitude of the risk that they faced by holding the Fund long term.  *See, e.g., Credit Suisse First Boston Corp. v. ARM Fin. Group*, 2001 U.S. Dist. LEXIS 3332, at *23 (S.D.N.Y. Mar. 28, 2001) ("[W]arnings of specific risks like those in the ARM Prospectus do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986 (E.D. Wis. 2002) ("[B]oilerplate language which warns generally that 'junk bonds' involve greater risks and limited liquidity . . . are inadequate to support a motion to dismiss").

### 3.    Note On Compounding Dealt Solely With Leverage.

Third, Defendants assert that the Prospectuses' note on "Understanding Compounding & The Effect Of Leverage" (*see, e.g.*, 2007 Prospectus at 67) adequately disclosed the compounding effect.  However, this note only related to Defendants' leveraged funds.

While the use of an omnibus prospectus for many different funds might make it difficult to see what information applies to which fund, that this additional discussion of compounding relates solely to leveraged funds is clear from the title of the note:  "Understanding Compounding and *the Effect of Leverage*."  Moreover, while the summary pages for the leveraged funds tell investors "[f]or more information about the effects of leverage, please see 'Understanding Compounding and the Effect of Leverage,'" investors in the Fund and other non-leveraged funds were not directed to the note on compounding and leverage.  *Compare* 2007 Prospectus at 9 (summary page for Russell 2000 1.5x Strategy Fund), *with* 2007 Prospectus at 16 (summary page for the Fund).

In order to claim that the note applies to unleveraged funds, Defendants misquoted the relevant language so as to omit the discussion of leverage.  Defendants claim that the note says:

---

pleading standard.  930 F. Supp 431, 433 (N.D. Cal. 1996).  As the *Zeid* court explained, under FRCP 9(b), "a plaintiff does not state a claim for securities *fraud* merely by asserting that a company's revelation of bad news means that 'earlier, cheerier' statements must have been false."  *Id.* at 434 (emphasis added).

> "[T]he warning that a 'cumulative percentage increase or decrease in the net asset value of a fund may diverge significantly from the cumulative percentage increase or decrease in the fund's benchmark due to the compounding effect of losses and gains' clearly applied to all of the Trust's benchmark funds."  (Mot. at 21)

The actual discussion (including the bolded text omitted by Defendants) clearly limits the discussion to the effects of leverage:

> "The examples demonstrate that over time, the cumulative percentage increase or decrease in the net asset value of a fund may diverge significantly from the cumulative percentage increase or decrease in the **multiple of the return of the index underlying a** fund's benchmark due to the compounding effect of losses and gains on the returns of the fund."  (2007 Prospectus at 67 (emphasis added))

The "multiple of the return" is simply another way to describe the effect of leverage.

Even in this note, the Prospectuses failed to warn investors that the fact that the compounding effect made the (unleveraged but inverse) Fund inappropriate for investors who sought to invest for periods longer than a single day.

### 4.    Returns Listed In Annual Reports Do Not Disclose Compounding Effect.

Finally, Defendants assert that because the annual reports show that "over time the cumulative returns of the Fund did not come close to matching the inverse of the cumulative price movement of the Long Treasury Bond" it is clear that the Fund could not track inversely to the benchmark over time.  Mot. at 17.  This argument misstates both the facts and the law.

Nothing in the annual reports' historical returns indicates that the reason that the Fund failed to track over these time frames is due to compounding.  Indeed, in describing "tracking error," the Prospectuses list many other possible reasons why the Fund could fail to track over time, including "Fund expenses, imperfect correlation between the Fund's investments and those of its benchmark, rounding of share prices, changes to the benchmark, regulatory policies, high portfolio turnover rate and leverage . . . ."  2007 Prospectus at 37; FAC ¶42.  A reasonable investor looking at the historical returns would not be able to isolate compounding as the reason that the Fund would fail to perform as expected.

-23-

Information contained in annual reports cannot cure misrepresentations contained in a prospectus as "investors are not generally required to look beyond a given document to discover what is true and what is not."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *see In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public").  In *Miller*, The Ninth Circuit held that courts should "not presume or require that investors independently seek out prior versions of SEC filings . . . ."  519 F.3d at 887.  Likewise, investors should not be required to seek out historical returns in annual reports to determine whether or not a prospectus is accurate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Rydex Defendants' motions to dismiss First Amended Complaint.

Dated: November 8, 2010

Respectfully submitted,

ALAN W. SPARER
MARC HABER
KEVIN H. LEWIS
JAMES S. NABWANGU
SPARER LAW GROUP

By:  _____
         */s/ Alan W. Sparer*
         ALAN W. SPARER

Attorneys for RYDEX LITIGATION GROUP