ALAN W. SPARER (No. 104921)
MARC HABER (No. 192981)
KEVIN H. LEWIS (No. 197421)
JAMES S. NABWANGU (No. 236601)
SPARER LAW GROUP
100 Pine Street, 33rd Floor
San Francisco, California  94111-5128
Telephone:      415/217-7300
Facsimile:      415/217-7307
asparer@sparerlaw.com
mhaber@sparerlaw.com
klewis@sparerlaw.com
jnabwangu@sparerlaw.com

Attorneys for RYDEX LITIGATION GROUP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES RAFTON, TRUSTEE OF THE JAMES AND CYNTHIA RAFTON TRUST,<br><br>Plaintiff,<br><br>v.<br><br>RYDEX SERIES FUNDS; PADCO ADVISORS INC. d/b/a RYDEX INVESTMENTS, INC.; RYDEX DISTRIBUTORS, INC.; RICHARD M. GOLDMAN; CARL G. VERBONCOEUR; JOHN O. DEMARET; NICK BONOS; MICHAEL P. BYRUM; COREY A. COLEHOUR; J. KENNETH DALTON; WERNER E. KELLER; THOMAS F. LYDON; PATRICK T. MCCARVILLE; ROGER SOMERS; and DOES 1 through 25, inclusive,<br><br>Defendants. | No. 10 CV 01171 LHK<br><br>Action Filed:  March 19, 2010<br><br>PLAINTIFFS' OPPOSITION TO INDEPENDENT TRUSTEES' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT<br><br>Date:      December 16, 2010<br>Time:      1:30 p.m.<br>Dept:      Courtroom 4, 5th Floor<br>Judge:     Hon. Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES TO BE DECIDED

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

ARGUMENT .......... 2

I.   PLAINTIFFS' SECTION 11 AND 12 CLAIMS ARE TIMELY. .......... 2

    A.   The Ninth Circuit's Inquiry Notice Standard. .......... 3

    B.   Information In The Registration Statement Did Not Put Plaintiffs On Notice Of the Problems With Mathematical Compounding. .......... 4

    C.   Charts In The Fund's Annual Reports Did Not Put Plaintiffs On Notice Of The Problems With Mathematical Compounding. .......... 8

    D.   Discussions In Trade Publications Were Likewise Insufficient To Put Investors On Notice Of The Inherent Problems With The Fund. .......... 9

    E.   Investors Could Not Reasonably Have Become Aware Of The Misstatements And Omissions Until The Summer Of 2009. .......... 11

II.   PLAINTFFS ARE NOT REQUIRED AFFIRMATIVELY TO PLEAD LOSS CAUSATION AND MUTUAL FUNDS ARE NOT IMMUNE FROM THE SECURITIES ACT. .......... 12

III.   PLAINTIFFS ADEQUATELY PLEAD SECTION 15 "CONTROL PERSON" CLAIMS UNDER THE SECURITIES ACT. .......... 15

IV.   THE COURT HAS JURISDICTION OVER THE CLAIMS AGAINST THE INDEPENDENT TRUSTEES ARISING OUT OF THE 2009 REGISTRATION STATEMENT. .......... 18

V.   THE COURT HAS JURISDICTION OVER THE CLAIMS AGAINST THE INDEPENDENT TRUSTEES ARISING OUT OF THE FUND'S ADVISOR, INVESTOR AND C-CLASS SHARES. .......... 20

CONCLUSION .......... 21

-i-

### TABLE OF AUTHORITIES

**CASES**                                                                                    **Page**

*Betz v. Trainer Wortham & Co. Inc.*, 519 F.3d 863 (9th Cir. 2008)                    3, 4, 6, 8, 9, 11

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)                                          13

*Hicks v. Morgan Stanley & Co.*, 2003 U.S. Dist. LEXIS 11972                               19, 20
(S.D.N.Y. July 16, 2003)

*Horne v. Flores*, __ U.S. __, 129 S. Ct. 2579 (2009)                                        19

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000)                              16, 17

*Guenther v. Cooper Life Scis., Inc.*, 1992 U.S. Dist. LEXIS 22601                           10
(N.D. Cal. Apr. 7, 1992)

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004)                            13

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005)                           18

*In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192                           10
(S.D.N.Y. 2004)

*In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009)              4, 12, 13, 14, 18

*In re Charles Schwab Corp. Sec. Litig.*, 2010 U.S. Dist. LEXIS 34553 (N.D. Cal.         14, 15
Apr. 8, 2010)

*In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328 (N.D. Cal. 1985)                       17

*In re DDi Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 1056 (C.D. Cal. Jan. 7, 2005)     4, 20, 21

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 258 F. Supp. 2d 576                       18
(S.D. Tex. 2003)

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 2010 U.S. Dist.                14
LEXIS 31360 (D. Mass. Mar. 31, 2010)

*In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562                       13
(S.D.N.Y. 2009)

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008), *cert. denied*, __ U.S.     13
__, 129 S. Ct. 1993 (2009)

*In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584 (N.D. Cal. 2009)            2, 19, 20, 21

*In re LDK Solar Sec. Litig.*, 2008 U.S. Dist. LEXIS 80717     2, 16
(N.D. Cal. Sept. 24, 2008)

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001)     18

*In re Merck & Co., Inc. Sec. Deriv. & "ERISA" Litig.*, 543 F.3d 150     4
(3d Cir. 2008)

*In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741 (D. Md. 2008)     13, 14

*In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004)     13

*In re Salomon Smith Barney Muual Fund Fees Litigation*, 441 F. Supp. 2d 579     15
(S.D.N.Y. 2006)

*In re Thornburg Mortgage, Inc. Securities Litigation*, 683 F. Supp.2d 1236     19, 20
(D.N.M. 2010)

*In re Wells Fargo Mortg. Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 39825     4, 20
(N.D. Cal. Apr. 22, 2010)

*In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009)     15

*Lewis v. Straka*, 2006 U.S. Dist. LEXIS 76716 (E.D. Wis. Oct. 12, 2006)     18

*Luksch v. Latham*, 675 F. Supp. 1198 (N.D. Cal. 1987)     10

*McGonigle v. Combs*, 968 F.2d 810 (9th Cir. 1992)     15

*N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119 (D. Kan. 2004)     18

*Reese v. Malone*, 2009 U.S. Dist. LEXIS 15774 (W.D. Wash. Feb. 27, 2009)     16

*Rochelle v. Marine Midland Grace Trust Co. of N.Y.*, 535 F.2d 523 (9th Cir. 1976)     11

*SEC v. Mozilo*, 2009 U.S. Dist. LEXIS 104689 (C.D. Cal. Nov. 3, 2009)     9

*Siemers v. Wells Fargo & Co.*, 2007 U.S. Dist. LEXIS 21935     13
(N.D. Cal. Mar. 9, 2007)

*Smith v. Suprema Specialties, Inc.*, 2007 U.S. Dist. LEXIS 30001     13
(D.N.J. Apr. 23, 2007)

