UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES RAFTON, TRUSTEE OF THE JAMES AND CYNTHIA RAFTON TRUST, ET AL., <br><br>　　　　　Plaintiffs,<br>　　v.<br><br>RYDEX SERIES FUNDS, ET AL.,<br><br>　　　　　Defendants. | Case No.: 10-CV-01171-LHK<br><br>ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS<br><br>(re: docket #39 and #42) |

In this putative securities class action, Plaintiffs James Rafton, a Trustee of the James and Cynthia Rafton Trust, and James Darst, Jr., a Trustee of the James and Hillary Darst Trust (collectively "Plaintiffs"), allege that Defendants, several entities and individuals associated with the "Rydex Inverse Government Long Bond Strategy Fund" (the "Fund"), violated federal securities laws by misrepresenting who was an appropriate investor in the Fund and by failing to adequately disclose a "mathematical compounding effect" that would cause the Fund to deviate from its benchmark, the inverse price of the 30-Year U.S. Treasury Bond. Defendants include entities and officers responsible for issuing, managing, and distributing shares of the Fund ("Rydex Defendants"), and also individuals that are Independent Trustees of the Fund ("Independent Trustee Defendants"). The Rydex Defendants and the Independent Trustee Defendants have filed separate motions to dismiss, although each set of Defendants joins in the other's motion. The

1

Court held a hearing on Defendants' motions on December 16, 2010.  For the reasons discussed below, the Rydex Defendants' motion to dismiss is DENIED and the Independent Trustee Defendants' motion to dismiss is DENIED IN PART and GRANTED IN PART.

# I. BACKGROUND

For purposes of ruling on Defendants' motion to dismiss, the Court accepts as true well-pled allegations in Plaintiffs' Complaint and construes material facts in the light most favorable to Plaintiffs. *Marceau v. Blackfeet Housing Authority*, 540 F.3d 916, 919 (9th Cir. 2008). Accordingly, unless otherwise noted, the following background draws heavily from the allegations in Plaintiffs' First Amended Complaint ("FAC").

### A. The Parties and the Rydex Inverse Government Long Bond Strategy Fund

Plaintiffs are trustees of Trusts that invested in the Rydex Inverse Government Long Bond Strategy Fund (the "Fund").  According to Plaintiffs, they purchased or acquired shares in the Fund between March 20, 2008 and December 19, 2008.  However, the Plaintiffs allege a class period of March 19, 2007 to March 19, 2010.  FAC ¶ 1.

Defendants are the Fund, PADCO Advisers, Inc. d/b/a Rydex Investments, Inc. (the Fund's manager and investment advisor), Rydex Distributors, Inc. (the Fund's distributor and principal underwriter), Richard M. Goldman (CEO of the Rydex Distributor), Carl G. Verboncoeur (President of the Fund), John O. Demaret (Chairman of Board of Trustees of Fund), Nick Bonos (Vice President of Fund), Michael P. Byrum (Chief Investment Officer of the Fund), and individual Trustees of the Fund (Corey A. Colehour, J. Kenneth Dalton, Werner E. Keller, Thomas F. Lydon, Patrick T. McCarville, and Roger Somers).  *Id*. at ¶¶ 9-23.

The Fund is a mutual fund, similar to an "exchange-traded fund" ("ETF") that was designed to track a particular benchmark, and specifically to track the *inverse* price movements of the 30-Year U.S. Treasury Bond ("Long Treasury Bond").  *Id*. at ¶ 30.  As an "inverse" fund, the Fund was designed to produce investment returns that are the opposite of the performance of the underlying benchmark, i.e., when the price of the benchmark decreases, the price of the fund should increase by the same percentage.  *Id*.  According to Plaintiffs, most inverse funds are designed to track a benchmark on a daily basis and reset daily.  *Id*. at ¶ 31.  With this daily re-

setting, such funds are subject to a "mathematical compounding effect" that leads a fund's price to deviate from the inverse movement of the benchmark for periods beyond a single day. *Id*. In a two-day example, if a benchmark index starts at 100 and closes at 101 on the first day, and goes back down to close at 100 on the second day, the benchmark is even over the two-day period, but the Fund (assuming it also started at 100 and has met its daily goal) will have actually lost value over the same two-day period. In this example, the calculation for the Fund is: 100 (start), 99 (end of day one, dropping 1% from 100 to 99 as benchmark increased 1% from 100 to 101), 99.98 (end of day two, increasing 0.99% from 99 to 99.98 as benchmark decreased 0.99% from 101 to 100). The compounding effect is more pronounced in periods of high volatility, in which the benchmark moves up and down in greater amounts. *Id*. at ¶ 32. Plaintiff's central allegation is that, because of this compounding effect, inverse funds are not appropriate for investors seeking to hold the investment for longer than a single day. *Id*. at ¶ 33.

