ALAN W. SPARER (No. 104921)
MARC HABER (No. 192981)
JAMES S. NABWANGU (No. 236601)
SPARER LAW GROUP
100 Pine Street, 33rd Floor
San Francisco, California  94111-5128
Telephone:      415/217-7300
Facsimile:       415/217-7307
asparer@sparerlaw.com
mhaber@sparerlaw.com
jnabwangu@sparerlaw.com

CLASS COUNSEL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES RAFTON, TRUSTEE OF THE JAMES AND CYNTHIA RAFTON TRUST, <br><br> Plaintiff, <br><br> v. <br><br> RYDEX SERIES FUNDS; PADCO ADVISORS INC. d/b/a RYDEX INVESTMENTS, INC.; RYDEX DISTRIBUTORS, INC.; RICHARD M. GOLDMAN; CARL G. VERBONCOEUR; JOHN O. DEMARET; NICK BONOS; MICHAEL P. BYRUM; COREY A. COLEHOUR; J. KENNETH DALTON; WERNER E. KELLER; THOMAS F. LYDON; PATRICK T. MCCARVILLE; ROGER SOMERS; and DOES 1 through 25, inclusive, <br><br> Defendants. | No. CV 10-01171 LHK <br><br> Action Filed:  March 19, 2010 <br><br> NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF <br><br> CLASS ACTION <br><br> Date:      January 5, 2012 <br> Time:      1:30 p.m. <br> Dept:      Courtroom 8, 4th Floor <br> Judge:    Hon. Lucy H. Koh |

1

**TABLE OF CONTENTS**

2

**Page**

3   NOTICE OF MOTION AND MOTION                                                    i

4   STATEMENT OF ISSUES TO BE DECIDED (Civ. L.R. 7-4(a)(3))                       ii

5   INTRODUCTION.                                                                  1

6   I.      BACKGROUND.                                                            2

7           A.      Commencement And Description Of The Action.                    2

8           B.      Overview Of Defenses Offered.                                  3

9           C.      The Appointment Of Lead Plaintiffs, And Defendants'
10                  Unsuccessful Motion To Transfer.                               3

11          D.      Defendants' Motions To Dismiss.                                4

12          E.      Discovery.                                                     4

13          F.      Negotiations Leading To The Settlement.                        5

14  II.     ARGUMENT.                                                              6

15          A.      The Settlement Meets The Standard For Judicial Approval.       6

16                  1.      The Settlement Is The Result Of Non-Collusive, Informed
17                          Negotiations.                                          8

18                  2.      The Settlement Amount Is Fair And Reasonable.          9

19                  3.      Proceeding Through Class Certification, Summary
20                          Judgment, Trial And Appeal Entailed Substantial Risks. 10

21                  4.      The Value Of An Immediate Recovery Greatly Outweighs
                            The Possibility Of Future Relief After Protracted And
22                          Expensive Litigation.                                  11

23                  5.      The Experienced View Of Counsel Is That The Proposed
                            Settlement Is Fair And Reasonable.                     12
24
                    6.      Response Of The Class Members To The Proposed
25                          Settlement.                                           12

26  III.    THE PLAN OF ALLOCATION SHOULD BE APPROVED.                            13

27  IV.     THE NOTICE PROCESS.                                                   14

28

A.    Record Of Fund Transactions Sent To Class Members With
Identified Transactions.                                                    16

B.    Potential Class Members With Partially Incomplete Transaction
Information.                                                                17

C.    Proof Of Claim Forms Sent to Unidentified Purchasers Or
Purchasers With Unidentified Transactions.                                  19

D.    The Claims Administrator Has Been Able To Provide Notice
To Substantially All Potential Class Members.                              19

CONCLUSION                                                                       21

TABLE OF CONTENTS

1

# TABLE OF AUTHORITIES

2

| **CASES** | **Page** |
|---|---|
| *Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) | 7 |
| *Churchill Vill., L.L.C. v. General Elec.*, 361 F.3d 566 (9th Cir. 2004) | 7, 17 |
| *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) | 7, 13 |
| *Create-A-Card, Inc. v. Intuit, Inc.*, 2009 U.S. Dist. LEXIS 93989 (N.D. Cal. Sept. 22, 2009) | 8, 15 |
| *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) | 7, 11 |
| *In re Charles Schwab Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 44547 (N.D. Cal. Apr. 19, 2011) | 11, 14, 15 |
| *In re Consol. Pinnacle W. Sec.*, 51 F.3d 194 (9th Cir. 1995) | 8 |
| *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166 (S.D. Cal. 2007) | 7 |
| *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) | 9 |
| *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2007) | 9, 13 |
| *In re Oracle Sec. Litig.*, 1994 U.S. Dist. LEXIS 21593 (N.D. Cal. June 16, 1994) | 13 |
| *In re Skilled Healthcare Group, Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 10139 (C.D. Cal. Jan. 26, 2011) | 9 |
| *In re TD Ameritrade Account Holder Litig.*, 2011 U.S. Dist. LEXIS 103222 (N.D. Cal. Sept. 12, 2011) | 7 |
| *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 1989 U.S. Dist. LEXIS 19146 (C.D. Cal. Mar. 9, 1989) | 12 |
| *Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515 (N.D. Cal. June 19, 2007) | 12 |
| *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819 (D. Mass. 1987) | 8 |
| *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) | 7 |
| *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) | 7 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATUTES & RULES**

Private Securities Litigation Reform Act of 1995    3

Securities Act of 1933    9
      §§11 or 12    13
      §§11 or 12(a)    13
      §§11 and/or 12(a)(2)    9
      §§11, 12(a)(2), 15    9

15 U.S.C.
      §77k    2
      §77l    2
      §77o    2

28 U.S.C. §1404(a)    3

Fed. R. Civ. P.
      23    1
      23(e)    6
      23(e)(2)    7

**OTHER**

Ellen M. Ryan & Laura E. Simmons, Cornerstone Research,
*Securities Class Action Settlements: 2010 Review and Analysis*, 2010,
media.complianceweek.com/documents/22/cornerstone2010analysis_5378.pdf    9

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that, pursuant to the Court's Order Granting Unopposed Motion for Preliminary Approval of Proposed Class Settlement and Approval of Notice Plan ("Preliminary Approval Order," Dkt. 99), on January 5, 2012, at 1:30 p.m., or as soon thereafter as may be heard before the Honorable Lucy H. Koh of the United States District Court for the Northern District of California, San Jose, California, Lead Plaintiffs James Rafton and James Darst Jr., will and hereby do move the Court for an order granting final approval of the Settlement in the above-captioned action on the terms set forth in the Stipulation and Agreement of Settlement dated July 28, 2011, including approval of the proposed Plan of Allocation for distribution of the Net Settlement Fund, and final certification of the Class as defined in the Court's Preliminary Approval Order, and approval of the notice process as implemented.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in Support thereof, the Declarations of Alan W. Sparer and Jennifer Keough, all pleadings and papers filed herein, the arguments of counsel, and any other matters properly before the Court.