Staehr *v. Hartford Fin. Servs. Group*, 547 F.3d 406 (2d Cir. 2008)     10

*Sterlin v. Biomune Sys.*, 154 F.3d 1191 (10th Cir. 1998)     4

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 690 F.     16
Supp. 2d 959 (D. Ariz. 2010)

TABLE OF AUTHORITIES

## STATUTES & RULES

15 U.S.C.
      §77k                                            13
      §77*l*                                         13
      §77m                                      2, 3
      §77o                                       16

Securities Act of 1933
      §§11, 12(a)(2), 15                   1
      §§11, 12                            2, 16
      §§11, 12(a)(2)                 13, 19
      §15                                 2, 15, 16

Securities Exchange Act of 1934 §10(b)      4, 15

17 C.F.R. §230.405                     17

Fed. R. Civ. P.
      8(a)                                       16
      12(b)(6)                   4, 13, 16, 18

TABLE OF AUTHORITIES

## STATEMENT OF THE ISSUES TO BE DECIDED

1.      Would a reasonable investor have discovered Defendants' misstatements and omissions regarding the Fund's investment objective and the effects of mathematical compounding on the Fund's performance from information in the Funds' Registration Statements, Prospectuses and Annual Reports, making Plaintiffs' Section 11 and 12(a)(2) claims time-barred?

2.      Would a reasonable investor have discovered Defendants' misstatements and omissions regarding the Fund's investment objective and the effects of mathematical compounding on the Fund's performance from information in certain newspaper articles cited by Defendants?

3.      Are Plaintiffs required to allege loss causation?

4.      Do Plaintiffs allegations—that the Fund wrongfully concealed the effect of mathematical compounding for long term holders of the Fund's shares and that their misrepresentations and omission caused Plaintiffs' losses—defeat Defendants' loss-causation defense?

5.      Are the Trustees "control persons" for purposes of Section 15 liability given their authority and control over the issuer and the Fund?

6.      Do Plaintiffs, who purchased A-Class shares pursuant the 2007 and 2008 Registration Statements and Prospectuses, have standing to pursue claims on behalf of purchasers of shares offered pursuant to the 2009 Registration Statement and Prospectus and purchasers of other classes of shares?

**INTRODUCTION**

Plaintiffs bring this class action against the Fund, its Investment Advisor and its underwriter for making untrue statements and omissions of material fact in the Prospectuses in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.  Plaintiffs allege that Defendants' 2007, 2008 and 2009 Prospectuses violated federal securities laws because they falsely stated that the Fund was designed for investors who anticipate that the price of the 30-Year U.S. Treasury Bond (the "Long Treasury Bond") would go down as interest rates rise.  However, because of an undisclosed mathematical compounding effect, the Fund did not and could not track the inverse price movements of its benchmark for periods longer than a single day.

Plaintiffs also bring claims against eleven individuals named for their roles as members of the Board of Trustees of the Fund, and who were responsible for preparing the Registration Statements and Prospectuses at issue, filing those documents with the SEC, and disseminating those documents to investors in the Fund.  First Amended Complaint ("FAC") ¶9.  This opposition addresses the motion to dismiss filed by these eleven "Individual Trustees"—each of whom was also responsible for oversight and corporate governance of the Fund.  FAC ¶92.  As more fully discussed below, the arguments offered by the Individual Trustees are without merit.

*First*, Plaintiffs' claims are not time-barred under the applicable Ninth Circuit inquiry notice standard.  Discussion of the effect of compounding and leverage in the Prospectuses did not relate to the Fund and therefore could not have placed a reasonably diligent investor on notice.  It is also clear from notices issued by securities regulators that investors and even securities professionals did not understand how compounding affected leveraged and inverse funds.  In July 2009, FINRA and the SEC warned investors and investment professionals about the impact of compounding with regard to investments such as the Fund.  Charts showing the annual performance of the Fund likewise do not put investors on notice, because they do not address Defendants' material misstatements and omissions, and do not explain the deviation between the Fund's price and the movement in the price of the Long Treasury Bond.  Finally, the

PLTFS' OPP TO INDEPENDENT TRUSTEES' MOTION TO DISMISS        No. 10 CV 01171 LHK

press reports cited by Defendants were not "mainstream reports" and were insufficient to trigger inquiry notice for a reasonably diligent investor.

*Second*, Defendants repeat a loss causation argument that has been rejected by every court to have considered it: that because mutual fund shares are based on the value of the fund's assets, the revelation of misleading statements cannot cause a plaintiff's losses. Although Plaintiffs are not required to plead loss causation the First Amended Complaint ("FAC or "Complaint") adequately does so. The subject of the Prospectuses' misstatements—the non-disclosure of the compounding effect and the inappropriateness of the Fund for long term investors—caused the actual losses suffered.

*Third*, the FAC adequately alleges that the Trustees are "control persons" for the purposes of Section 15 liability. At the pleading stage, general allegations that individual defendants are senior executives and signed the prospectus suffice. *In re LDK Solar Sec. Litig.*, 2008 U.S. Dist. LEXIS 80717, at *39 (N.D. Cal. Sept. 24, 2008). The Complaint alleges this in sufficient detail to satisfy Rule 8(a).

*Fourth*, Plaintiffs have standing to pursue claims on behalf of purchasers under the 2009 Registration Statement, and the Fund's Advisor, Investor and C-Class Shares. Where a Plaintiff alleges a common course of conduct and a unitary legal theory for an entire class period, trial courts in this district have found that such a plaintiff has standing to pursue claims on behalf of purchasers of other securities of the issuer. *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009).

### STATEMENT OF FACTS

To avoid duplication, Plaintiffs incorporate the statement of facts set forth in Plaintiffs' Opposition to the Rydex Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint filed herewith.

### ARGUMENT

### I.   PLAINTIFFS' SECTION 11 AND 12 CLAIMS ARE TIMELY.

The initial action brought by Plaintiffs against the Fund was filed on March 19, 2010. Claims under the Securities Act 1933 must be brought within "one year after the discovery of the

PLTFS' OPP TO INDEPENDENT TRUSTEES' MOTION TO DISMISS        No. 10 CV 01171 LHK

1   untrue statement or the omission, or after such discovery should have been made by the exercise

2   of reasonable diligence . . . ."  15 U.S.C. §77m.  In no event may claims under the Securities Act

3   be filed later than three years after the public offering or sale of the security.  *Id*.  Therefore in

4   order to prevail on this motion to dismiss, Defendants must establish that investors exercising

5   reasonable diligence should have discovered that the Fund's Registration Statements and

6   Prospectuses included misrepresentations about the Fund's investment objective and the effects

7   of mathematical compounding on long term holders of the Fund's shares before March 19, 2009.