**B. Plaintiffs' Allegations Regarding the 2007, 2008 and 2009 Registration Statements**

The Fund sold four classes of shares: Advisor, Investor, A and C. *Id*. at ¶ 34. The shares relevant to the putative class period were issued pursuant to a July 30, 2007 Registration Statement and Prospectus (collectively "2007 Registration Statement"), a July 29, 2008 Registration Statement and Prospectus (collectively "July 2008 Registration Statement"), and a July 29, 2009 Registration Statement and Prospectus (collectively "July 2009 Registration Statement"). *Id*. at ¶ 35. According to Plaintiff, each of the Registration Statements contained substantially similar untrue statements of material fact and/or omitted material facts, as "investors holding Fund shares during the Class period lost money even though the benchmark price of the U.S. Treasury Long Bond fell--precisely the type of period during which investors would have expected to make money." *Id*. at ¶ 38. For example, Plaintiffs allege that between March 20, 2008 and February 22, 2010, the price of the U.S. Treasury Long Bond fell by 4.91%, but the Fund price did not increase and instead also fell by 11.29%. *Id*.

3
Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

### 1. The July 2007 and July 2008 Registration Statements

The 2007 and 2008 Registration Statements for the Fund included information about Fund Objective, Principal Investment Strategy, Investor Profile, and Understanding Compounding & the Effect of Leverage. The July 2007 Registration Statement contains these statements:

> FUND OBJECTIVE
> The Inverse Government Long Bond Strategy Fund seeks to provide total returns that inversely correlate to the price movements of a benchmark for U.S. Treasury debt instruments or futures contracts on a specified debt instrument. The Fund's current benchmark is the inverse of the daily price movement of the Long Treasury Bond. The Long Treasury Bond is the U.S. Treasury bond with the longest maturity, which is currently 30 years. The price movement of the Long Treasury Bond is based on the daily price change of the most recently issued Long Treasury Bond.
>
> If the Fund meets its objective, the value of the Fund's shares will increase on a daily basis when the price of the Long Treasury Bond decreases. When the price of the Long Treasury Bond increases, however, the value of the Fund's shares should decrease on a daily basis by an inversely proportionate amount (E.G., if the price of the Long Treasury Bond increases by 2%, the value of the Fund's shares should go down by 2% on that day).
>
> PRINCIPAL INVESTMENT STRATEGY
> Unlike a traditional index fund, the Fund's objective is to perform, on a daily basis, exactly opposite its benchmark, the Long Treasury Bond. As its primary investment strategy, the Fund enters into short sales and swap transactions, and engages in futures and options transactions. On a day-to-day basis, the Fund holds U.S. Government securities or cash equivalents to collateralize its short sales and derivative positions.
>
> INVESTOR PROFILE
> Investors who expect the value of the Long Treasury Bond to go down and want investment gains when it does so. These investors must also be willing to bear the risk of equal losses if value of the Long Treasury Bond goes up."

*Id*. at ¶ 39. Similarly, the July 2008 Registration Statement stated:

> FUND OBJECTIVE
> The Inverse Government Long Bond Strategy Fund seeks to provide total returns that inversely correlate to the price movements of a benchmark for U.S. Treasury debt instruments or futures contracts on a specified debt instrument. The Fund's current benchmark is the inverse (opposite) of the daily price movement of the Long Treasury Bond. The Long Treasury Bond is the U.S. Treasury bond with the longest maturity, which is currently 30 years. The price movement of the Long Treasury Bond is based on the daily price change of the most recently issued