**STATEMENT OF ISSUES TO BE DECIDED (Civ. L.R. 7-4(a)(3))**

1.      Whether the terms of the proposed $5.5 million settlement are fair, adequate and reasonable in light of the risks of further litigation.

2.      Whether the preliminary certification of the Settlement Class as satisfying the requirements of Rule 23 of the Federal Rules of Civil Procedure (Federal Rule 23") should be affirmed.

3.      Whether the proposed Plan of Allocation is fair, adequate and reasonable.

4.      Whether the Notice process as implemented constituted due, adequate and sufficient notice to those entitled to receive it and met the due process requirements of Federal Rule 23.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Lead Plaintiffs, James Rafton and James Darst, Jr., respectfully submit this Memorandum of Points and Authorities in support of the Motion for Final Approval of Class Action Settlement. The proposed settlement resolves all claims of the Settlement Class against Defendants on the terms and conditions set forth in the Stipulation and Agreement of Settlement dated July 28, 2011 ("Stipulation") (Dkt. 97).  In exchange Defendants will pay the Settlement Class $5.5 million.[1]

Lead Plaintiffs and Lead Counsel believe the settlement is an excellent result for the Settlement Class.  The Proposed Settlement is the product of arms-length negotiations by experienced counsel, and was agreed to only after significant discovery and expert analysis allowing the parties to realistically and thoroughly assess the strengths and weaknesses of their respective positions.  The total monetary relief is substantial and represents a recovery of approximately 40% of the maximum losses to the Settlement Class attributable to the effects of mathematical compounding, the primary focus of this litigation.   In addition, Lead Counsel designed and implemented a unique claims management plan which minimizes the effort Class Members are required to make in order to obtain a settlement payout.  As a result, it is estimated that at least 52,000 Class Members, or 67.74% of those claimants who are known to qualify for payment, will actually obtain a recovery.

In connection with this request for final approval of the settlement, Lead Plaintiffs request that the Court confirm that: (1) the terms and conditions set forth in the Stipulation are fair, adequate and reasonable in light of the risks of further litigation; (2) the Settlement Class meets the requirement for certification under Federal Rule 23; (3) the proposed Plan of Allocation is fair, adequate and reasonable; and (4) the notice process as implemented constitutes due, adequate and sufficient notice, and meets the due process requirement of Federal Rule 23.

---

[1]Unless otherwise stated, capitalized terms have the meaning provided in the Stipulation.

NTC OF MTN & MTN FOR FINAL APPRVL OF SETTLEMENT; MPA      No. CV 10-01171 LHK

# I.

## BACKGROUND.

### A.    Commencement And Description Of The Action.

Plaintiff James Rafton filed the original complaint against Defendants on March 19, 2010. On August 13, 2010, Lead Plaintiffs filed their First Amended Complaint ("FAC") alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§77k, 77l and 77o), arising out of misstatements in the Fund's 2007, 2008 and 2009 Registration Statements and Prospectuses. The putative class was defined as all persons and entities who purchased shares of the Fund during the period from March 19, 2007 through March 19, 2010.

The FAC alleged that the Fund was sold to investors through registration statements and prospectuses ("Registration Statements") that failed to adequately disclose a mathematical compounding effect, which virtually assured that the Fund would not accurately track its benchmark over time. According to the FAC, the Registration Statements also failed to disclose that the Fund was inappropriate for investors who intended to hold it longer than a single day. *Id.* ¶¶39-40, 47.

In support of their claims Lead Plaintiffs noted that: (1) the Registration Statements and related material stated that the Fund was appropriate for investors who sought investment benefits in a "rising interest rate environment" (FAC ¶¶39-40; 2007 Annual Report at 32); (2) that the fee structure for certain classes of Fund shares imposed burdens and/or penalties which if applied would serve as a disincentive for investors to sell their shares in less than a year (2007 Prospectus at 54; 2008 Prospectus at 75); and (3) that in summer 2009, the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") issued notices to investors and brokers specifically identifying the risks of holding inverse funds like the Rydex Fund for periods longer than a single day, and reminding brokers of their disclosure obligations. The FAC also notes that shortly thereafter Defendants amended their Registration Statement to provide additional discussion of compounding as it affected the Fund. FAC ¶¶60-66.

**B.      Overview Of Defenses Offered.**

Defendants offered multiple defenses, and denied having any liability to Lead Plaintiffs or Class Members.  Among the defenses asserted by Defendants were the following: (1) that the Registration Statements were clear and accurate, and contained no material misrepresentation or omissions; (2) that the Registration Statements adequately explained to Class Members the facts and risks regarding compounding; (3) that the Fund was an appropriate investment for periods longer than one day; (4) that the compounding effect, which is inherent in all inverse funds that track the daily price movement of a benchmark, was widely known and widely discussed in publicly available articles and research reports; (5) that the Fund had no obligation to opine and did not opine about the types of investors for whom the Fund is suitable; (6) that the alleged misstatements in the Registration Statements could not have caused any decline in the Fund's net asset value ("NAV"); and (7) that the SEC and FINRA warnings in summer 2009 should be a cutoff date for all or some Class Members, reducing their potential recovery by over 80%. Defendants also disputed the amount of potentially recoverable damages and argued that much of the decline in the Fund's NAV was not related to the misrepresentations alleged in the case.

Lead Plaintiffs and Lead Counsel carefully considered each of these defenses, and others, before deciding that the Settlement was in the best interests of the Class.