8   Defendants fail to make such a showing.

9           **A.**     **The Ninth Circuit's Inquiry Notice Standard.**

10        Under settled Ninth Circuit law, "*the defendant bears a considerable burden in*

11  *demonstrating* that the plaintiff's claim is time barred."  *Betz v. Trainer Wortham & Co. Inc.*, 519

12  F.3d 863, 871 (9th Cir. 2008) (emphasis added).  To assess inquiry notice, the Ninth Circuit

13  applies an "inquiry-plus-reasonable-diligence" test.  "[I]nquiry notice triggers an investor's duty

14  to exercise reasonable diligence" and the "statute of limitations period begins to run once the

15  investor, in the exercise of reasonable diligence, should have discovered the facts underlying the

16  alleged fraud."  *Id*. at 870 (citation and internal quotation marks omitted).  The first prong,

17  "inquiry notice," is satisfied when: "there exists sufficient suspicion of fraud to cause a

18  reasonable investor to investigate the matter further ….  The facts constituting inquiry notice

19  must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere

20  suspicion . . . to incite the victim to investigate."  *Id*. at 871 (citation and internal quotation marks

21  omitted).

22        If the investor was on inquiry notice, courts then ask whether the investor, in the exercise

23  of reasonable diligence, should have discovered the facts constituting the alleged fraud.  This is

24  an objective standard.  *Id*.  The Ninth Circuit has instructed, however, that "[t]he question of

25  what a reasonably prudent investor should have known is particularly suited to a jury

26  determination" and that "the defendant bears a considerable burden in demonstrating, *at the*

27

28

-3-

*summary judgment stage*, that the plaintiff's claim is time barred."[1]  *Id*. at 871-72 (emphasis added; citation and internal quotation marks omitted).  The burden must be at least as high when a court considers a motion to dismiss.  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 557 (N.D. Cal. 2009) (applying *Betz* and declining to find that Section 11 claims were untimely); *In re DDi Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 1056, at *51 (C.D. Cal. Jan. 7, 2005) ("Defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law" and "inquiry notice [may be found on a Rule 12(b)(6) motion to dismiss] only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct") (citation and internal quotation marks omitted).[2]

**B.    Information In The Registration Statements Did Not Put Plaintiffs On Notice Of The Problems With Mathematical Compounding.**

Defendants incorrectly argue that the misrepresentations and omissions alleged in the FAC were so obvious and the statements were so clearly false that Plaintiffs should have commenced suit much sooner than March 19, 2009.  Mot. at 2-6.  In support of this argument, Defendants claim that "the Registration Statements and Prospectuses, themselves, thoroughly disclosed the very statements about which Plaintiffs complain."  *Id*. at 3.  Specifically, Defendants argue that the Registration Statements and Prospectuses were "replete with language explaining the effect of compounding" and that the documents emphasized that the "'Fund's

---

[1]The Ninth Circuit's finding in *Betz* was in the context of a summary judgment motion in a Section 10(b) case.

[2]Courts in other districts also have cautioned against encouraging the premature filing of securities actions by broadly interpreting the inquiry notice standard.  *See, e.g., In re Merck & Co., Inc. Sec. Deriv. & "ERISA" Litig.*, 543 F.3d 150, 164-65 (3d Cir. 2008); *see also Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202 (10th Cir. 1998) ("[T]he applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims").  Moreover, as at least one court in the Ninth Circuit has observed, the statute of limitations defense is fact-intensive and is generally not appropriate for consideration at the pleading stage.  *In re Wells Fargo Mortg. Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 39825, at *23, *26-*27 (N.D. Cal. Apr. 22, 2010).

objective [was] to perform, on a daily basis, exactly opposite its benchmark.'" Mot. at 3 (emphasis omitted). This argument fails.

*First*, contrary to Defendants' assertions, the discussion of the effects of compounding and leverage in the Prospectuses did not relate to the Fund. As alleged in the FAC, Defendants issued the 2007, 2008 and 2009 Registration Statements for the Inverse Long Bond Fund as part of an omnibus document that covered dozens of funds with entirely different objectives and risks, and that totaled over 900 pages. FAC ¶¶44, 62. While a discussion of the effects of compounding and leverage was referenced in the portions of the prospectuses relating to each of the funds utilizing leverage, this discussion was not referenced in relation to the Inverse Long Bond Fund. *Id*. For example, the summary page for the Russell 2000 1.5x Strategy Fund states "For more information about the effects of leverage, please see 'Understanding Compounding and *the Effect of Leverage*.'" 2007 Prospectus at 9 (emphasis added). The summary page for the Fund contains no such reference. It is also clear that this additional discussion of compounding related solely to leveraged funds, inasmuch as the section itself is entitled "Understanding Compounding and *the Effect of Leverage*." 2007 Prospectus at 67 (emphasis added). Not unsurprisingly, this additional discussion focused on compounding as an effect of leverage:

> "UNDERSTANDING COMPOUNDING & THE EFFECT OF LEVERAGE
>
> "It is important to understand the effects of compounding when investing in any mutual fund, especially funds that use leverage as part of their investment strategy. **The impact of leverage on a fund will generally cause the fund's performance to not match the performance of the index underlying the fund's benchmark over a period of time greater than one day.**" (*Id*. (emphasis added))

Accordingly, while the Defendants warned investors in certain leveraged Rydex funds of the risks of compounding, the Fund's Prospectus failed to put reasonably diligent investors on notice of those compounding risks inherent in investing in the Fund, which was an inverse and not a leveraged Rydex product.

*Second*, the disclosures regarding the Fund's "principal investment strategy" were insufficient to put a reasonable investor on inquiry notice when read in the context of the Fund's disclosures regarding the Fund's Objective and Investor Profile, and in the context of how the Fund was marketed.  Although Defendants note that the Principal Investment Strategy stated that the objective of the Fund is to "'perform, *on a daily basis*, exactly opposite the daily price movement of the Long Treasury Bond'" (Mot. at 3), this statement does not explain that the Fund's shares are correspondingly inappropriate to hold for periods longer than a single trading session.  Moreover, understanding products such as the Fund, and the effects of mathematical compounding is not trivial or obvious.  Stating that the Fund's principal investment strategy is to perform, on a daily basis, exactly opposite an index, tells nothing to reasonable investors other than announcing how the Fund intends to meet its Investment Objective.  *Betz*, 519 F.3d at 871 ("The facts constituting inquiry notice must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion . . . to incite the victim to investigate") (citation and internal quotation marks omitted).   In other words, there is nothing obvious to the average investor when he or she reads the phrase "on a daily basis" that would cause that investor to suspect that the Fund would fail meet its investment objective the longer its shares are held.

In fact, it is clear that the securities regulators understood that investors and even securities professionals did not understand how compounding affects leveraged and inverse funds.  As noted by FINRA in its July 2009 alert to investment professionals: "'Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products, and the marketing and sale of these products to unsophisticated investors is very much on FINRA's radar screen.'"  FAC ¶50.  After the regulator raised red flags regarding the marketing of inverse funds, Defendants themselves added additional warnings to the Fund's prospectuses, cautioning that the Fund was only appropriate for investors who "understand the consequences of seeking investment results on a daily basis" and who "intend to actively monitor and manage their investments on a daily basis."  2009 Prospectus at 1; FAC ¶60.  That Defendants felt the need to supplement their disclosures is further evidence that a reasonable investor was not on notice that their original disclosures were insufficient.