> Long Treasury Bond.
>
> If the Fund meets its objective, the value of the Fund's shares will increase on a daily basis when the price of the Long Treasury Bond decreases. When the price of the Long Treasury Bond increases, however, the value of the Fund's shares should decrease on a daily basis by an inversely proportionate amount (e.g., if the price of the Long Treasury Bond increases by 2%, the value of the Fund's shares should go down by 2% on that day).
>
> PRINCIPAL INVESTMENT STRATEGY
>
> Unlike a traditional index fund, the Inverse Government Long Bond Strategy Fund's objective is to perform, on a daily basis, exactly opposite the daily price movement of the Long Treasury Bond. The Fund employs as its investment strategy a program of engaging in short sales and investing to a significant extent in derivative instruments, which primarily consist of futures contracts, interest rate swaps, and options on securities and futures contracts. Under normal circumstances, the Fund will invest at least 80% of its net assets in financial instruments with economic characteristics that should perform opposite to fixed income securities issued by the U.S. Government. This is a nonfundamental investment policy that can be changed by the Fund upon 60 days' prior notice to shareholders. On a day-to-day basis, the Fund may hold U.S. Government securities or cash equivalents to collateralize its short sales and derivative positions.
>
> INVESTOR PROFILE
>
> The Inverse Government Long Bond Strategy Fund is intended for investors who expect the value of the Long Treasury Bond to go down and want investment gains when it does so. These investors must also be willing to bear the risk of equal losses if the value of the Long Treasury Bond goes up.

*Id*. at ¶ 40.  Both the 2007 and 2008 Registration Statements also included these statements:

> TRACKING ERROR RISK - Tracking error risk refers to the risk that the Fund's Advisor may not be able to cause the Fund's performance to match that of the Fund's benchmark, either on a daily or aggregate basis. Factors such as Fund expenses, imperfect correlation between the Fund's investments and those of its benchmark, rounding of share prices, changes to the benchmark, regulatory policies, high portfolio turnover rate and leverage all contribute to tracking error. In addition, because each Fund, except for the Mid-Cap 1.5x Strategy Fund, Russell 2000(R) 1.5x Strategy Fund, Europe 1.25x Strategy Fund, Japan 1.25x Strategy Fund and Government Long Bond 1.2x Strategy Fund, is tracking the performance of its benchmark on a daily basis, mathematical compounding may prevent a Fund from correlating with the monthly, quarterly, annual or other period performance of its benchmark. Tracking error may cause the Fund's performance to be less than you expect.
>
> UNDERSTANDING COMPOUNDING & THE EFFECT OF LEVERAGE

> It is important to understand the effects of compounding when investing in any mutual fund, especially funds that use leverage as part of their investment strategy. The impact of leverage on a fund will generally cause the fund's performance to not match the performance of the index underlying the fund's benchmark over a period of time greater than one day. The following simple examples provide an illustration:
>
> EXAMPLE A: Assume you invest $100 in Fund A, a typical index fund that seeks to match the performance of its underlying index. If the index increases 10% on day one, the value of your shares in Fund A would be expected to increase $10 (10% of $100) to $110. The next day, if the index decreases 10%, the value of your shares in Fund A would be expected to decrease $11 (10% of $110) to $99.
>
> EXAMPLE B: Assume you invested $100 in Fund B, a fund that seeks to return 200% of the performance of its underlying index. If the index increases 10% on day one, the value of your shares in Fund B would be expected to increase $20 (20% of $100) to $120. The next day, if the index decreases 10%, the value of your shares in Fund B would be expected to decrease $24 (20% of $120) to $96.
>
> Because of the effect of compounding, in each case the value of your investment declined even though the index went up 10% on day one and down 10% on day two. However, the effect of compounding was more pronounced when combined with leverage (Example B).
>
> The examples demonstrate that over time, the cumulative percentage increase or decrease in the net asset value of a fund may diverge significantly from the cumulative percentage increase or decrease in the multiple of the return of the index underlying a fund's benchmark due to the compounding effect of losses and gains on the returns of the fund. It is also expected that a fund's use of consistently applied leverage will cause the fund to underperform the compounded return of twice its benchmark in a trendless or flat market.

*Id*. at ¶¶ 42-44.

According to Plaintiffs, the 2007 and 2008 Registration Statements were false and misleading because they failed to disclose that the Fund: would rarely, if ever, track the 30 U.S. Treasury Bond for periods longer than one day; would inevitably diverge from the inverse performance of the benchmark; was not suitable for investors holding the Fund for longer than a single day; would, because of compounding, prevent the Fund from achieving its objective for

1   periods longer than a day; and would be "altogether inappropriate as a directional investment for
2   periods longer than a single day." *Id*. at ¶¶ 46-48.

### 2. 2009 Regulatory Notices

Plaintiffs point to two "red flags raised" in 2009.  On June 11, 2009, the Financial Industry Regulatory Authority (FINRA) issued a regulatory notice that "remind[ed] firms of their sales practice obligations in connection with inverse ETFs [exchange-traded funds]," and noted that "due to the effects of compounding," the performance of inverse ETF's (along with other highly complex financial instruments) "can differ significantly from their stated daily objective. Therefore, inverse and leveraged ETF's that are reset daily typically are unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets." *Id*. at ¶ 49.