**C.      The Appointment Of Lead Plaintiffs, And Defendants' Unsuccessful Motion To Transfer.**

After the time prescribed by the Private Securities Litigation Reform Act, James Rafton and James Darst, Jr. moved for appointment as Lead Plaintiffs.  On June 29, 2010, Judge Charles R. Breyer issued an order finding that Messrs. Rafton and Darst had the largest financial interest of any applicant and that they "otherwise satisfie[d] the requirements of Fed. R. Civ. Pro. 23." Messrs. Rafton and Darst were appointed as Lead Plaintiffs and their selection of Sparer Law Group as Lead Counsel was approved.

Also on June 29, 2010, following extensive briefing and oral argument, Defendants' motion to transfer venue to the District of Maryland pursuant to 28 U.S.C. §1404(a) was denied by Judge Breyer.

1    Shortly thereafter, on August 2, 2010, this action was transferred to the Honorable Lucy

2    H. Koh.

3         **D.    Defendants' Motions To Dismiss.**

4    On October 8, 2010, the Rydex Defendants and the Individual Defendants filed separate

5    motions to dismiss the FAC.  On November 8, 2010, Lead Plaintiffs filed separate oppositions to

6    each of the motions, and on November 30, 2010, Defendants filed their replies in further support

7    of their motions.

8    On January 5, 2011, the Court issued an order denying the Rydex Defendants' motion to

9    dismiss in its entirety, and denying in part and granting in part the Individual Defendants' motion

10   to dismiss.  The Court held that Plaintiffs lacked standing to bring claims under the Fund's 2009

11   Registration Statement, but allowed all of their claims under the 2007 and 2008 Registration

12   Statements to proceed as pleaded.

13   On April 22, 2011, Defendants moved for leave to file a motion for reconsideration of the

14   Court's denial of Defendants' motion to dismiss on the issue of loss causation and in the

15   alternative, moved for certification of the Court's order denying the motions to dismiss.  On

16   May 2, 2011, the Court denied both motions.

17        **E.    Discovery.**

18   Beginning in March 2011, the Parties exchanged initial Rule 26(a) disclosures, and

19   propounded and responded to extensive written requests for production of documents and

20   information.  Thereafter, Defendants produced thousands of pages of documents, as well as all of

21   the trading data for putative Class Members during the Class Period.  The documents analyzed by

22   Class Counsel included: all Prospectuses and related Statements of Additional Information; the

23   Fund's online and print marketing materials; internal documents created by Defendants' Fund

24   managers to promote the Fund; news articles in the public domain regarding the effects of

25   compounding; and internal e-mail discussions among Defendants' employees regarding the

26   management of the Fund, the Fund's tracking error, the effects of compounding on the Fund's

27   returns, investor inquiries, and the Fund's fee structure.

28

In addition, as discussed more fully below, Class Counsel negotiated the production of trading data in electronically readable form, which permitted its experts to analyze issues relating to loss causation, damages and product suitability.  This information was used to prepare expert testimony related to class certification and to evaluate settlement.

On May 13, 2011, Defendants served their initial expert report on class certification issues.

The Parties also obtained and shared discovery by subpoena of Lead Plaintiffs' personal financial advisor and brokerage firm.  Defendants then took the depositions of Messrs. Rafton and Darst over a 3-day period in late May 2011.

In all, the Parties exchanged and reviewed over 30,000 pages of subpoenaed or produced documents, as well as electronic data informally exchanged for purposes of conducting settlement discussions.

**F.       Negotiations Leading To The Settlement.**

At the time of the Initial Case Management Conference, the parties designated W. Randall Wulff as a mediator, recognizing that his schedule and that of counsel would not allow mediation until early August 2011, after the class certification briefing was complete. Declaration Of Alan W. Sparer In Support Of (1) Motion For Final Approval Of Class Action Settlement And (2) Motion For Award Of Attorneys' Fees And Litigation Expenses And For Reimbursement Of Lead Plaintiffs' Costs And Expenses ("Sparer Decl.") ¶3.  During the course of discovery, the Parties concluded that an earlier settlement effort would be more efficient and cost effective than the later-scheduled mediation.  To that end, Lead Plaintiffs and Defendants scheduled a confidential settlement meeting in San Francisco for May 26, 2011.  *Id.*

As noted above, Defendants' expert designation and expert report on class certification issues had been served on May 13, 2011, pursuant to the pre-existing trial schedule.  In preparation for the meeting, Defendants also provided extensive trading data for all putative Class Members for the Class Period, so that the parties could exchange damage calculations.  *Id.* ¶3.  The settlement meeting was attended by counsel, experts for both sides, and representatives for Defendant Rydex.  Class Counsel engaged the services of a former SEC economist, Dr. Craig

1   McCann of Securities Litigation and Consulting Group ("SLCG"), to perform the damage

2   calculations and provide quantitative analysis of issues relating to class certification. *Id*. In

3   preparation for responding to Defendants' expert report, and in preparation for the May 26, 2011

4   settlement meeting, Dr. McCann's staff performed a thorough analysis of the Fund's trading data

5   and prepared detailed damage calculations. *Id*. Class Counsel also engaged as a rebuttal expert,

6   a former finance professor and Wall Street bond specialist, to address substantive issues,

7   including the adequacy of the disclosures in the Registration Statements relating to the effects of

8   compounding, and the suitability of the Fund as a vehicle for tracking the inverse of the Treasury

9   Long Bond. Both Plaintiffs' experts were well advanced in the preparation of their rebuttal

10  analysis when the May 26 settlement meeting occurred. *Id*. ¶3.

11        The meeting lasted the better part of the day on May 26, and was followed in the

12  succeeding weeks by telephonic conference calls between Plaintiffs' and Defendants' experts and

13  by negotiations between counsel on almost a daily basis. Lead Plaintiffs were consulted

14  regularly in person or by telephone. *Id*. ¶5. On June 7, 2011, the Parties agreed in principal to a

15  proposed settlement amount and executed a Memorandum Of Understanding. The Parties

16  advised the Court of their tentative settlement at the June 8, 2011 Case Management Conference,

17  and July 25, 2011 was scheduled as the deadline for filing the Motion for Preliminary Approval,

18  which was subsequently extended until July 28, 2011. *Id*.

19        The preparation and negotiation of final settlement terms was a lengthy process which

20  was not concluded until the date of filing of the Motion for Preliminary Approval, and included

21  substantive detailed discussions of the schedule, notice provisions, plan of allocation, release

22  terms and break-up terms. *Id*.