*Third*, Defendants' misrepresentations and omissions regarding compounding were even harder to discern because throughout the Class Period, Defendants actively marketed the Fund to investors as a way to take advantage of the anticipated decline in Long Treasury Bond prices over time.  The Fund's Investment Objective in each Prospectus was "to provide total returns that inversely correlate to the price movements of a benchmark for U.S. Treasury debt instruments or futures contracts on a specified debt instrument."  2007 Prospectus at 16; 2008 Prospectus at 28; 2009 Prospectus at 25; FAC ¶¶39, 40, 59.  The Fund Investor Profile states that the Fund was aimed at:  "Investors who expect the value of the Long Treasury Bond to go down and want investment gains when it does so."  2007 Prospectus at 16; 2008 Prospectus at 28; 2009 Prospectus at ¶25; FAC ¶¶39, 40, 59.  Even the Fund's 2007 Annual Report states, "[a]n investor benefits from Rydex Inverse Government Long Bond Fund in a rising interest rate environment."  2007 Annual Report at 32.  These statements all suggest that the fund was appropriate for holding over longer periods of time.  By contrast, the Prospectuses do not state that because of the effects of mathematical compounding the Fund is only appropriate for investors who expect the value of the Long Treasury Bond to go down *for a single day*.  Nor do the Prospectuses state that investors benefit from the Fund in a rising interest rate environment *but only for a single day*.

The fee structure of the Fund also makes clear that Defendants designed the Fund to ensure that investors would hold the shares for long periods of time.  The Fund's "A-Class" shares (the shares purchased by Plaintiffs) have a 4.75% sales charge, a "load" that is imposed on each purchase.[3]  2007 Prospectus at 54; 2008 Prospectus at 75.  The Fund's "C-Class" shares have no up-front load.  In return for paying the up-front load, A-Class investors pay lower annual fees and expenses.  As of 2008, the annual fees and expenses were approximately 0.6% lower for A-Class investors than C-Class investors.  This means that A-Class investors such as Plaintiffs would have to hold shares in the Fund for *nearly eight years* before they would break even on the fees and expenses compared to C-Class investors.  In other words, A-Class shares encourage

---

[3]The sales charge may be reduced or waived for some purchases, such as investors who invest larger amounts.  *See, e.g.*, 2007 Prospectus at 76.

1  investors to hold the shares for many years. The existence of the A-Class shares makes no sense,

2  if as Defendants claim, the Fund was to be held only for a single day.

3       The Fund also specifically encouraged investors not to sell their shares for at least a year

4  or a year and a half, depending on the class of shares. The Prospectuses warn certain A-Class

5  investors that "if you sell your shares within 18 months of purchase, you will normally have to

6  pay a 1.00% contingent deferred sales charge . . . ." 2007 Prospectus at 60 n.4; 2008 Prospectus

7  at 74 n.4; 2009 Prospectus at 72 n.4. Similarly, all C-Class investors who sell their shares in "the

8  first year following purchase" likewise must pay a 1.00% deferred sales charge. 2007 Prospectus

9  at 60 n.3.; 2008 Prospectus at 74 n.3; 2009 Prospectus at 72 n.3. These economic disincentives

10  to selling A- and C-Class shares before 18 months or one year, respectively, tell investors in the

11  strongest possible terms that they should expect to hold their shares for at least that long.

12       In light of how the Fund was described, structured and marketed, the statements in the

13  Prospectuses were insufficient as a matter of law to raise the suspicion of a reasonable investor.

14  *Betz*, 519 F.3d at 871.

15

16         **C.**    **Charts In The Fund's Annual Reports Did Not Put Plaintiffs On Notice Of The Problems With Mathematical Compounding.**

17       Defendants also contend that charts in the annual reports showing the Fund's cumulative

18  returns compared to movements in the price of the Long Treasury Bond provided in certain

19  shareholder reports put shareholders on notice that the Fund *could not* meet its investment

20  objective if held for long periods of time. However, these graphs again fail to satisfy the first

21  prong in *Betz* for the reasons stated above.

22       A review of the charts shows that they did not provide facts required to make a

23  reasonably diligent investor suspicious of Defendants' false statements. The charts are offered

24  without commentary or explanation, and therefore do not address the specific misrepresentations

25  and omissions at issue regarding compounding. It is not clear from the charts what caused the

26  deviation between the Fund's price and the movement in the price of the Long Treasury Bond.

27  The Fund's disclosures list several reasons why the Fund could deviate from its index over time.

28  *See, e.g.*, FAC ¶42 (The 2008 Prospectus states: "[the Fund's performance] may not be able …

PLTFS' OPP TO INDEPENDENT TRUSTEES' MOTION TO DISMISS     No. 10 CV 01171 LHK

1  to match that of the Fund's benchmark…. Factors such as Fund expenses, imperfect correlation

2  between the Fund's investments and those of its benchmark, rounding of share prices, changes to

3  the benchmark, regulatory policies, high portfolio turnover and leverage all contribute to tracking

4  error"). In order to determine what effect compounding had on the Fund, as opposed to these

5  other factors, from the graphs, would require data and analysis of financial matters out of the

6  realm of understanding of a reasonable investor. In short, it is unreasonable for typical investor

7  to be expected to glean from a graph that a Fund is virtually guaranteed to underperform its

8  benchmark over the long run because of the effects of compounding. *See SEC v. Mozilo*, 2009

9  U.S. Dist. LEXIS 104689, at *30 (C.D. Cal. Nov. 3, 2009) (finding it difficult to determine as a

10  matter of law whether disclosed information was "readily" or "reasonably available" to investor,

11  when investor would need "to decipher complex raw data to understand" purported disclosure of

12  allegedly concealed facts). The interpretation of the graphs provided in the shareholder reports

13  involve technical analysis that is beyond the reach of a reasonable investor, who, in any event,

14  had no reason to think such an analysis was necessary.

15      Finally, until November 17, 2009—the date the Fund published its updated Statement of

16  Additional Information—the Fund continued to repeat the false statements in the Registration

17  Statements regarding the Fund's investment objectives and investor profile. Courts in the Ninth

18  Circuit will not find inquiry notice as a matter of law where "the plaintiff alleges that the

19  defendants' reassurances convinced the plaintiff to postpone his or her legal action." *Betz*, 519

20  F.3d at 872.

21

22          **D.      Discussions In Trade Publications Were Likewise Insufficient To Put
                       Investors On Notice Of The Inherent Problems With The Fund.**

23      Defendants next argue that a handful of articles in *The Wall Street Journal*, *Registered*

24  *Rep.*, *MarketWatch* and *Morningstar* should have put investors on notice that the Fund was

25  unsuitable to hold over the long term because of the effects of compounding. Mot. at 4-6. This

26  argument lacks merit.