On August 18, 2009, the Securities and Exchange Commission (SEC) and FINRA issued an alert stating: "Leveraged and inverse ETFs typically are designed to achieve their stated performance objectives on a daily basis.  Some investors might invest in these ETFs with the expectation that the ETFs may meet their stated daily performance objectives over the long term as well.  Investors should be aware that performance of these ETFs over a period longer than one day can differ significantly from their stated objectives."  *Id*. at ¶ 52.

According to Plaintiffs, in response to these regulatory notices, certain Wall Street firms (e.g., Edward Jones & Co., UBS, and Charles Schwab) halted the sale of leveraged and inverse funds, or at least warned their clients to "proceed with extreme caution" when holding the funds for longer than a day.  *Id*. at ¶¶ 55-58.

### 3. The July 2009 Registration Statement and Supplements

The July 2009 Registration system includes substantially similar language in terms of Fund Objective, Investment Strategy, and Investor Profile.  However, the July 2009 Registration Statement included this additional cautionary language: "[t]he return of each Fund for periods longer than a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for that longer period."  The Statement also stated: "The Funds should be utilized only by sophisticated investors or professional investment advisors who

7

(a) understand the risks associated with the use of leverage; (b) understand the consequences of seeking investment results on a daily basis; (c) understand the risk of shorting; and (d) intend to actively monitor and manage their investments on a daily basis." *Id*. at ¶¶ 59-61.

On August 7, 2009, Defendants issued a supplement to the July 2009 Registration Statement, adding three graphs to the section on "Understanding Compounding and the Effect of Leverage." *Id*. at ¶ 64. On November 17, 2009, Defendants issued another supplement adding more warnings, stating that the Fund is "not intended to be used by, and are not appropriate for, investors who do not intend to actively monitor and manage their portfolios" and that "the path or trend of the benchmark during the longer period may be at least as important to the Daily Leveraged Fund's or Inverse Fund's return for the longer period as the cumulative return of the benchmark for the relevant longer period." *Id*. at ¶ 65.

According to Plaintiffs, even with these additional warnings, the July 2009 Registration Statement is still false and misleading because it failed to disclose that: the inverse correlation between the Fund and the 30-year U.S. Treasury Bond would only occur in the "rarest circumstances, and inadvertently if at all;" the Fund performance over time would inevitably diverge from the inverse performance of the 30-year U.S. Treasury Bond; and the Fund is "unsuitable" for investors who plan to hold it for longer than one day. *Id*. at ¶ 67.

## II. LEGAL STANDARDS

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. To withstand a motion to dismiss, a plaintiff must "plead enough facts to state a claim that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Generally, a court may not consider material outside of the complaint without converting the Rule 12(b)(6) motion into a summary judgment motion. *See Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991). A court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Fed. R. Evid. 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 at n. 19 (9th Cir. 1989. For example, the court may consider the full text of the relevant documents to determine whether the plaintiffs have alleged material misrepresentations or omissions without converting the motion into one for summary

8

1 judgment . *See In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir. 1996). "Leave to amend should be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

## III. DISCUSSION

The Rydex Defendants and the Independent Trustee Defendants have separately moved to dismiss. The Rydex Defendants move to dismiss on the grounds that the Fund's disclosures contained no actionable misstatements or omissions. The Independent Trustee Defendants move to dismiss on the grounds that Plaintiffs' claims are time-barred, that Plaintiffs have not suffered compensable damages, and that Plaintiffs have failed to plead requisite elements for certain of the securities claims. Plaintiffs have filed oppositions to both motions.

**A. Rydex Defendants' Motion to Dismiss Section 11 and Section 12(a)(2) Claims**

Claims under Sections 11 and 12(a)(2) of the Securities Act contain roughly parallel elements. Moreover, unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation. Section 11 of the Securities Act focuses on misstatements or omissions in registration statements. Section 11 creates a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To establish a claim under Section 11, a plaintiff must allege: (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, "that is, it would have misled a reasonable investor about the nature of his or her investment." *See Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *see also In re Stac Elec. Sec. Litig.*, 89 F.2d at 1404 (9th Cir. 2006).

Section 12(a)(2) of the Securities Act establishes liability for persons who offer or sell securities by means of prospectuses or oral communications that include untrue or misleading statements or omissions. *See* 15 U.S.C. § 77(a)(2). A plaintiff must establish that he or she purchased shares directly in the offering pursuant to the prospectus alleged to be misleading.