23                                    **II.**

24                               **ARGUMENT.**

25  **A.    The Settlement Meets The Standard For Judicial Approval.**

26        In deciding whether to approve a proposed settlement of a class action under Federal Rule

27  of Civil Procedure 23(e), the court must find, exercising its own discretion, that the proposed

28

1    settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *Class Plaintiffs v. City of*

2    *Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

3        In exercising this discretion, the Ninth Circuit has noted that settlements of disputed class

4    action claims are encouraged.  *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir.

5    1976) ("[T]here is an overriding public interest in settling and quieting litigation," and this is

6    "particularly true in class action suits …").  In assessing whether a settlement is fair and

7    reasonable, the court "is not to make a final determination of liability or damages, or to hold a

8    trial or rehearsal of the trial."  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617 (N.D. Cal. 1979).  It

9    is also not the court's responsibility to determine whether a better settlement might have been

10   negotiated.  *Id*.  Rather, the court's review is limited "'to the extent necessary to reach a reasoned

11   judgment that the agreement is not the product of fraud or overreaching by, or collusion between,

12   the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to

13   all concerned.'"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (citation

14   omitted).  A strong initial presumption of fairness attaches to a proposed settlement where the

15   settlement is the product of arm's length negotiations among experienced counsel.  *In re Immune*

16   *Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007).

17       The Ninth Circuit also has explained that the ultimate determination of whether a class

18   action settlement should be approved necessarily involves a balancing of several factors,

19   including: (1) "the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely

20   duration of further litigation; (3) the risk of maintaining class action status throughout the trial;

21   (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the

22   proceedings; (6) the experience and views of counsel"; and (7) "the reaction of class members to

23   the proposed settlement."  *In re TD Ameritrade Account Holder Litig.*, 2011 U.S. Dist. LEXIS

24   103222, at *10-*11 (N.D. Cal. Sept. 12, 2011) (quoting *Churchill Vill., L.L.C. v. General Elec.*,

25   361 F.3d 566, 575 (9th Cir. 2004).  "The relative degree of importance to be attached to any

26   particular factor will depend upon and be dictated by the nature of the claims advanced, the types

27   of relief sought, and the unique facts and circumstances presented by each individual case."

28   *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

-7-

1    The settlement here meets the Ninth Circuit's standard for approval.

2

3    **1.     The Settlement Is The Result Of Non-Collusive, Informed Negotiations.**

4    As noted above, Courts, including the Ninth Circuit, give considerable weight to the

5    presence of arm's length negotiations conducted by competent counsel when evaluating a

6    proposed settlement. *Create-A-Card, Inc. v. Intuit, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *14

7    (N.D. Cal. Sept. 22, 2009) ("[C]ourts recognize that arm's-length negotiations conducted by

8    competent counsel are prima facie evidence of fair settlements") (citing *In re Consol. Pinnacle*

9    *W. Sec.*, 51 F.3d 194, 197 n.6 (9th Cir. 1995); *see also M. Berenson Co. v. Faneuil Hall*

10   *Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987) (holding that where "a proposed class

11   settlement has been reached after meaningful discovery, after arm's length negotiations by

12   capable counsel, it is presumptively fair").

13   In this case the settlement is the result of serious, informed, non-collusive negotiations

14   conducted in good faith over a period of two months.  By the time the settlement was reached,

15   the litigation had proceeded to a point at which both Lead Plaintiffs and Defendants had a clear

16   view of the strengths and weaknesses of their respective cases.  The settlement reflects over

17   one-and-one-half years of effort by Lead Plaintiffs, including pre-filing investigation, locating

18   and interviewing potential experts, filing a complaint and an amended complaint, substantial

19   research, successful opposition to a motion to transfer venue and two motions to dismiss, and

20   review of thousands of pages of documents.  In addition, the settlement was reached only after

21   experts for all parties had fully analyzed their respective claims and defenses, including liability,

22   causation and damage issues.  This review included informal, direct exchanges between experts

23   for Lead Plaintiffs and Defendants relating to the Fund's trading data, net out-of-pocket losses,

24   and the impact of compounding on Fund returns.  Sparer Decl. ¶3.

25   The fact that the parties required two months of discussions before reaching final

26   agreement is further evidence that the settlement process was adversarial and non-collusive.

27   Accordingly, the settlement is entitled to a strong initial presumption of fairness.

28

2.      **The Settlement Amount Is Fair And Reasonable.**

The proposed Settlement of $5.5 million represents a meaningful recovery of the damages suffered by the Class as a result of the compounding effect, and is well within the range of what is considered fair, reasonable and adequate.

Class Counsel estimates that the settlement amount represents approximately 40% of the maximum recoverable loss to the Settlement Class resulting from the tracking error due to compounding.  This percentage reflects the amount of the settlement relative to the most realistic recoverable damages at trial, and is an amount that compares favorably to other settlements that have been approved in this Circuit.  *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (noting that a settlement of $2 million out of a potential $12 million, or 16.66%, was fair and adequate); *In re Skilled Healthcare Group, Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 10139, at *11 (C.D. Cal. Jan. 26, 2011) ("[A] settlement fund that recoups twenty percent of the class's estimated maximum possible damages seems a sound choice"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2007) ("The Settlement will give Plaintiffs $ 13.75 million, which is just over 9% of the maximum potential recovery asserted by either party …, [which] is higher than the median percentage of investor losses recovered in recent shareholder class action settlements").

In addition, the proposed Settlement in nominal terms exceeds the median settlement for class actions asserting claims under Sections 11 or 12 of the Securities Act of 1933.  During the fifteen-year period after the passage of the Private Securities Litigation Reform Act of 1995, the median settlement for Sections 11 or 12(a)(2) cases was $3.6 million.[2]  Sparer Decl. ¶9 & Ex. A at 9 (Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, *Securities Class Action Settlements: 2010 Review and Analysis*, 2010, media.complianceweek.com/documents/22/cornerstone2010analysis_5378.pdf.

---

[2]Although Cornerstone Research data is often referenced as a benchmark for the fairness of class action settlements, we note that the research sample involving only Section 11 and/or 12(a)(2) claims in Cornerstone's data is very small, amounting to only 55 cases.  In addition, there is no available data for cases where, as here, the damages resulting from the Section 11 and 12 violations (non-disclosure of compounding effects) are likely to be less than the full amount of net out-of-pocket losses during the Class Period.