27      *First*, Defendants face a high bar in establishing that statements outside a prospectus

28  make omitted information general public knowledge. In the Ninth Circuit, determination of

-9-

1   when an investor is on notice of a claim is generally considered a jury question, particularly

2   when the dispute is over constructive or inquiry notice rather than actual notice.  *In Luksch v.*

3   *Latham*, 675 F. Supp. 1198, 1201 (N.D. Cal. 1987).  "[M]ass media disclosure does not generally

4   place a shareholder on inquiry notice."  *Guenther v. Cooper Life Scis., Inc.*, 1992 U.S. Dist.

5   LEXIS 22601, at *17 (N.D. Cal. Apr. 7, 1992).

6   　　　　To trigger inquiry notice from press reports, the information must be widespread,

7   prominent, and accessible.  *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 432 (2d Cir.

8   2008).  In *Staehr*, the court rejected the argument that articles in financial industry newsletters

9   were sufficient to put investors on inquiry notice of their claims:

10   　　　　　　"We have never affirmed the dismissal of a complaint as time-
         barred based on a story that appeared only in a specialty
11   　　　　　　publication, as opposed to mainstream press reports that are more
         likely to come to the attention of an investor of ordinary
12   　　　　　　intelligence.  We are reluctant to affirm such a dismissal where, as
         here, the specialty . . . publications' circulation or the extent to
13   　　　　　　which a reasonable investor would be aware of the limited
         coverage."  (*Id.*)
14

15   　　　　Here, the articles cited by Defendants were hardly "mainstream press reports."  The

16   articles in *Registered Rep.*, *MarketWatch* and *Morningstar* are industry trade publications with

17   limited circulation.  *See, e.g.*, Declaration of Marc Haber In Opposition To Defendants' Motions

18   to Dismiss ("Haber Decl.") Ex. B at 4 (*Morningstar* 2010 Media Kit, *available at*

19   http://advisor.morningstar.com/upload/pdf/AdvisorRateCard.pdf) (reporting 70,000 average

20   monthly unique visits to Morningstar.com); *id.*, Ex. C (*Registered Rep* Statement of Ownership,

21   Management, and Circulation) (reporting 98,839 average annual copies distributed).  These are

22   not the type of widespread publications whose articles have been found to form the basis for

23   constructive notice.  *Cf. In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192,

24   211 (S.D.N.Y. 2004) (finding that an article in The Washington Post—a national publication *with*

25   *a weekly circulation of over five million*—and the commencement of civil and criminal

26   investigations by the SEC and DOJ within two weeks of the article was sufficient to trigger

27   inquiry notice).

28   　　　　*Second*, stripping away the trade publications above, the only article with national

1   circulation that Defendants cite is a 2003 article from *The Wall Street Journal*.  However, that

2   article is insufficient to trigger inquiry notice even if a reasonably diligent investor had reviewed

3   it.  Although the article mentions the problem of mathematical compounding in passing on the

4   second to last page, the issue of compounding was not its focus.  The article was a background

5   piece on ETF and mutual fund products that track indices and the companies that offer them.  As

6   a result, the article is not the kind of press report found sufficient to trigger inquiry notice.  *Cf.*

7   *Rochelle v. Marine Midland Grace Trust Co. of N.Y.*, 535 F.2d 523, 532 (9th Cir. 1976)

8   ("Information in public records or published by the news media may be so massive that investors

9   will not be heard to say that they remained ignorant of the financial plight of the corporation

10  involved. . . .  But situations will rarely arise when we can say that public notoriety about a

11  corporation's financial condition is sufficiently great to charge an investor with such knowledge

12  as a matter of law").

13         Moreover, the isolated *Wall Street Journal* article that Defendants cite was written in

14  2003, well before Plaintiffs purchased their shares under the 2007 Prospectus, and as is clear

15  from the document Defendants' cite, this article is not available online.  *See* Bridwell Decl. Ex. A

16  ("5/1/03 On Wall Street (Pg. Unavail. Online)").  Defendants fail to explain how a reasonably

17  diligent investor could have reviewed the article during the class period.  The handful of articles

18  quoted by Defendants is insufficient to find as a matter of law that investors were expected to

19  know that the Fund could never meet its investment objectives of tracking the inverse of the price

20  of the 30-year U.S. Treasury Bond on a long-term basis.

21

22         **E.    Investors Could Not Reasonably Have Become Aware Of The
                    Misstatements And Omissions Until The Summer Of 2009.**

23         The FAC alleges: (1) specific dates when Plaintiffs were first plausibly on notice; (2) the

24  reason those dates are significant; and (3) that despite the exercise of reasonable diligence, why

25  investors could not have discovered their claims at an earlier time.  FAC ¶¶49-54.  Plaintiffs

26  allege that a FINRA notice to investment professionals was issued June 11, 2009 and that the

27  SEC issued a similar notice to the general public on August 18, 2009.  Those notices are strong

28  evidence that the Fund's disclosures regarding the effects of compounding were not generally

PLTFS' OPP TO INDEPENDENT TRUSTEES' MOTION TO DISMISS        No. 10 CV 01171 LHK

available to a reasonably prudent investor at an earlier time.  In fact, the SEC alert begins by stating: "The SEC staff and FINRA are issuing this Alert because we believe individual investors may be confused about the performance objectives of leveraged and inverse exchange-traded funds (ETFs)."  Korol Decl. Ex. L (Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors); FAC ¶52.  The FINRA notice to investment professionals likewise was an alert to investment professionals, who are often gatekeepers to the public regarding the basic characteristics of investment products.  That FINRA felt it necessary to alert these professionals regarding possible misperceptions of these products is telling.

In response to these notices, firms across Wall Street changed their practices with regards to the sale of leveraged and inverse funds.  In July 2009, Edward Jones & Co. halted the sale of its leveraged and inverse funds, calling them "one of the most misunderstood and potentially dangerous types of ETFs."  FAC ¶55.  Similarly, UBS said it would not sell leveraged and inverse funds.  FAC ¶56.  Charles Schwab sent its clients the specific warning that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors… for holding periods longer than a day, these funds may not give you the returns you may be expecting.  Proceed with extreme caution."  FAC ¶57.

Defendants have failed to demonstrate that a "reasonably diligent investor" would have discovered the falsity of the statements in the Registration Statements and the existence of a Securities Act claim.  The reality is that such "sufficient suspicion" did not reasonably exist prior to the FINRA and SEC releases.  *Betz*, 519 F.3d at 871; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. at 556.  The initial complaint of this action was timely filed on March 19, 2010—well within one year of these alerts.

## II.   PLAINTIFFS ARE NOT REQUIRED AFFIRMATIVELY TO PLEAD LOSS CAUSATION AND MUTUAL FUNDS ARE NOT IMMUNE FROM THE SECURITIES ACT.