9

Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 535 (9th Cir. 1989). Similar to a Section 11 claim, a claim under Section 12(a)(2) does not require a showing of intent or knowledge, as even negligent misrepresentations or material omissions are actionable.

Unless the allegations sound in fraud, the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA) do not apply to Section 11 or Section 12 claims. *Rubke*, 551 F.3d at 1161. Allegations of non-fraudulent conduct only need satisfy the ordinary pleading standards of Rule 8. *See Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1027 (9th Cir. 2005). Scienter is not required for liability under Section 11 or Section 12; defendants are "liable for innocent or negligent material misstatements or omissions." *See Kaplan v. Rose*, 49 F.3d 1363, 1371 n.9 (9th Cir. 1994). Moreover, where the adequacy of the disclosures is at issue, Defendants must make a "stringent showing" that "reasonable minds could not disagree" that the disclosures were not misleading. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (dismissal on the pleadings based on sufficient cautionary language "requires a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'").

### 1. Misrepresentations or Omissions

Plaintiffs' allegations do not sound in fraud, and Defendants do not argue otherwise. Accordingly, the notice pleading standard of Rule 8 governs. In the instant action, Plaintiffs have sufficiently alleged both a material misrepresentation and an omission of material fact. Plaintiffs have adequately alleged that Defendants: 1) marketed their Fund as a way to profit from a decline in the value of the 30-year U.S. Treasury bond, but did not specify that the Fund was only appropriate for investors who thought the value of the 30-year Treasury bond would fall *that day* and discouraged investors from selling shares over the shorter term with sales charges for shares sold within a year or eighteen months of purchase; and 2) did not disclose that the daily tracking of the Fund *necessarily* implicates a mathematical compounding effect that will lead to deviation from the benchmark, and instead only made a general statement that "tracking error" is "possible" or "may" occur. The Court finds that, in the context of ruling upon a motion to dismiss under the

10
Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

1    liberal Rule 8 pleading standard, Plaintiffs have stated a claim under Section 11 and Section
2    12(a)(2) of the Securities Act by alleging that Defendants' disclosures regarding an appropriate
3    investor for the Fund and the inherent risk of compounding were misleading. *See Fecht v. The*
4    *Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (adequacy of disclosure is mixed question of law and
5    fact not usually resolved as a matter of law unless issue is "so obvious that reasonable minds could
6    not differ"). Thus, the Rydex Defendants' motion to dismiss is denied.

7    Specifically, Defendants argued that they repeatedly disclosed: 1) the Fund's daily
8    investment objective; and 2) the potential effects of compounding over time. Defendants did
9    disclose the daily objective of the Fund. However, disclosing the daily objective of the Fund is
10   insufficient, at least at the pleading stage, to overcome Plaintiffs' allegations that they were misled
11   by Defendants into thinking that the Fund was an appropriate long-term investment. *See Miller v.*
12   *Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (finding that the district court committed clear
13   error in dismissing securities claims where defendants' disclosures were "literally accurate," but
14   were presented in a context and manner that misled investors); *compare Brody*, 280 F.3d at 1006
15   (dismissing securities claim under heightened PLSRA pleading standard where plaintiffs only
16   alleged "incomplete" disclosures as opposed to misleading disclosures). Defendants marketed the
17   Fund as appropriate for "[i]nvestors who expect the value of the Long Treasury Bond to go down
18   and want investment gains when it does so" and for investors that want "benefits" in a "rising
19   interest rate environment." In addition, investors were subject to a sales charge if they sold shares
20   within a year or eighteen months of purchase. Although Defendants argue that investors could
21   have transferred their shares into other Rydex funds without these sales charges, investors could
22   not sell their shares for cash within a year or eighteen months without paying the sales charges. An
23   investor with the "total mix" of information is not necessarily unreasonable in believing that an
24   investment with a daily objective is also appropriate as a long-term investment, especially where
25   the particular investment at issue includes charges for shorter term sales, but not for longer term
26   sales. *See Brody*, 280 F.3d at 1006 (a statement that is "literally true" may still be misleading if it
27   presents a false impression of the nature of the security).
28

Moreover, Defendants overstate the extent of their disclosures on compounding. In their briefing before the Court, Defendants refer to the "inherent," "readily apparent," "undeniably clear" effect and risk of compounding on *any* investment with a daily benchmark. The Fund's actual disclosures were more general and ambiguous, referencing "tracking error risk" and using conditional language that mathematical compounding "may" prevent a Fund from correlating with the benchmark. This is more than a dispute over adverbs. Plaintiffs allege that Defendants failed to disclose the magnitude of the risk they faced by holding the Fund for longer than a single day because of the inevitable effect of compounding. *See Miller*, 519 F.3d at 886; *see also In Re Daou Systems*, 411 F.3d at 1019-21 (finding that plaintiffs satisfied the heightened pleading standards of a claim under 10(b) where defendants misleadingly understated magnitude of risk in investing in defendant company).