1    In short, on a purely numerical basis, the settlement provides a substantial recovery, and

2    compares favorably with other settlements approved in this Circuit.

3                    **3.      Proceeding Through Class Certification, Summary Judgment, Trial
             And Appeal Entailed Substantial Risks.**
4

5    As strongly as Lead Plaintiffs and Lead Counsel believed in their case, we nevertheless

6    recognized that there were significant risks to pursuing this action to trial.  Among the most

7    significant of these risks and uncertainties were the following.

8    *First*, the question whether the disclosures contained in the Registration statement

9    contained material misrepresentations and omissions would be decided by a jury, and there is no

10   assurance that the Jury would find in favor of Plaintiffs.  Plaintiffs acknowledged that the

11   compounding error was discussed, but alleged that the discussions were incomplete, falsely

12   characterized "inevitable" losses as merely "possible," and buried the more complete discussions

13   of mathematical compounding in sections of the Registration Statements addressing Rydex's

14   many other *leveraged* inverse funds.  However, if a jury were to conclude that a reasonable

15   investor would not have been misled, and that the Registration Statement disclosures were on

16   balance sufficient, there would be no recovery for the Class.

17   *Second*, Plaintiffs alleged that the Registration Statements failed to adequately emphasize

18   that the Fund was only suitable for investors who planned to hold it for no longer than a single

19   trading session.  In response, Defendants planned to present evidence through expert testimony

20   that the Fund statistically tracked its index with reasonable accuracy, despite the compounding

21   errors, and therefore was not unsuitable as a long term hold.

22   *Third*, it was undisputed that the SEC and FINRA warned customers in Summer 2009

23   that inverse and leveraged inverse funds such as the Rydex Funds were subject to compounding

24   error and only suitable for investors who planned to hold them no longer than a single day.

25   Defendants argued that these notices represented a point at which Class Members were on notice

26   of the alleged misrepresentations in the Registration Statements, and should therefore cut off the

27   accrual of damages and shorten the Class Period.  An analysis of the damages showed that if such

28

1    a cutoff date were adopted by the trier of fact, the potential recovery of the Class would be

2    reduced by over 80%.

3           *Fourth*, it was anticipated that many of these issues would be framed so as to suggest that

4    the Lead Plaintiffs were not typical or that that individual questions of fact would predominate

5    over class issues.  While Plaintiffs did not believe that Defendants would succeed in avoiding

6    class certification, the matter was likely to be vigorously litigated and result in issues that could

7    be raised in an appeal if and when Plaintiffs prevailed at trial.

8                            **4.      The Value Of An Immediate Recovery Greatly Outweighs
                                    The Possibility Of Future Relief After Protracted And
9                                    Expensive Litigation.**

10          Courts consistently have held that the expense and possible duration of the litigation

11   should be considered in evaluating the reasonableness of a settlement.  *In re Charles Schwab*

12   *Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 44547, at *17 (N.D. Cal. Apr. 19, 2011) (quoting

13   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).  Here, the settlement guarantees

14   a substantial recovery for Class Members now, while averting the need for lengthy and expensive

15   litigation.  Without a settlement, any recovery by the Class is likely to be delayed by years, even

16   if Lead Plaintiffs are ultimately successful.  By contrast, the proposed $5.5 million cash payment

17   by Defendants provides the Class with an immediate and guaranteed substantial result.

18          In considering whether to enter into the Settlement, Lead Plaintiffs weighed the value of

19   an immediate settlement against the prospect that significant proceedings remained ahead,

20   including additional discovery, class certification briefing, summary judgment briefing, *Daubert*

21   motions, trial preparation, a trial and potential appeals.  In addition, the size of the potential Class

22   recovery was limited by the fact that the damages derived primarily from a tracking error

23   introduced by the effect on NAV of mathematical compounding during periods of Long Bond

24   price volatility.  The parties were largely in agreement as to the amount of the damages, and both

25   sides faced the dilemma that the cost of protracted litigation would be disproportionate to the

26   amount in dispute.  Compared to the settlement Class Counsel was able to negotiate, protracted

27   litigation potentially could have reduced the net recovery to Class Members, even if Plaintiffs

28   prevailed at trial.  There is no doubt that the significant time and expense of continuing with the

1   litigation would be substantial, and that such transactional costs would significantly reduce

2   whatever judgment Class Members recovered.

3        **5.  The Experienced View Of Counsel Is That The Proposed**
         **Settlement Is Fair And Reasonable.**

4

5      Although a district court should not simply rubber stamp stipulated settlements, numerous

6   courts have recognized that the opinion of experienced counsel supporting the settlement is

7   entitled to considerable weight. *Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515, at *3-*4

8   (N.D. Cal. June 19, 2007); *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec.*

9   *Litig.*, 1989 U.S. Dist. LEXIS 19146, at *8 (C.D. Cal. Mar. 9, 1989) (Experienced counsel's

10  assessment that the settlement is reasonable and fair should be given "significant weight").

11     Class Counsel, who have significant experience in prosecuting and negotiating securities

12  actions, believe that the settlement is fair and reasonable, and in the best interest of the Class.

13  *See* Sparer Decl. ¶2, 11 & Ex. B.  Class Counsel began their initial investigation of this matter in

14  early January 2010; researched and filed the complaint; successfully opposed motions to change

15  venue and to dismiss; reviewed tens of thousands of pages of documents; and were closely

16  involved, with the assistance of finance professionals, in analyzing the trading data for the Fund

17  during the Class Period.  *Id.* ¶2.  As a result, Class Counsel is well versed in the facts and the

18  legal issues in the case, and came to the determination that the proposed settlement was fair only

19  after extensive analysis of the strengths and weaknesses of the case.  *Id.* ¶2.  Accordingly, this

20  factor also supports approval of the Settlement.

21       **6.  Response Of The Class Members To The Proposed Settlement.**

22     The deadline for Class Members to file objections or request exclusion does not pass until

23  December 15, 2011, and Class Counsel will provide an update on or prior to the Fairness

24  Hearing.  However, as of the date of filing of this Motion, over 96,000 individual notices have

25  been mailed and no Class Member has objected to the Proposed Settlement, the Plan of

26  Allocation, the Motion for Award of Attorneys' Fees and Litigation Expenses, or the proposed

27  reimbursements for the Class Representatives.  Sparer Decl. ¶6.  No potential Class Member has

28

1   sought to be excluded from the Class.  *Id.*  Therefore, the response from Class Members thus far

2   strongly supports approval.