Defendants assert that Plaintiffs' claims fail because of the absence of loss causation, although they style the argument as a failure to plead compensable damages.  Mot. at 6-10.  Defendants argue that the price of shares in mutual funds is determined entirely by the value of the assets in the fund's portfolio, and that the allegedly false disclosures and omissions in the

prospectuses could not have had any effect on the value of the mutual fund or Plaintiffs' losses. *Id*. at 7.  This loss causation argument has been rejected by every court that has reviewed the issue.

First, Plaintiffs are not required to affirmatively plead loss causation in the types of claims at issue in this case.  *See* 15 U.S.C. §§77k, *l*.   Rather, it is presumed from a materially misleading prospectus, and thus can appear only as an affirmative defense under Section 11(e), which concerns measuring damages in a Section 11(a) claim.  *See Smith v. Suprema Specialties, Inc.*, 2007 U.S. Dist. LEXIS 30001, at *24 (D.N.J. Apr. 23, 2007) (holding that loss causation is a statutory affirmative defense for Section 11 and Section 12(a)(2) claims and refusing to consider defendants' loss causation argument at class certification); *see also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("Under sections 11 and 12(a)(2), plaintiffs do not bear the burden of proving causation").  Thus, although Defendants may raise the lack of causation as an affirmative defense, courts consistently have held that this does not provide grounds for dismissal at the 12(b)(6) stage.  *See, e.g., In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004).[4]

*Second*, Defendants' logic relies on the incorrect assumption that mutual funds are somehow immune from the provisions of the Securities Act.  Stated differently, if Defendants' position were correct, it would preclude all Section 11 or 12(a)(2) claims involving mutual funds because all such claims are predicated on misstatements and/or omissions.  Not surprisingly,

---

[4]Even where it is an element of a claim, loss causation is easily pled.  All that is required are allegations of "facts to support a theory that is not facially implausible."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008), *cert. denied*, __ U.S. __, 129 S. Ct. 1993 (2009).  In *Siemers v. Wells Fargo & Co*., 2007 U.S. Dist. LEXIS 21935, at *16 (N.D. Cal. Mar. 9, 2007), plaintiffs alleged a securities-fraud claim arising from losses stemming from the diminution in a mutual fund's value caused by secret kickbacks paid from the fund's assets.  There, the court reasoned that loss causation, as refined by *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005), is a broad concept encompassing many theories of loss.  *See id.* at *45-*46 (citing *Dura*'s explanation that a plaintiff need only give some indication of the causal connection so that the defendant is fairly on notice of the plaintiff's causation theory); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546, 550 (N.D. Cal. 2009) (misstatements about the riskiness of an open-end mutual fund can lead to compensable damages under Sections 11 and 12(a)(2)).

---

1   Defendants have not cited a single case in support of this position.  In fact, this theory has been

2   rejected by every court that has considered it, including a recent decision in this District.  *See,*

3   *e.g., In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. at 547 (denying defendants' motion to

4   dismiss raising similar arguments) (Alsup, J.); *In re Evergreen Ultra Short Opportunities Fund*

5   *Sec. Litig.*, 2010 U.S. Dist. LEXIS 31360, at *94-*95 (D. Mass. Mar. 31, 2010);  *In re Mut.*

6   *Funds Inv. Litig.*, 590 F. Supp. 2d 741, 748 (D. Md. 2008) (although the loss causation inquiry

7   often hinges on the timing of purchases and sales in relation to the typical inflation-disclosure-

8   deflation cycle, loss causation is not limited to that scenario).  As Judge Alsup explained in

9   *Schwab*:

10          "Defendants' narrow formulation of loss causation would
11      effectively insulate mutual fund companies from claims for a wide
        range of material misrepresentations regarding fund policies, risks
12      and investment decisions.  Defendants would immunize a scheme
        that purported to invest in low-risk government bonds but in fact
13      invested in legitimate but high-risk treasure-hunting expeditions.
        Loss causation, however, is not limited to the common 'corrective
14      disclosure-price drop' scenario.

15          "As courts in other circuits have explained, a plaintiff may
16      establish loss causation by alleging "'that the subject of the
        fraudulent statement or omission was the cause of the actual loss
17      suffered';" that defendants' 'misstatements and omissions
        concealed the price-volatility risk (or some other risk) that
18      materialized and played some part in diminishing the market of'
        the security.
19

20                      *       *       *       *

21          "Here, plaintiffs certainly alleged that the *subject* of the fraudulent
22      statements caused their losses—that defendants misrepresented or
        failed to disclose portfolio risks, the materialization of which
23      caused (or exacerbated) the losses.  Similarly, if defendants
        misrepresented the scope of the fund's risks, and the undisclosed
24      risks exacerbated the losses, then plaintiffs' resulting
        undervaluation of risks might be deemed to have caused some
25      portion of their losses."  (257 F.R.D. at 547 (internal citations
        omitted))
26

27      The court in *Schwab* also denied defendants' motion for summary judgment on loss

28  causation grounds, holding that:

-14-

1

2

3

4

> "[I]f a mutual fund holds itself out as investing no more than 25 percent in a single industry but then, as actually planned, invests fifty percent in a single industry, there is no escape by blaming the industry rather than the promoter. *The materialization of the concealed risk caused the loss*." (*In re Charles Schwab Corp. Sec. Litig.*, 2010 U.S. Dist. LEXIS 34553, at *22 (N.D. Cal. Apr. 8, 2010) (emphasis added))

5        As in *Schwab*, Plaintiffs allege that the materialization of the undisclosed risk of holding

6   the Fund's shares over long periods of time caused Plaintiffs' losses.  Accordingly, the same

7   reasoning articulated in *Schwab* applies here, and as a result, Plaintiffs have adequately alleged

8   loss causation even though they were not required to do so.

9        The cases relied upon by Defendants involve alleged fraud-based violations of the

10  securities laws under Section 10(b), where unlike here, loss causation is an element of a *prima*

11  *facie* claim.  *See, e.g., In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir.

12  2009); *McGonigle v. Combs*, 968 F.2d 810, 820-21 (9th Cir. 1992).[5]  These cases not only

13  involve heightened pleading standards, but also make no mention of Defendants' principal

14  argument here—that mutual funds are immune from liability under the Securities Act because

15  loss causation is limited to the common "corrective disclosure-price drop" scenario.  For the

16  reasons set forth in the *Schwab* case and others involving mutual funds, there is no basis for

17  applying the loss causation principles in these Section 10(b) cases to the claims at issue here.