In any event, Defendants have not satisfied the "stringent showing" necessary to establish that their disclosures and cautionary language were sufficient as a matter of law. *See Livid Holdings Ltd.*, 416 F.3d at 947. Accordingly, the Rydex Defendants' motion to dismiss for lack of actionable misrepresentation or omission is denied.

### 2. Materiality

To succeed on their Section 11 and Section 12(a)(2) claims, Plaintiffs are also required to establish that the omission or misrepresentation was material, "that is, it would have misled a reasonable investor about the nature of his or her investment." *See Rubke*, 551 F.3d at 1161. Defendants, at this stage, do not challenge the materiality of the alleged misrepresentations and omissions. Accordingly, whether Plaintiffs' "reasonably" relied on the alleged misrepresentations and omissions (i.e., whether the misrepresentations/omissions were "material") is not yet ripe for review and will likely be an issue for summary judgment. *See Siracusano v. Matrixx Initiatives*, Inc., 585 F.3d 1167, 1177-78 (9th Cir. 2009) (question of "materiality" usually within "province of trier of fact"); *see also* Fecht, 70 F.3d at 1081 (9th Cir. 1995) (adequacy of disclosure and materiality are mixed questions of law and fact not usually resolved as a matter of law).

**B. Independent Trustee Defendants' Motion to Dismiss**

**1. Whether Plaintiffs Section 11 and Section 12(a)(2) Claims are time-barred?**

Claims brought under Sections 11 and 12(a)(2) of the Securities Act of 1933 are barred "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Plaintiffs must file their claims "within one year of actual notice *or inquiry notice* of an untrue or misleading statement." *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1411 (9th Cir. 1996). The Supreme Court has set a high bar for establishing inquiry notice as a matter of law in securities cases. In *Merck & Co. v. Reynolds*, the Supreme Court ruled that "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'"[1] As courts in this District have reasoned, the determination of inquiry notice is "fact intensive" and is usually not appropriate at the pleading stage. *See, e.g.*, *In re Bare Escentuals, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 103612 (N.D. Cal. Sept. 30, 2010) ("the court finds that resolution of the limitations issue is not appropriate at the pleading stage, but must be determined once an evidentiary record has been developed.").

Plaintiffs filed suit in March 2010. Thus, it is Defendants' burden to establish that Plaintiffs did discover or could have discovered the allegedly untrue statement or omission before March 2009. The Independent Trustee Defendants argue that: 1) the Registration Statements and Prospectuses themselves, along with the Fund's Annual Reports, put Plaintiffs on notice of the alleged misrepresentations and omissions; and 2) "well-publicized" news articles put plaintiffs on notice of the facts underlying their claims years before they filed suit. The Court is not persuaded.

As noted above, it was not obvious from the disclosures in the Registration Statements and Prospectuses that a fund with a daily benchmark would be inappropriate or highly risky (because of compounding, as Plaintiffs allege) for periods longer than a day. The Annual Reports include graphs showing a deviation, but it is not clear that compounding is the cause of that deviation. In other words, those graphs did not clearly give Plaintiffs notice of the misrepresentations they allege

---

[1] Although the Court recognizes that *Merck* analyzed inquiry notice in the context of the heightened pleading standards of a 10(b) securities violation, the same doctrine of inquiry notice is applicable to securities claims under Section 11 and Section 12(a)(2).

13
Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

1   here.  Nor do the three news articles cited by Defendants, as a matter of law, place plaintiffs on

2   inquiry notice.  *See In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d 958, 967

3   (N.D. Cal. April 22, 2010) (despite substantial press coverage regarding mortgage-backed

4   securities, the court could not "conclude that this press coverage put plaintiffs on notice of their

5   claims as a matter of law.").  The articles did not discuss the specific Fund at issue here, and

6   Plaintiffs dispute whether the articles were "widely available."

7         Accordingly, Defendants have failed to overcome the especially high hurdle in establishing

8   inquiry notice as a matter of law.  Thus, the Independent Trustee Defendants' motion to dismiss for

9   lack of timeliness is denied.