3                                                  **III.**

4                           **THE PLAN OF ALLOCATION SHOULD BE APPROVED.**

5          Approval of a plan of allocation of settlement proceeds "'is governed by the same

6   standards of review applicable to approval of the settlement as a whole: the plan must be fair,

7   reasonable and adequate.'"  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1045 (quoting *In re*

8   *Oracle Sec. Litig.*, 1994 U.S. Dist. LEXIS 21593, at *3 (N.D. Cal. June 16, 1994), and citing

9   *Class Plaintiffs. v City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir 1992)).  "It is reasonable to

10  allocate the settlement funds to class members based on the extent of their injuries or the strength

11  of their claims on the merits."  *Id.*

12         The Plan of Allocation proposed here meets these criteria.  The Net Settlement Fund

13  available for distribution will be less than the total losses or damages alleged to be suffered by

14  Class Members.  Therefore, Lead Plaintiffs and Class Counsel were required to develop a plan of

15  allocation to distribute the Net Settlement Fund to Class Members.  To achieve an equitable

16  payment, Lead Plaintiffs proposed to allocate the proceeds of the settlement pro rata among Class

17  Members based on each Class Member's Recognized Losses.

18         The Recognized Losses represent the sum of: (1) 100% of the Class Member's loss

19  attributable to the tracking error introduced by compounding, not to exceed the larger of the

20  Class Member's losses under Section 11 or Section 12(a) ("net out-of-pocket loss"), *and* (2) 5%

21  of the Class Member's net out-of-pocket loss.[3]  *See* Declaration of Jennifer Keough ("Keough

22  Decl.") Ex. B at 4-5 (Notice for Identified Purchasers).

23         Basing the payout of each Class Member on his or her Recognized Losses results in a

24  distribution of payouts that accounts for the two principal misrepresentations alleged in the FAC.

25  Inasmuch as the FAC focused on Defendants' failure to disclose the tracking error produced by

26         _____

        [3]The "not to exceed" limitation reflects the statutory limitation that potential Class

27  Members with no net out-of-pocket loss are not eligible to recover any damages under Sections
    11 or 12(a) of the Securities Act of 1933 even if their gains were reduced by compromising

28  losses.

                                                  -13-
    _____
    NTC OF MTN & MTN FOR FINAL APPRVL OF SETTLEMENT; MPA      No. CV 10-01171 LHK

1    compounding, most of the recovery is allocated to reflect the impact of that factor.  However, it

2    was also alleged that the Rydex Fund was unsuitable as a vehicle for investors to benefit from a

3    rise in interest rates if held for longer than a single trading session.  Accordingly, a portion of the

4    recovery is based on net out-of-pocket loss from the investment itself.  The portion is not

5    significant inasmuch as interest rates fell during the Class Period resulting in out-of-pocket losses

6    that would have occurred regardless of the compounding effect or unsuitability as a long-term

7    hold.

8           Distributions will be made to Class Members who do not exclude themselves from the

9    settlement after all claims are processed and after the Court has finally approved the settlement.

10   The distributions will allocate the Net Settlement Fund pro rata based on the amount of each

11   Class Member's Recognized Losses compared to the total Recognized Losses of all Class

12   Members.  If any funds remain in the Net Settlement Fund by reason of un-cashed checks or

13   otherwise, then, after the Claims Administrator makes reasonable and diligent efforts to distribute

14   such funds, any balance remaining will be contributed to one or more nonsectarian, not for profit,

15   501(c)(3) organization(s) designated by Class Counsel.

16                                            **IV.**

17                              **THE NOTICE PROCESS.**

18          The notice process proposed by Lead Plaintiffs and adopted in the Court's Preliminary

19   Approval Order goes to great lengths to identify potential class members, provide individual

20   notice and simplify the process of asserting damage claims.  Using data obtained from Rydex and

21   from 243 intermediaries, the claims administrator, Garden City Group, Inc. ("GCG") mailed

22   individualized notices to over 68,000 Class Members and potential Class Members.  Keough

23   Decl. ¶¶7, 20, 23-24.  Those notices each included a personalized Record of Fund Transactions

24   ("ROFT") containing Rydex transaction data.  *Id*. ¶19.  Another 28,000-plus individualized

25   notices and Proof of Claim Forms were mailed to *potential* Class Members.  *Id*. ¶26.  The notice

26   process followed parallels and/or compares favorably to procedures approved by courts in this

27   District.  *In re Charles Schwab Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 44547, at *16

28   (approving similar notice procedures that used contact information and transaction records

                                            -14-

obtained from mutual fund company to provide notice to class members);[4] *Create-A-Card, Inc. v. Intuit, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *5-*6 (N.D. Cal. 2009) (finding notice campaign comprised of direct mail, e-mail, publication of the settlement on a website, and the creation of a toll-free number by the claims administrator, provided the best practicable notice to the class).

In coordination with Class Counsel, GCG implemented the notice process as follows:

(1) On September 20, 2011, the Rydex Defendants provided GCG with an initial file of data with names, addresses and GCG was provided later with account data for all accounts reflected in Defendants' records as having acquired Rydex Fund shares during the Class Period (Keough Decl. ¶4).;

(2) On September 22, 2011, Defendants provided names and addresses of certain broker-dealers or other financial advisors ("Intermediaries") reflected in Defendants' records as having acquired Rydex Fund shares on behalf of their customers during the Class Period (*id.*);

(3) On September 27, 2011, GCG sent a notification to 243 Intermediaries at 551 different addresses requesting that all transaction and contact information data for accounts that acquired Rydex Fund shares during the class period be provided to GCG (*id.*. ¶7);

(4) On October 26, 2011, GCG began mailing Notices along with Records of Fund Transactions for Class Members with Identified Transactions (*id.* ¶20);

(5) Also on October 26, 2011, GCG began mailing Notices and Proof of Claims Forms to Class Members with Unidentified Purchases or Purchasers with Unidentified Transactions (*id.* ¶26);

(6) On November 10, 2011, the Summary notice was published in Investor's Business Daily and over PR Newswire (i*d.* ¶27); and

(7) As of November 23, 2011, GCG completed the process of mailing notice by first class mail to over 96,000 Class Members and potential Class Members identified from the information supplied by Defendants and by the Intermediaries. *Id.* ¶18.