18

19  **III.   PLAINTIFFS ADEQUATELY PLEAD SECTION 15 "CONTROL PERSON" CLAIMS UNDER THE SECURITIES ACT.**

20       The Individual Trustee Defendants also dispute that they are "control persons" for

21  purposes of Section 15 of the Securities Act.  *See* Mot. at 10-12.  *First*, the FAC adequately

22  alleges that the Individual Defendants all exercised control over the Fund and authorized the

23

24       [5]Defendants also cite *In re Salomon Smith Barney Mutual Fund Fees Litigation*, 441 F. Supp. 2d 579, 589 (S.D.N.Y. 2006), which also is inapposite.  In that case Plaintiffs were

25  asserting liability under the Securities Act, the Exchange Act and 1940 Investment Act, for an alleged illegal mutual fund kickback scheme, which required them to prove that absent the

26  alleged fraud they would have sought better and less costly investments.  There, the court determined that the plaintiffs would be unable to establish loss causation on the face of the

27  complaint because the investors suffered no loss from a diminution in value of their shares, and moreover, a shareholder cannot recover for damages based on hypothetical investments they did

28  not make.  *Id.* at 589.  Defendants do not suggest how such a test could or should be applied here.

1   release of the offering materials at issue.  *Second*, as discussed more fully below, Defendants'

2   arguments raise questions of fact that are premature for a 12(b)(6) motion.

3       Section 15(a) of the Securities Act imposes joint and several liability upon every person

4   who controls any person liable under Sections 11 or 12.  15 U.S.C. §77o.  To state a *prima facie*

5   case of control liability, a plaintiff must allege: (i) a primary violation of Section 11 or 12; and

6   (ii) that the defendant exercised actual power or control over the primary violator.  *See, e.g.,*

7   *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Rule 9(b)'s heightened

8   pleading requirements do not apply to control-person claims.  *In re LDK Solar Sec. Litig.*, 2008

9   U.S. Dist. LEXIS 80717, at *38 (N.D. Cal. Sept. 24, 2008).  At the pleading stage, general

10  allegations that individual defendants are senior executives and signed the prospectus suffice to

11  satisfy Rule 8(a).  *Id.*

12      The FAC's general allegations at Paragraphs 12-22 and 91-92 satisfy these standards.

13  Though Defendants are vague as to which of them actually disputes Plaintiffs' control-person

14  allegations, we note that five of the Individual Defendants (Defendants Goldman, Verboncoeur,

15  Demaret, Bonos and Byrum) were either senior officers of the Fund, its investment manager, its

16  Distributor, or Independent Trustees who exercised control over the Fund.  *Id.*  The FAC alleges

17  also that all of the Section 15 Defendants, except Defendant Goldman, signed the Fund's 2007,

18  2008 and 2009 Registration Statements.  *Id.*  Defendant Goldman only signed the Fund's 2009

19  Registration Statement.  These general allegations satisfy the pleading standard.

20      The Independent Trustees argue that a stricter pleading standard applies, and that

21  Plaintiffs must plead their control-person allegations with particularity showing that each of them

22  actually participated in the operation of the Fund.  Mot. at 12 n.18.  Even cases cited by

23  Defendants do not go so far.  *See, e.g., Teamsters Local 617 Pension & Welfare Funds v. Apollo*

24  *Group, Inc.*, 690 F. Supp. 2d 959, 971 (D. Ariz. 2010) ("[I]t *is not necessary to show actual*

25  *participation* or the exercise of power[] to make out a *prima facie* § 20(a) claim in the Ninth

26  Circuit") (citation and internal quotation marks omitted); *Reese v. Malone*, 2009 U.S. Dist.

27  LEXIS 15774, at *27 (W.D. Wash. Feb. 27, 2009) (general allegations concerning an

28  individual's title and responsibilities are sufficient at the pleading stage).  More importantly,

-16-

1    Defendants' analysis overlooks the definition of "control," which means "the possession, direct

2    or indirect, of the power to direct or cause the direction of the management and policies of a

3    person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R.

4    §230.405.  The "'power to control or influence'" the primary violator is sufficient to establish

5    membership in a corporation's control group.  *Howard*, 228 F.3d at 1065; *In re Convergent*

6    *Techs. Sec. Litig.*, 108 F.R.D. 328, 342 (N.D. Cal. 1985) (control stems from "the power or

7    influence to direct significant aspects of the management of the corporation").  As demonstrated

8    immediately above, Defendants' titles and positions, along with reviewing and signing financial

9    statements, can lead to control-person liability, even without culpable participation in the

10   violation.  *See also Howard*, 228 F.3d at 1065-66.

11          Implicitly, the Trustees contend that they were so uninvolved in the operation of the Trust

12   that it cannot be said that they could control or influence the alleged Section 11 or 12 violations

13   stated in the FAC.  However, this argument is entirely contradicted by the Registration

14   Statements at issue, and is at best a factual dispute.

15          For instance, the Statements of Additional Information for each Prospectus explain that

16   the Fund's Board of Trustees is tasked with supervising "the management and affairs of the

17   Trust."  *See, e.g.*, Haber Decl. Ex. A at 783 of 965 (2007 Prospectus, Statement of Additional

18   Information).  Further, although the day-to-day operations of the Fund are overseen by the

19   Fund's investment advisor, these activities are "subject to the general supervision and control of

20   the Board and the officers of the Trust."  *Id*. at 790 of 965.  The 2009 Statement of Additional

21   Information also provides that the Board's Governance Committee is tasked with among other

22   things: (1) monitoring and making recommendations regarding committees of the Board;

23   (2) overseeing the process regarding the Board's periodic self-assessments; and (3) making

24   recommendations to the Board concerning all other matters pertaining to the functioning of the

25   Board and its committees pertaining to the governance of the Trust.  Haber Decl. Ex. D at 1221

26   (2009 Prospectus, Statement of Additional Information).  The members of the Board's

27   Governance Committee include Defendants Demaret, Keller, Lydon, and McCarville.

28          Further, the Board has a standing audit committee composed of each of the Trust's

-17-

1   independent trustees, including Defendants Colehour, Dalton, Demaret, Keller, Lydon,

2   McCarville and Somers.  *Id.*, Ex. A at 787 of 965.  Courts presume that an outside director and

3   audit committee member who signs an SEC filing has the power to control those who write the

4   report, within the meaning of Section 20(a).  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433,

5   488 (S.D.N.Y. 2005); *N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1144-45 (D. Kan. 2004); *In re*

6   *Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003); *In re*

7   *Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001).  Such a person is

8   in a position to approve the corporation's financial statements and thus has the power to direct or

9   cause the direction of the corporation's management and polices, at least insofar as the

10  management and policies relate to ensuring accuracy in the contents of company reports and SEC

11  registrations that they actually sign.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 488-89.  In

12  short, there is an abundance of evidence that the Individual Defendants were actively involved in

13  the operations of the Trust and exerted supervision and control of the Fund.

14          Moreover, Defendants' arguments raise questions of fact and are therefore inappropriate

15  in the context of a 12(b)(6) motion.  *See Lewis v. Straka*, 2006 U.S. Dist. LEXIS 76716, at *29-

16  *30 (E.D. Wis. Oct. 12, 2006) (holding that "[w]hether a defendant is a controlling person is

17  usually a question of fact which cannot be resolved at the pleading stage"); *Schwab*, 257 F.R.D.