          **2.  Whether Plaintiffs have suffered "compensable damages?"**

11   Under the Securities Act:

> if the defendant proves that any portion or all of such damages
> represents other than the depreciation in value of such security
> resulting from such part of the registration statement,
> with respect to which his liability is asserted, not being true or
> omitting to state a material fact required to be stated therein or
> necessary to make the statements therein not misleading,
> such portion of or all such damages shall not be recoverable.

16   15 U.S.C. §77k(e).  This concept of "loss causation" means that there must be "a causal connection

17   between the material misrepresentation and the loss."  *See Dura Pharmaceuticals, Inc. v. Broudo*,

18   544 U.S. 336, 342 (2005).  Loss causation, i.e., a showing that the omission caused the security to

19   fall in value, is distinct from "transaction causation," which involved a showing that the omission

20   caused the plaintiff to enter into the transaction (buy the stock) in the first place.  Lack of loss

21   causation is an affirmative defense (i.e., not an element of a claim), but courts have sometimes

22   dismissed securities claims on the pleadings where the lack of loss causation is clearly apparent

23   from the face of the complaint and judicially noticeable documents.  *See, e.g., In re DNAP*

24   *Securities Litigation*, 2000 U.S. Dist. LEXIS 13482, 2000 WL 1358619, *3 (N.D. Cal. 2000).

25         Here, Defendants argue that, unlike traditional stocks, mutual funds and exchange traded

26   funds are not traded on the public market, and instead are priced according to their "net asset

27   value" (NAV), which is equal to (Assets - Liabilities) / Shares Outstanding.  Thus, according to

28   Defendants, only the Fund's investments (its assets and liabilities) can affect its price, not its

14

Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

disclosures. Under what Defendants refer to as the "broad" view of this argument, even if Defendants did fail to disclose who was an appropriate investor for the Fund and the nature of the compounding effect, those omissions are immaterial because they could not affect the Fund's price. In other words, Plaintiffs cannot show (and can never show) loss causation with this type of Fund.

This argument has recently been rejected by another judge in this District, and for good reason. *See In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (in a case involving securities claims under Section 11, 12(a)(2), and 15, holding that plaintiffs did not need to plead loss causation at the motion to dismiss stage and, in any event, that plaintiffs could establish "loss causation" by proving that the "materialization of the concealed risk caused the loss."). If Defendants are correct that disclosures are immaterial to mutual funds/exchange traded funds, then there can never be a Section 11 or Section 12(a)(2) claim of misrepresentation or material omission against such funds. That would lead to the absurd result that such funds could even *intentionally* misrepresent material facts with impunity.

At oral argument on December 16, 2010, Defendants also presented a narrower version of their "loss causation" argument, stating that, at least in this case, the risk of compounding was never concealed and so could not have "materialized" to cause Plaintiffs' loss. Although the determination of the affirmative defense of loss causation is more appropriate on a motion for summary judgment, the Court finds that Plaintiffs have plausibly alleged loss causation in as much as Plaintiffs allege that their loss in this case was caused, or exacerbated by, the "materialization" of the concealed/undisclosed risk that holding the Fund for longer than one day would inevitably lead to a failure of the Fund to track the inverse performance of the 30-year U.S. Treasury Bond. Defendants may be correct that Plaintiffs will have a hard time establishing loss causation with this type of fund. *But cf. In Re Daou Systems Inc.*, 411 F.3d at 1025 ("a plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation."). The only point decided here is that Plaintiffs should have the opportunity to make that showing.

Accordingly, the Independent Trustee Defendants' motion to dismiss for failure to establish loss causation is denied.

15
Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

### 3. The Claim under Section 15 of the Securities Act

Section 15 of the Securities Act makes any person who controls a person who violates certain sections of the Act (11 or 12), liable jointly and severally "with and to the same extent as the controlled person." *In re Daou Systems*, 411 F.3d at 1029-30. To state a claim under Section 15, plaintiff must establish (1) a primary violation of the pertinent federal securities laws, and (2) that defendants exercised actual power or control over the primary violator. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id*.

Plaintiffs have satisfied the first prong by establishing an underlying Section 11 and Section 12(a)(2) violation. Defendants submit that Plaintiffs' allegations regarding "control" (i.e., that Defendants are high level officers and signed registration statements) are merely conclusory and do not satisfy the heightened pleading standard of *Twombly* and *Iqbal*. However, Defendants extend this argument about a heightened pleading standard too far. It is certainly "plausible" that high level officers (like the Independent Trustees) who signed the Registration Statements were in a position to exercise control over the Fund and its disclosures. *See Howard*, 228 F.3d at 1065 (in order to establish a prima facie case for control person liability, "it is not necessary to show actual participation or the exercise of actual power); *see also In re Charles Schwab*, 257 F.R.D. at 550 (denying motion to dismiss Section 15 claims because "[i]t is a plausible inference, for example, that individuals who were officers of the fund (and other Schwab entities, in some cases) and who signed the registration statements were in a position to exercise power and control over Schwab Investments.").