---

[4]In the *In re Charles Schwab Corp. Securities Litigation* case the complexities of obtaining class member contact information and transaction data were substantially less because the mutual fund in question was marketed substantially to direct Schwab customers, as opposed to through Intermediaries, as here.

1        On September 28, 2011, GCG also went live with a website dedicated to the settlement

2   (and to which the notices refer), which includes a case summary, a listing of important dates

3   related to the settlement and final approval, and downloadable copies of important documents

4   (including the notices), and answers to frequently asked questions. *Id*. ¶29. The website also

5   reminds Class Members that (consistent with the Preliminary Approval Order) any Proof of

6   Claim submitted by mail must be postmarked no later than December 15, 2011, *or* 30 days after

7   the date of mailing of individual notice and Proof of Claim Form, whichever was later, and that

8   any Proof of Claim filed through the website must be submitted by this same deadline. *Id.*

9        The Notices also advise potential Class Members of the website and toll-free number

10  maintained by the Claims Administrator for access exclusively in connection with the settlement.

11  *Id*. ¶28.

12

13       **A.**    **Record Of Fund Transactions Sent To Class Members With IdentifiedTransactions.**

14       The Preliminary Approval Order called for mailing to each Class Member for whom

15  complete transaction data could be obtained a Notice to Identified Purchasers with Identified

16  Transactions ("Identified Purchaser Notice"), a Report of Fund Transactions ("ROFT"), and a

17  Fund Transaction Dispute Form. *Id*. ¶¶20-21. A copy of this "Identified Purchaser Notice" is

18  attached to the Declaration of Jennifer Keough as Exhibit. B.

19       This Notice and the alternative Notice for Unidentified Purchasers or Purchasers with

20  Unidentified Transactions (both of which were previously approved by the Court) are

21  comprehensive, yet easy to read and understand. The first few pages of the Notices summarize

22  important information, such as the securities and time period covered by the settlement, the total

23  settlement amount, the nature of the case, the reasons for settlement, the potential outcome of the

24  case, the attorneys' fees and expenses sought, the deadline to object, the date of the fairness

25  hearing, and how to obtain further information. *Id*., Exs. B, D.

26       The next pages of the Notices provide more detail in clear, straightforward language,

27  explaining: why potential Class Members have received a notice; the subject matter of the action;

28  why there is a settlement; who is included in the settlement class; and how the net settlement

1   funds will be distributed among Class Members.  *Id.*  These notices meet the standard in this

2   Circuit for providing fair, reasonable and adequate notice to absent class members.  *Churchill*

3   *Vill., L.L.C. v. General Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (Notice is satisfactory if it

4   "generally describes the terms of the settlement in sufficient detail to alert those with adverse

5   viewpoints to investigate and to come forward and be heard") (citation and internal quotation

6   marks omitted).

7       The individualized ROFT, mailed to each Class Member for whom complete trading data

8   was available, summarizes the total purchases made during the Class Period, applicable sales,

9   dividends, and provides a Summary of Recognized Losses.  Keough Decl. Ex. B.  The Summary

10  of Recognized Losses will be used by GCG to determine pro rata distributions once the proposed

11  settlement is approved.  The second section of the ROFT includes a Schedule of Account

12  Activity Detail listing each eligible trade for the Class Member (*e.g.*, purchase, sale, dividend

13  reinvestment).  *Id.*

14      If a Class Member believes that there is an error in the account activity detail, he or she

15  can complete and return a "Fund Transaction Dispute" form to GCG no later than 30 days from

16  the date the Notice and ROFT were mailed.  This form, along with a return envelope, was

17  included with each notice package.  *Id.* ¶21.  Class Members who choose to file a Fund

18  Transaction Dispute form challenging their transaction data, or who choose to exclude

19  themselves from the Class, can do so electronically or by mail.  *Id.*  As the Notice clearly states,

20  unless the Class Member chooses to opt out, object to the settlement, or challenge his or her

21  ROFT, no action is required.  A check for the Class Member's pro rata share of the recovery will

22  be mailed in due course.  *Id.*

23      Altogether, a total of 52,529 Identified Purchaser Packets were mailed to Class Members

24  between October 26, 2011 and November 23, 2011.  *Id.* ¶20.

25

26      **B.     Potential Class Members With Partially Incomplete Transaction
                 Information.**

27      As noted above, Defendants did not possess contact information and/or transaction data

28  for many potential Class Members who purchased their Fund shares through Intermediaries.

1   Pursuant to the Preliminary Approval Order, GCG obtained additional information from

2   Intermediaries in a process that began on September 21, 2011, with efforts to identify the

3   Intermediaries from the Rydex data and continued with the mailing to 243 Intermediaries at 551

4   addresses.  *Id*. ¶7.  A copy of the letter to Intermediaries is attached as Exhibit A to the

5   Declaration of Jennifer Keough.  The process of obtaining information from the Intermediaries

6   was not completed until November 18, 2011, and involved repeated contacts with multiple

7   Intermediaries by email and telephone to resolve issues presented by the contact information

8   supplied and/or the transaction data, which was sometimes incomplete or internally inconsistent.

9   *Id*. ¶10.  Anomalies in the data included zero prices for certain share transactions, prices that

10  were wildly inconsistent with the net asset values reported in the Rydex data, and missing data

11  relating to cash and share dividends.  *Id*. ¶16.

12        In many of these cases, the data from Intermediaries contained only minor problems, such

13  as a single defect in a reported transaction or missing data on a single dividend distribution, while

14  the remaining reported transactions otherwise appeared to be correct.  *Id*. ¶22.  In such cases,

15  GCG sent the Class Member an Identified Purchaser Notice with an *incomplete* ROFT, which

16  noted the presence of incomplete data and did not include a calculation of the potential Class

17  Member's Recognized Losses.  *Id*.  Instead, the Notice Package included a prominent one-page

18  notice, known as a "Buck Slip," instructing the potential Class Member that his or her ROFT was

19  incomplete.  *Id*., Ex. C (Sample Buck Slip to Record of Identified Transactions).  In large

20  lettering the Buck Slip states as follows:

21        "<u>IMPORTANT NOTICE:</u>  This notice is being provided because
22        information set forth in your Section I. Fund Transactions Summary and
        Section II. Account Activity Detail may not be complete or may contain
23        errors. In addition, records of some of your transactions in the fund during
        the class period may be missing.  **IF YOU DO NOT SUPPLY THE**
24        **MISSING INFORMATION OR CONFIRM THAT YOUR RECORD**
        **OF FUND TRANSACTIONS IS ACCURATE, WE WILL NOT BE**
25        **ABLE TO SEND YOU A PAYMENT.**

26        "Please carefully check your records and provide the Claims Administrator
27        with information necessary for the Claims Administrator to complete your
        Summary of Recognized Losses."