18  at 550 ("Whether [the defendant] is a controlling person is an intensely factual question,

19  involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and

20  the defendant's power to control corporate actions") (citation and internal quotation marks

21  omitted).  Accordingly, even if Plaintiffs have inadequately alleged that the Trustee Defendants

22  were "control persons," Plaintiffs' Section 15 claim should not be dismissed, because such a

23  determination is premature.

24  **IV.   THE COURT HAS JURISDICTION OVER THE CLAIMS AGAINST THE**
        **INDEPENDENT TRUSTEES ARISING OUT OF THE 2009**
25      **REGISTRATION STATEMENT.**

26          Defendants argue that Plaintiffs lack standing to bring claims based on the 2009

27  Registration Statement because Plaintiffs purchased their shares before the effective date of the

28  2009 Registration Statement.  This argument lacks merit.

-18-

1      Plaintiffs have constitutional standing to assert their claims.  The FAC alleges that: (1)

2   Plaintiffs suffered an injury-in-fact by having purchased fund shares pursuant to Prospectuses

3   that did not adequately disclose risks that materialized; (2) their injuries are traceable to the

4   actions of Defendants who made those misrepresentations and omissions; and (3) those injuries

5   can be redressed by a favorable ruling.  *Horne v. Flores*, __ U.S. __, 129 S. Ct. 2579, 2585

6   (2009).

7      That Plaintiffs did not purchase shares issued under the 2009 Registration Statement

8   neither undermines their standing nor deprives the Court of jurisdiction over the claims involving

9   the Registration Statement.  *See Hicks v. Morgan Stanley & Co.*, 2003 U.S. Dist. LEXIS 11972,

10  at *9-*11 (S.D.N.Y. July 16, 2003) (concluding that the named plaintiff could be appointed to

11  represent a class that included claims traceable to registration statements issued by the mutual

12  fund before the plaintiff's purchases, because the complaint alleged a common course of conduct

13  and a unitary legal theory for the entire class period).  In *Hicks*, the Plaintiff alleged that

14  Defendants issued prospectuses and registration statements that contained false statements about

15  the Trust's NAV, as the loans in the mutual fund's portfolio were not properly valued and were

16  not marked-to-market when they should have been.  *Id*. at *11.  The same reasoning applies here

17  because the FAC has alleged a unitary legal theory regarding the misrepresented and undisclosed

18  effect of compounding in the Fund's 2007, 2008 and 2009 Prospectuses.

19     Although *Hicks* was decided in the Southern District of New York, District Courts in the

20  Ninth Circuit have found standing for plaintiffs in similar cases.  For example, in *In re Juniper*

21  *Networks, Inc. Securities Litigation*, the court held that equity purchasers had standing to pursue

22  claims on behalf of purchasers of the company's notes, even though the notes were offered to

23  bondholders under a different prospectus.  264 F.R.D. 584, 594 (N.D. Cal. 2009) (Ware, J.)

24  (finding that the "alleged harm to note purchasers and stock purchasers stems from the same

25  allegedly improper conduct").

26     Similarly, in *In re Thornburg Mortgage, Inc. Securities Litigation*, the lead plaintiffs sued

27  several underwriters of Thornburg's securities under Section 11 and 12(a)(2).  683 F. Supp. 2d

28  1236 (D.N.M. 2010).  Certain underwriters sought dismissal on the ground that the lead plaintiff

PLTFS' OPP TO INDEPENDENT TRUSTEES' MOTION TO DISMISS          No. 10 CV 01171 LHK

1   had not purchased securities traceable to the offering they underwrote.  The court rejected this

2   argument, holding that it had jurisdiction over the entire action because the lead plaintiffs had

3   constitutional standing to pursue claims against the remaining defendants.  *Id*. at 1254.  The court

4   exercised supplemental jurisdiction over the claims against the underwriters because the claims

5   involving their offering were part of the same common nucleus of operative fact, were related to

6   the same series of SEC filings by the same issuer, and were therefore part of the same case or

7   controversy.  *Id*.  The court reserved until later proceedings the issue of whether the lead

8   plaintiffs could pursue class claims against these underwriter defendants.  *Id.* at 1255.[6]

9          Accordingly, that Plaintiffs did not purchase shares under the 2009 Registration

10  Statement is immaterial.  The representations and omissions in the 2007, 2008 and 2009

11  Registration Statements are all part of the same common nucleus of operative facts: that

12  Defendants failed to warn investors that the effects of compounding would make it a virtual

13  certainty that the Fund would underperform its benchmark over long periods and that the Fund

14  was not appropriate for investors who intended to hold the shares for longer than a single day.

15  The Court therefore should reject Defendants' standing argument on this motion to dismiss.

16

17  **V.     THE COURT HAS JURISDICTION OVER THE CLAIMS AGAINST THE
         INDEPENDENT TRUSTEES ARISING OUT OF THE FUND'S ADVISOR,
         INVESTOR AND C-CLASS SHARES.**

18

19         Defendants incorrectly argue that Plaintiffs lack standing to assert claims on behalf of the

20  purchasers of the Fund's Advisor, Investor and C-Class shares.  Mot. at 15.  Courts regularly

21  appoint plaintiffs of one type of securities to represent purchasers of other types of securities of

22  the same issuer where the alleged harm stems from the same allegedly improper conduct and

23  where the interests of those purchasers are aligned.  *See, e.g., In re DDi Corp. Sec. Litig.*, 2005

24

25         [6]We note at least one case within this District where the court found that plaintiffs had no
    standing to assert claims that a prospectus is misleading when they did not purchase claims
26  pursuant to the prospectus.  *See, e.g., In re Wells Fargo Mortg. Backed Certificates Litig.*, 2010
    U.S. Dist. LEXIS 39825, at *16 (N.D. Cal. Apr. 22, 2010).  However, there is no controlling
27  Ninth Circuit authority on this matter and the logic and reasoning in *Jupiter*, *Hicks* and
    *Thornburg* is more applicable to this case.

28

PLTFS' OPP TO INDEPENDENT TRUSTEES' MOTION TO DISMISS         No. 10 CV 01171 LHK

U.S. Dist. LEXIS 28216, at *22-*24 (C.D. Cal. July 20, 2006) (allowing common stock holders standing to pursue claims on behalf of convertible note holders); *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009).  Accordingly, Defendants' Motion insofar as they assert that Plaintiffs lack standing to assert claims on behalf of those who purchased Advisor, Investor or C-Class shares should also be denied.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: November 8, 2010

Respectfully submitted,

ALAN W. SPARER
MARC HABER
KEVIN H. LEWIS
JAMES S. NABWANGU
SPARER LAW GROUP

By:  _____*/s/ Alan W. Sparer*_____
                    ALAN W. SPARER

Attorneys for RYDEX LITIGATION GROUP