Accordingly, the Independent Trustee Defendants' motion to dismiss the Section 15 claim is denied.

### 4. Whether Plaintiffs lack standing regarding claims relating to the July 2009 Registration Statement and the 2007 and 2008 "Advisor," "Investor" and "C Class" shares?

Plaintiffs acquired shares in the Fund between March 20, 2008 and December 19, 2008. But the 2009 Registration Statement was not issued until July 2009. Thus, Defendants argue that Plaintiffs do not have standing to bring Section 11 and 12(a)(2) claims because their shares were not purchased "pursuant to" the July 2009 Registration Statement. Plaintiffs acknowledge that they did not purchases shares pursuant to the 2009 Registration Statement, but argue that the misrepresentations and omissions from the 2007, 2008, and 2009 Registration Statements are all "part of the same common nucleus of operative fact." As courts in this District have held, a named plaintiff has standing only to the extent the claims are based on documents that governed their own purchases. *See, e.g.*, *In re Wells Fargo Mortg. Backed Certificates Litig.,* 712 F. Supp. 2d 958, 963 (N.D. Cal. April 22, 2010) ("Although plaintiffs have alleged that the Prospectuses and Prospectus Supplements contained some similar false statements or omissions, the case law is clear that a named plaintiff has standing under Section 11 only as to the documents that governed his own purchase of securities."); *see also In re Wells Fargo Mortgage-Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 124498 (N.D. Cal. Oct. 19, 2010) ("Multiple courts have rejected an extension of this 'common registration' theory to situations where, as here, Plaintiffs' claims rely on separate disclosures or omissions made for each Offering."). Thus, the Court agrees with Defendants that Plaintiffs lack standing to bring claims pursuant to the July 2009 Registration Statement, especially since the July 2009 Registration Statement includes a different set of disclosures and additional warnings about the effect of compounding on the Fund. Accordingly, the Independent Trustee Defendants' motion to dismiss the Section 11 and 12(a)(2) claims pursuant to the July 2009 Registration Statement is granted.

Similarly, Defendants contend that Plaintiffs only bought "A Class" shares of the Fund, and thus Plaintiffs have no standing to bring claims based on the other three types of shares (Advisor, Investor and C Class) pursuant to the July 2007 and July 2008 Registration Statements. Plaintiffs respond that they have standing to assert claims on behalf of investors of the "Advisor," "Investor," and "Class C" shares because courts have allowed purchasers of one class of securities to represent

17
Case No.: 10-CV-01171-LHK
ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

purchasers of another class of securities when the alleged harm stems from the same improper conduct or the same issuance. *See In re Juniper Networks Secs. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) ("plaintiffs with a valid securities claim may represent the interests of purchasers of other types of securities in a class action where the alleged harm stems from the same allegedly improper conduct"). The Court finds that Plaintiffs have the better argument because all four types of shares were issued pursuant to the July 2007 and July 2008 Registration Statements, which included the same disclosures for the A Class shares as for the Advisor, Investor, and C Class Shares. *See In re DDi Corp. Sec. Litig.,* 2005 U.S. Dist. LEXIS 28216, *23 (C.D. Cal. July 20, 2005) (holding that named plaintiffs, who had bought common stock, could represent investors who bought convertible notes because both were traceable to same issuance).

Accordingly, the Independent Trustee Defendants' motion to dismiss for lack of standing as to the Advisor, Investor, and C Class shares is denied.

### IV. CONCLUSION

For the reasons described above, the Rydex Defendants' motion to dismiss [dkt. #39] is DENIED. The Independent Trustee Defendants' motion to dismiss [dkt. #42] is DENIED with respect to the arguments regarding lack of timeliness, loss causation, control liability, and standing as to the Advisor, Investor, and C Class shares issued pursuant to the July 2007 and July 2008 Registration Statements. The Independent Trustee Defendants' motion to dismiss is GRANTED with respect to the claims under the July 2009 Registration Statement for lack of standing.

**IT IS SO ORDERED.**

Dated: January 5, 2011

*Lucy H. Koh*
LUCY H. KOH
United States District Judge