28

-18-

Class Counsel and GCG believe that this modified Identified Purchaser Notice is the best notice practicable under the circumstances, since it provides affected purchasers with all the information known to GCG and the Intermediaries and requires the least effort on the part of the potential Class Member to present a claim.  Altogether, 15,725 Identified Purchaser Notices with Partially Complete ROFTs and Buck Slips were mailed to potential Class Members.  *Id.* ¶23.

**C.      Proof Of Claim Forms Sent To Unidentified Purchasers Or Purchasers With Unidentified Transactions.**

Where, despite GCG's best efforts, the transaction data was so defective or substantially incomplete, or where damage calculations indicated that there were no Recognized Losses, CGC mailed the potential Class Member an Unidentified Purchasers or Unidentified Transactions Notice together with a Proof of Claim Form.  *Id.* ¶25.  A copy of the Unidentified Purchaser Notice Packet is attached as Exhibit D to the Declaration of Jennifer Keough.  In all, 28,209 such Packets were mailed, of which the vast majority (18,920) were purchasers without Recognized Losses.  *Id.* ¶26.  In sending notices to these purchasers, it allows them the opportunity to prove eligibility for a recovery even though they were reported to have no Recognized Loss.  *Id.*

After the notice by publication, GCG was also contacted by other Intermediaries that requested copies of the Unidentified Purchasers or Unidentified Transactions Notice and a Proof of Claim Form.  GCG complied with these requests.  *Id.* ¶8.

Potential Class Members who receive the Unidentified Purchaser Notice Packet by mail have until the later of December 15, 2011 or 30 days from the date of mailing to submit a Proof of Claim, object to the settlement or exclude themselves from the Class.  Such action may be taken by mail or electronically on the dedicated website established by GCG for the Rydex Fund settlement.  *Id.* ¶29.

**D.      The Claims Administrator Has Been Able To Provide Notice To Substantially All Potential Class Members.**

As of November 28, 2011, GCG had mailed a total of 96,463 notices to Class Members. The table below reflects the breakdown of the different categories of notice provided to Class Members:

| Type of Notice | # | % |
|---|---|---|
| Identified Purchaser Notice with complete ROFT and Summary of Recognized Losses | 52,529 | 54.45% |
| Identified Purchaser Notice with partially complete ROFT and Buck Slip | 15,725 | 16.30% |
| Unidentified Purchasers or Identified Transactions Notice with Proof of Claim | 28,209 | 29.24% |
| TOTAL | 96,463 | 100% |

As shown above, approximately 70% of the Notices were sent to Class Members, along with complete or nearly complete ROFTs indicating that they are entitled to recovery under the settlement. The remainder represents purchasers who are unlikely to have Recognized Losses but who were sent individual notice and given the opportunity to submit a claim, object or exclude themselves from the settlement. Altogether, the Rydex Fund purchasers who received individual notice comprise 99% of the potential Class Members identified by Defendants and the Intermediaries.[5] As a result, GCG believes that the participation rate in the Proposed Settlement will be substantial and far higher than typical securities class action settlements, since no action is required for these Class Members to participate.

To date, the United States Post Office (the "Post Office") has returned 1,999 notices to GCG with an updated address, and these notices have been re-mailed to the new addresses.

---

[5]Ultimately, GCG was able to obtain from the Intermediaries contact information and transaction data for the Intermediary customers in all but three instances. Sparer Decl. ¶7. Federated Clearing Services apparently has two account holders with Rydex shares, but has been unable to provide contact information or transaction data for those accounts. *Id.* Brown Brother Harriman & Co. ("BBH") has 38 accounts identified by Rydex, which BBH advises are foreign banks which may be trading for their own account or for customers not identified to the Intermediary. Because BBH did not respond until on or about November 18, 2011, and because the process of making direct contact with its customers would be time consuming, even assuming its client banks cooperated, BBH has agreed to provide notice by email to each of the bank's customers and make each aware of the Clams Administration Website and the December 15, 2011 deadlines to object and file a claim or opt out of the case. *Id.* Only one Intermediary, Janney Montgomery Scott LLC, which in the Rydex data had 193 accounts, refused to comply with the Court's order. After representing that it would comply with the Court's Order over a period of several weeks, on November 16, 2011, the Intermediary notified Counsel and GCG that it would only be providing customer names and addresses (no transaction data) "as is customary with Class Action Notices." Each of the Janney customers has been sent an Unidentified Purchaser or Unidentified Claims Notice and Proof of Claim Form. *Id.*

1   Keough Decl. ¶30.  Since notices were sent out on a rolling basis through late November, GCG

2   may receive a small number of additional returned undeliverable notices.

3                                              **CONCLUSION**

4          For all the foregoing reasons, the Court should give final approval to the proposed

5   Stipulation and Agreement for Settlement, Plan of Allocation, and Notice Plan as fair, reasonably

6   adequate; reaffirm its preliminary certification of the Settlement Claim under Federal

7   Rule 23; and find that Class Counsel and the Claims Administrator have fully implemented the

8   notice and claims administration process though the date of hearing.

9   Dated: December 1, 2011                    Respectfully submitted,

10                                             ALAN W. SPARER
                                               MARC HABER
11                                             JAMES S. NABWANGU
                                               SPARER LAW GROUP
12

13                                             By: _____ */s/ Alan W. Sparer*_____
                                                            ALAN W. SPARER
14

15                                             CLASS COUNSEL

16

17

18

19

20

21

22

23

24

25

26

27

28

NTC OF MTN & MTN FOR FINAL APPRVL OF SETTLEMENT; MPA     No. CV 10-01171 LHK